# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FIR TREE VALUE MASTER FUND, LP and FT SOF V HOLDINGS, LLC, | No. |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | **COMPLAINT** |
| TEVA PHARMACEUTICAL INDUSTRIES LTD.; EREZ VIGODMAN; EYAL DESHEH; SIGURDUR OLAFSSON; and DEBORAH GRIFFIN, | |
| Defendants. | |

## TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ........................................................................ 2

II.    JURISDICTION AND VENUE ..................................................................... 8

III.   PARTIES ........................................................................................................ 8

       A.    Plaintiffs and their Adviser ................................................................. 8

       B.    Defendants ........................................................................................... 9

IV.    SUBSTANTIVE ALLEGATIONS ............................................................. 11

       A.    Teva Struggles Before the Relevant Period ...................................... 11

       B.    Defendants' Price-Hike Strategy Drove Profits During the Relevant Period ............ 14

       C.    Teva's Collusion with Other Drug Manufacturers ........................... 15

             1.    Allegations in the State AG Complaints .................................. 16

             2.    Indices of Collusion in the Market for Generic Drugs ........... 18

       D.    Teva's Price Increases Were Approved by Senior Executives ......... 19

       E.    The Undisclosed Price-Hike Scheme and Collusive Profits Inflated the Price
             of Teva's Securities .......................................................................... 21

             1.    Teva's Turnaround Story Drives Up ADS Prices in 2014 ........ 22

             2.    Teva's Reported Profits and Securities Prices Continue to Rise in 2015,
                   Supporting Teva's ADS Offerings ........................................... 27

             3.    As the Price-Hike Strategy Collapsed in 2016, Defendants Rushed Their
                   $20 Billion Offering ................................................................. 34

             4.    Fourth Quarter and Full Year 2015 Results .............................. 35

             5.    Pricing Concerns Increase, Defendants Go On The Offense ........... 36

             6.    First Quarter 2016 Results ........................................................ 36

             7.    Teva's Security Prices Fall Back to Earth as the Fraud Unravels ........ 41

i

8.     Teva's Generics Day ........................................................................ 42

F.     Defendants' Fraud Continues to Unravel in 4Q 2016 ................................ 43

G.     The True Nature of Teva's Business Finally Becomes Clear ...................... 45

V.     FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................ 49

A.     Defendants Violated Their Statutory Duty to Disclose Pricing Trends .................... 50

B.     Defendants' False and Misleading Statements That Teva Operated in a
       Competitive Market with Respect to Price ................................................ 52

       1.     False Statements on Conference Calls ................................................ 53

       2.     False Statements in Teva's SEC Filings ............................................. 54

C.     False and Misleading Statements and Omissions Regarding Pricing ......................... 56

       1.     Fourth Quarter and Full Year 2013 False and Misleading Financial
              Disclosures ................................................................................ 56

       2.     First Quarter 2014 False and Misleading Financial Disclosures ...................... 57

       3.     Second Quarter 2014 False and Misleading Financial Disclosures ................. 58

       4.     Third Quarter 2014 False and Misleading Financial Disclosures .................... 59

       5.     December 11, 2014 False and Misleading Statements ................................ 61

       6.     Fourth Quarter and Full Year 2014 False and Misleading Financial
              Disclosures ................................................................................ 62

       7.     First Quarter 2015 False and Misleading Financial Disclosures ...................... 64

       8.     June 11, 2015 False and Misleading Statements ................................. 65

       9.     Second Quarter 2015 False and Misleading Financial Disclosures ................. 66

       10.    Third Quarter 2015 False and Misleading Financial Disclosures .................... 67

       11.    November 19, 2015 False and Misleading Statements ..................................... 69

       12.    Teva's Registration Documents for Its Secondary ADS and Preferred
              Share Offerings Contained False and Misleading Statements ........................ 70

13.    January 11, 2016 False and Misleading Statements ........................................... 71

14.    Fourth Quarter and Full Year 2015 False and Misleading Financial
        Disclosures ........................................................................................................ 72

15.    March 8, 2016 False and Misleading Statements ............................................... 75

16.    First Quarter 2016 False and Misleading Financial Disclosures ...................... 76

17.    False and Misleading Statements on Conference Calls Before The $20
        Billion Debt Offering ........................................................................................ 79

18.    False July 13, 2016 Guidance Assumption ....................................................... 81

19.    The False and Misleading Notes Registration Statement and Prospectus ......... 82

20.    Second Quarter 2016 False and Misleading Financial Disclosures ................... 83

21.    In the Third Quarter 2016, Defendants Continue to Deny Price Inflation
        and Increased Pricing Pressure in Statements to Investors ............................... 85

22.    Third Quarter 2016 False and Misleading Financial Disclosures ..................... 87

23.    The January 6, 2017 Guidance Call .................................................................. 90

24.    Fourth Quarter and Full Year 2016 False and Misleading Financial
        Disclosures ........................................................................................................ 90

D.    False and Misleading Statements Regarding Actavis Acquisition ............................ 91

VI.    ADDITIONAL ALLEGATIONS OF SCIENTER ................................................................. 96

A.    Defendants Were Motivated to Use Teva's ADS as "Currency" for a
        "Transformational" Acquisition ................................................................................. 96

B.    Conscious Misbehavior or Recklessness ................................................................... 97

1.    Implementation and Concealment of the Price-Hike Strategy .......................... 97

2.    Continuous Access to Documents and Information Tracking Profits from
        Price Increases ................................................................................................. 99

3.    Defendants Spoke Repeatedly About the Pricing of Generic Drugs ................. 99

4.    Defendants' and Analysts' Focus on Generics ............................................... 101

5.    The Magnitude, Importance, and Duration of the Fraud ................................. 102

6.    Contemporaneous Red Flags ........................................................................ 103

7.    Officer Terminations Support Scienter ......................................................... 104

8.    Evidence of Collusion Supports a Strong Inference of Scienter .................... 105

9.    Other Facts Supporting Scienter .................................................................. 106

C.    Corporate Scienter .............................................................................................. 108

VII.    LOSS CAUSATION ..................................................................................................... 108

A.    August 4-5, 2016 ................................................................................................. 110

B.    November 3, 2016, December 13-16, 2016 .......................................................... 110

C.    November 15, 2016 .............................................................................................. 112

D.    December 5-6, 2016 ............................................................................................. 114

E.    January 6, 2017 ................................................................................................... 114

VIII.    ADDITIONAL SUBSEQUENT DEVELOPMENTS CONTINUE TO REVEAL
THE TRUTH ................................................................................................................ 116

A.    February 6-7, 2017 .............................................................................................. 116

B.    August 3-7, 2017 ................................................................................................. 117

C.    November 2, 2017 ................................................................................................ 119

D.    February 8, 2018 ................................................................................................. 120

E.    December 7-10, 2018 ........................................................................................... 120

F.    May 10-13, 2019 ................................................................................................. 121

IX.    RELIANCE ................................................................................................................... 122

A.    Plaintiffs' Reliance .............................................................................................. 122

B.    Presumption of Reliance and Fraud-On-The-Market Doctrine .............................. 124

X.    INFLATED PROFIT ANALYSIS ................................................................................ 125

XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS
      CAUTION DOCTRINE ................................................................................. 126

XII.  CLAIMS FOR RELIEF .................................................................................. 127

      COUNT I For Violations of Section 10(b) of the Exchange Act and Rule
      10b-5  (Against All Defendants) .................................................................... 127

      COUNT II For Violations of Section 20(a) of the Exchange Act  (Against
      All Defendants) ............................................................................................ 128

      COUNT III Violation of Section 11 of the Securities Act (Against Teva
      Pharmaceutical Industries Ltd., Vigodman, Desheh, and Griffin) ................... 129

      COUNT IV Violation of Section 12(a)(2) of the Securities Act  (Against
      Teva Pharmaceutical Industries Ltd., Vigodman, Desheh, and Griffin) ........... 131

      COUNT V Violation of Section 15 of the Securities Act  (Against
      Defendants Teva, Vigodman, Desheh, and Griffin) ........................................ 132

PRAYER FOR RELIEF .......................................................................................... 134

JURY DEMAND .................................................................................................... 134

**GLOSSARY OF TERMS**

| Term | Definition |
|------|------------|
| Defendants | Defendants Teva Pharmaceutical Industries Ltd., Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, and Deborah Griffin. References to Defendants include only those individuals then employed by Teva at the referenced time. |
| Actavis | Allergan Generics, acquired by Teva on or around August 2, 2016 |
| ADS | Teva's American Depository Shares |
| ADS Final Prospectus | The final prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 at 5:19 p.m. ET |
| ADS Offering | The public offering of ADS completed on or about December 3, 2015 and January 6, 2016 |
| ADS/Preferred Offering Materials | The ADS/Preferred Registration Statement, along with the base and preliminary prospectuses and related prospectus supplements constituting part of the ADS/Preferred Registration Statement including the ADS Final Prospectus and Preferred Final Prospectus, and the documents incorporated by reference therein |
| ADS/Preferred Offerings | The ADS Offering and the Preferred Offering |
| ADS/Preferred Registration Statement | The shelf registration statement on Form F-3 Teva filed with the SEC on November 30, 2015. |
| ADS/Preferred and Notes Registration Statements | The shelf registration statement on Form F-3 Teva filed with the SEC on November 30, 2015 (for the ADS/Preferred Offering), and the Post-Effective Amendment No. 1 to its shelf registration statement on the Form F-3 Teva filed with the SEC on July 13, 2016 (for the Notes Offering) |
| Adviser/the Fir Tree Adviser | Fir Tree Capital Management LP (f/k/a Fir Tree, Inc.) (d/b/a Fir Tree Partners), which served as Plaintiffs' investment adviser |
| API | Active Pharmaceutical Ingredient use to make pharmaceutical products |
| Board | Teva's Board of Directors |
| Cavanaugh | Maureen Cavanaugh, Teva USA's Senior VP and Chief Operating Officer, North America Generics during the Relevant Period |
| CAO | Chief Accounting Officer |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| COO | Chief Operating Officer |
| COGS | Cost of Goods Sold |

| Term | Definition |
|---|---|
| Desheh | Defendant Eyal Desheh, Teva's CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, when he served as Teva's Interim President and CEO |
| DOJ | U.S. Department of Justice |
| Galownia | Kevin Galownia, Teva's VP of Pricing Operations since January 2018, and formerly Teva's Senior Director, Marketing from January 2010 to March 2014, and its Senior Director, Marketing Operations from September 2014 to December 2017 |
| GAO | U.S. Government Accountability Office |
| GAO Report | GAO audit report titled, "Generic Drugs Under Medicare" and publically released on September 12, 2016 |
| Generics Day | The September 9, 2016 investor day conference Teva hosted to discuss its generics business |
| Generics MDL | *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, Case No. 2:16-md-02724 (E.D. Pa.) |
| Glazer | Jeffrey Glazer, former CEO of Heritage Pharmaceuticals |
| Griffin | Defendant Deborah Griffin, Teva's SVP and CAO (Principal Accounting Officer) who also served as the Authorized U.S. Representative of Teva and Teva Finance during the Relevant Period. She was also VP and CFO of Teva USA during the Relevant Period. |
| Heritage | Heritage Pharmaceuticals Inc |
| Inflated Profits | The amount of profit Teva generated as a result of its price increases which was quantified by plaintiffs in the Teva Securities Class Action. |
| LBE | The Latest Best Estimate, a document produced quarterly with the involvement of Oberman, Olafsson, Griffin, and Cavanaugh, that tracked whether financial forecasts were being met, and which was delivered to Teva's Israeli executives, including Vigodman and Desheh |
| Levin | Jeremy M. Levin, Teva's CEO from May 9, 2012 to October 30, 2013 |
| Malek | Jason Malek, Former President of Heritage |
| MD&A | The Management Discussion & Analysis section of SEC Form 20-F |
| NDC Code | National Drug Code, a unique three-segment product identifier for drugs required by the Food, Drug, and Cosmetic Act (21 U.S.C. § 360) |
| Notes | Collectively certain U.S.-dollar-denominated senior notes issued by Teva Finance in a public offering on or about July 21, 2016, namely:<br>1.400% Senior Notes due July 20, 2018 ("2018 Notes");<br>1.700% Senior Notes due July 19, 2019 ("2019 Notes");<br>2.200% Senior Notes due July 21, 2021 ("2021 Notes");<br>2.800% Senior Notes due July 21, 2023 ("2023 Notes"); |

| Term | Definition |
|---|---|
| | 3.150% Senior Notes due Oct. 1, 2026 ("2026 Notes"); and 4.100% Senior Notes due Oct. 1, 2046 ("2046 Notes") |
| Notes Final Prospectus | The prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on July 19, 2016 |
| Notes Offering | The public offering of the Notes completed on or about July 21, 2016 |
| Notes Offering Materials | The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of Notes Registration Statement, including the Notes Final Prospectus, and the documents incorporated by inference therein |
| Notes Registration Statement | The Post-Effective Amendment No. 1 to the shelf registration statement on Form F-3 Teva filed with the SEC on July 13, 2016 |
| NYSE | New York Stock Exchange |
| Oberman | Allan Oberman, President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014 |
| Offerings | The ADS/Preferred Offerings and the Notes Offering |
| Offering Materials | The ADS/Preferred Offering Materials and the Notes Offering Materials |
| Officer Defendants | Defendants Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, and Deborah Griffin. References to the Officer Defendants include only those individuals then employed by Teva at the referenced time. |
| Olafsson | Defendant Sigurdur ("Siggi") Olafsson, President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016 |
| Patel | Nisha Patel, Teva's former Director of Strategic Customer Marketing from April 2013 to August 2014 and its Director of National Accounts from September 2014 to December 2016 |
| Peterburg | Defendant Yitzhak Peterburg, Teva's Interim President and CEO from February 6, 2017 to October 31, 2017, a Teva Director from June 2009 to July 2010, and from 2012 until December 12, 2017, and Chairman of Teva's Board of Directors from January 1, 2015 to February 6, 2017 |
| Plaintiffs | The Fir Tree Funds |
| Preferred Final Prospectus | The final prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 at 5:26 p.m. ET |
| Preferred Offering | The public offering of Preferred Shares completed on or about December 3, 2015 and January 6, 2016 |
| Preferred Shares | 7.00% mandatory convertible preferred shares issued to the public on or about December 3, 2015 and January 6, 2016 |
| Pricing Group | A group of Teva employees, led by Galownia in the United States, whose day-to-day responsibilities included analysis of the pricing for Teva's generic drugs |
| R&D | Research and Development |

| Term | Definition |
|---|---|
| Relevant Period | Between February 6, 2014 and August 3, 2017, inclusive |
| RFP | Request for Proposal, a blind-bidding process intended to solicit a "best and final" offer where each firm that submits a response without knowing what competing firms are bidding |
| S&M | Sales and Marketing |
| SEC | Securities and Exchange Commission |
| Sherman Act | Sherman Antitrust Act |
| State AGs | The Attorneys General of certain states, districts, and territories participating in the investigation of collusion in the U.S. generic pharmaceuticals market and/or the Generics MDL |
| 2018 AG Complaint | The Consolidated Amended Complaint filed against Teva and others on June 18, 2018 in the Generics MDL by the Attorneys General of 47 States, the District of Columbia, and Puerto Rico |
| 2019 AG Complaint | The Complaint filed against Teva and others in the Generics MDL by the by the Attorneys General of 44 States and Puerto Rico, dated May 10, 2019 |
| Teva or the Company | Defendants Teva Pharmaceutical Industries Ltd and Teva USA |
| Teva Finance | Defendant Teva Pharmaceutical Finance Netherlands III B.V. |
| Teva Securities | ADS, Preferred Shares, and Notes, collectively |
| Teva USA | Teva Pharmaceuticals USA, Inc. |
| TSCA or the Teva Securities Class Action | The action captioned *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries Ltd.*, *et al.*, No. 3:17-cv-00558 (SRU) (D. Conn.) |
| TSCA Complaint | Second Amended Consolidated Class Action Complaint, *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries Ltd.*, *et al.*, No. 3:17-cv-00558 (SRU) (D. Conn.) (December 13, 2019) |
| Vigodman | Defendant Erez Vigodman, Teva's President and CEO from February 11, 2014 to February 6, 2017 and one of its directors of the Board from June 22, 2009 to February 6, 2017 |
| WAC | Wholesale Acquisition Cost, the list price of a generic manufacturer's drug to a wholesaler or a direct purchaser without discounts |
| YOY | Year-Over-Year |

Plaintiffs Fir Tree Value Master Fund, L.P. and FT SOF V Holdings, LLC ("Plaintiffs" or the "Fir Tree Funds"), purchasers and holders of ADS sponsored by Teva Pharmaceutical Industries Ltd. ("Teva" or the "Company") and certain call options on Teva ADSs, between February 6, 2014 and August 3, 2017, both dates inclusive (the "Relevant Period"), allege in this action (the "Action") (i) fraud based claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and (ii) strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), against Teva and certain of its current and former employees and officers.[1]

Plaintiffs allege the following based upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon investigation of counsel, including, among other things: (i) review and analysis of public filings made by Teva with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by Defendants; (iii) review and analysis of news articles and conference call transcripts; (iv) review and analysis of other court filings related to Teva, including the Second Amended Consolidated Class Action Complaint for violation of the federal securities laws (the "TSCA Complaint") in *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries Ltd.*, *et al.*, No.3:17-cv-00558 (SRU) (D. Conn.) (the "Teva Securities Class Action" or the "TSCA") and pleadings and other materials in or relating to *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724, No. 2:16-md-02724 (CMR) (E.D. Pa.); (v) review and analysis of other publicly available information concerning Teva; (vi) review and analysis of other publicly available information; and (vii) information obtained from

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed in the Glossary of Terms attached hereto.

discussions or interviews with knowledgeable individuals. Plaintiffs believe that additional evidence will support the allegations herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    This action arises from Defendants' material misrepresentations and omissions concerning the sources and sustainability of Teva's performance and revenues during the Relevant Period. These misrepresentations and omissions caused investors, including Plaintiffs, to purchase Teva's securities at artificially inflated prices.

2.    Before the Relevant Period, Teva's generic division, which accounted for half the Company's revenue, was struggling. Facing negative investor sentiment, the Company fired its CEO without warning, and appointed an interim CEO while it searched for a successor. Analysts viewed Teva with skepticism and its ADS price remained low.

3.    Beginning in 2014, however, Teva's prospects appeared to start turning around. After a long string of disappointing quarters, the Company reported increased profitability in the fourth quarter of 2013, on the strength of revenue increases in its U.S. generics division, and it announced Erez Vigodman  as the new CEO, and shortly thereafter, Sigurdur Olafsson as the head of global generics, a newly created position. Two years of incredible growth in the U.S. generic division followed, fueling a bullish new story about Teva. As profits rose, so did the price of Teva's ADS.

4.    Defendants told investors that this remarkable turnaround was in spite of "intense competition" in the U.S. generics market and insisted that price increases played little to no part in the Company's success—that, on the contrary, Teva experienced very consistent, very stable price erosion of 5% across its generics portfolio. Instead, Defendants attributed Teva's success to

2

a superior product portfolio, careful management of new product launches, and an ambitious cost cutting program.  This narrative was false.

5.      In truth, Teva's remarkable financial growth was the result of a strategy, devised and implemented at the highest levels of the Company, to systematically raise drug prices across Teva's generic drug portfolio. The strategy was initiated in early 2013 and continued into 2016, when scrutiny by governments and the public made the strategy impossible.

6.      All told, Teva imposed price increases nearly 100 times just before and during the Relevant Period. Teva's senior officers considered and approved each increase, and then carefully tracked the profits generated on a daily, weekly, and quarterly basis. Over the Relevant Period, the financial impact of the strategy was staggering, totaling over $2.3 billion in profits attributable solely to the price increases (the "Inflated Profit").[2]

7.      Defendants were able to impose and sustain these price increases during the Relevant Period in at least three ways. First, they were able to raise prices on drugs in which they held a monopoly. Second, they were able to raise drug prices in parallel with their competitors. And third, as alleged in the TSCA Complaint and the 2019 AG Complaint, Defendants colluded with their competitors to fix prices for at least 16 of the price-hiked drugs, and colluded to fix prices and/or allocate market share on as many as 107 drugs.  Allegations of Teva's collusion are supported by indicia of collusion, as discussed in Section IV.C, below, and by facts uncovered by the State AGs through their investigation and discovery in the Generics MDL.

---

[2] The "Inflated Profit" was calculated by counsel in the TSCA using the methodology described in the TSCA Complaint, and summarized in Section X, below.  This methodology does not take into account the effects of all the price increases or market allocation schemes alleged in the 2019 State AG Complaint, and so may underestimate the contribution of price hikes and collusion to Teva's revenues.

8.      Defendants were highly effective at concealing the role of price hikes in driving Teva's rapid growth. Neither Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes in price, or revenues per drug, let alone profits. Wall Street analysts, intimately familiar with Teva's business and disclosures, had no way to know if Teva was profiting from systematic price increases, except to ask Defendants.

9.      When analysts did ask whether Teva's profits and performance were connected to price increases, the Officer Defendants answered with explicit denials, stating for example:

- "[A]ll the improvement you see in our … margins is ***not driven by price.*** It is driven by quantities and by mix and by efficiency measures. ***Not by price, 2014, 2015, and that's a very important message.***" (CEO Vigodman, Oct. 29, 2015)

- "So how did we" achieve $1 billion in increased profit margin?" ***"Not by pricing*** but by portfolio mix, new products, and efficiency measures." (Head of Global Generics, Olafsson, Feb. 11, 2016)

- "Now there's a lot of ***noise around pricing issues***. . . .Our exposure to all these things is very minimal. . . . ***Teva was not associated with any of that.***" (CFO Desheh, Nov. 19, 2015)

10.     Contrary to these false statements, Defendants were well aware that the price-hike strategy yielded hundreds of millions of dollars of Inflated Profit quarter-over-quarter through the second quarter of 2015, as discussed further below.

11.     Defendants had to conceal the price-hike strategy because it was inherently risky and unsustainable for a variety of reasons, including that two-thirds of the increases were done in tandem with other drug manufacturers, and many—if not all—of those parallel increases were the result of collusion. Wholesale purchasers of generic drugs routinely set pricing through competitive RFP bidding. Thus, when Teva raised prices, any manufacturer in the generic drug

market could underbid Teva and wipe out Teva's market share. Additionally, the appearance of price gouging or collusion could draw public outrage, law enforcement scrutiny, and civil and criminal liability. These extraordinary profits could vanish as quickly as they appeared.

12.     Defendants were aware that the profits could be short-lived. But one of Defendants' primary motives was to inflate the share price in order to make a large acquisition that Teva otherwise could not afford. In January 2014, Teva's CFO, Desheh, predicted that within 12 to 24 months, Teva's "stock price will go up and we'll be able to use our share as a currency . . . to fund transactions" that could transform Teva into an even larger, more dominant force in generics. CEO Vigodman was reported to also want to undertake a significant acquisition as he took the helm in February 2014, at the start of the Relevant Period.

13.     Just as Desheh previewed, within 18 months, Teva's ADS price shot up along with the increasing profits. Indeed, the share price hit an all-time high of $72 on July 27, 2015, the day Teva announced it was acquiring Actavis for $40 billion. Of course, Teva did not have the cash; the price tag equaled roughly 20 years of Teva's recent average profits. As Defendants intended all along, they would use Teva's securities as "currency" and raise $27 billion from investors.

14.     Defendants' plan had to contend with ever-increasing scrutiny of the role of pricing in the generics by investors and governments.  By mid-2015, generic drug pricing had come under intense focus from law enforcement, and Congress was calling for legislation to regulate pricing. Analysts grew concerned, but CFO Desheh simply lied: "there's a lot of noise around pricing issues. Some of it's coming from politicians . . . . Our exposure to all these things is very minimal."

15.     Defendants continued to mislead investors about the price-hike strategy in 2016, as other pharmaceutical companies reported disappointing earnings and attributed them to increased pressure to reduce prices. When asked whether Teva faced pricing-related risks, Olafsson falsely claimed that Teva was not exposed: "Teva has not seen any fundamental change or worsening in the pricing environment." Vigodman claimed "[w]hat we see is a 4% to 5% erosion [in pricing] . . . . That's not something which is different from what we said during 2015." This was false. Pricing pressure was eating into Teva's Inflated Profits; in the first quarter of 2016, Inflated Profits were 45% lower than they were a year earlier.

16.     Then, on July 12, 2016, the Connecticut Attorney General served Teva with a subpoena concerning its pricing for generic drugs. At the same time, previous price increases were yielding lower Inflated Profits, and Teva was experiencing its worst quarter in years. Investors had no idea about the price-hike strategy, let alone that it was falling apart, but Defendants must have known the coming revelations would make raising capital from investors difficult, if not impossible.  On July 13, 2016—the day after receiving the Connecticut AG's subpoena—Defendants announced that they were accelerating the $20 billion debt offering that had been scheduled for the fall of 2016, and filed the Notes Registration Statement the same day.

17.     Defendants' gambit worked—and just in time. Teva raised the cash, and closed the deal on August 2, 2016. The very next day, Teva reported disappointing earnings and disclosed the subpoenas. Still, Defendants denied that price increases ever occurred. For example, on September 8, 2016, Olafsson claimed that "people that say that . . . there's a big generic price inflation, are simply wrong."

18.     The price-hike strategy steadily unraveled after the Notes Offering. In November 2016, Bloomberg reported that Teva was a target of the DOJ and State AGs' investigations and

looming charges. As Teva lost the ability to maintain price increases, and profits continued to

decline, Olafsson, an architect of the strategy and the driving force of the Actavis transaction,

was fired on December 5, 2016. A week later, the State AGs sued Teva for violations of the

Sherman Act. In short order, CEO Vigodman was terminated in February 2017, and CFO

Desheh was also out by May 2017. On August 3, 2017, the very first investor call after their

terminations, Teva announced it was required to take a $6.1 billion write-down of its entire

generics business because its fundamental value had been "permanently impaired."

19.     As the true state of Teva's business emerged, questions began to arise about

Teva's ability to service over $30 billion in debt; the credit-rating agencies immediately

downgraded the Company's debt to just above "junk". And after 30 years of maintaining or

increasing its dividend, the new Board and management were forced to cut Teva's dividend by

75%. Without the secret price-hike strategy, Teva was a fundamentally weaker company than

investors were led to believe. The share price plummeted in reaction to this news.

20.     Defendants carried out this securities fraud through four interrelated categories of

misstatements and omissions. First, Defendants explicitly attributed Teva's financial

performance to legitimate business strategies, including cost cutting and product selection.

Having attributed the source of Teva's revenues, Defendants were required to disclose the reality

that Teva's performance was driven by the undisclosed price-hike strategy. Second, under Item 5

of Form 20-F, Defendants were obligated to disclose that the price-hike strategy was impacting

Teva's profits, both as they dramatically increased, and later as they evaporated.  Third,

Defendants repeatedly stated that Teva was excelling in a highly competitive environment. That

was far from the truth, as Teva was only able to sustain the Inflated Profits because of a lack of

competition. Whether illegal or not, this was a precarious reality, which could be, and ultimately was, undercut.

## II.   JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to: (i) Section 27 of the Exchange Act (15 U.S.C. § 78aa); and, separately, (ii) Section 22 of the Securities Act (15 U.S.C. § 77v). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

22.     Venue is proper in this District pursuant to: (i) Section 27 of the Exchange Act (15 U.S.C. § 78aa); and, separately, (ii) Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)). In addition, venue is proper pursuant to 28 U.S.C. § 1391.

23.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telecommunications, and the facilities of the New York Stock Exchange ("NYSE").

## III.   PARTIES

### A.     Plaintiffs and their Adviser

24.     Fir Tree Capital Management LP (f/k/a Fir Tree, Inc.) (d/b/a Fir Tree Partners) (the "Fir Tree Adviser" or the "Adviser") is a global asset adviser based in New York, New York. The following investment funds and accounts that are managed and/or advised by Fir Tree Partners are Plaintiffs in this Action: (i) Fir Tree Value Master Fund, L.P., a limited partnership organized under the laws of the Cayman Islands, and (ii) FT SOF V Holdings, LLC, a Delaware limited liability company. The Adviser and the Fir Tree Funds are collectively referred to herein as "Fir Tree." Plaintiffs acquired, held, and/or sold certain Teva Securities during the Relevant Period—including, but not limited to, ADSs acquired in the 2015 ADS/Preferred Offering and

8

pursuant and traceable to the 2015 ADS/Preferred Offering materials, ADS purchased on the NYSE, and certain call options, between February 6, 2014 and January 11, 2017—and were damaged upon the revelation of the alleged corrective disclosures.

**B.    Defendants**

25.    Defendant Teva Pharmaceutical Industries Ltd., the world's largest generic drug manufacturer, is incorporated in Israel with its executive offices at 5 Basel Street, P.O. Box 3190, Petach Tikva, 4951033, Israel. Teva's wholly-owned subsidiary, Teva USA, has its principal offices at 1090 Horsham Road, North Wales, Pennsylvania, 19454. Teva ADS trade on the NYSE under the symbol "TEVA." Teva Preferred Shares and Notes are traded in the U.S.

26.    Teva has two reporting segments to its business, specialty medicines and generic medicines. During the Relevant Period, Teva's generics segment contributed approximately one half of the Company's revenues. Teva's U.S. generics business is the most important part of its generics segment comprising approximately 50% of overall generics revenues.

27.    Defendant Erez Vigodman ("Vigodman") served as Teva's President and CEO from February 11, 2014 to February 6, 2017 and as a Teva Director from June 22, 2009 to February 6, 2017. Vigodman signed and certified certain of Teva's alleged false and misleading reports on Forms 20-F and Forms 6-K filed with the SEC during the Relevant Period, as well as the ADS/Preferred and Notes Registration Statements. Vigodman also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein. During his tenure at Teva, Vigodman possessed the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

28.     Defendant Eyal Desheh ("Desheh") served as Teva's Chief Financial Officer ("CFO") from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, a period during which he served as Teva's Interim CEO and Interim President. Desheh signed and certified certain of Teva's false and misleading reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as well as the ADS/Preferred and Notes Registration Statements filed with the SEC. Desheh also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein.

29.     Defendant Sigurdur Olafsson ("Olafsson") served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016. Olafsson made false and misleading statements on numerous conference calls with investors and analysts, as alleged herein. During his tenure at Teva, Olafsson possessed the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

30.     Defendant Deborah Griffin ("Griffin") serves as Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), and served as the Authorized U.S. Representative of Teva, and the Authorized U.S. Representative of Teva Finance during the Relevant Period. She was also VP and CFO of Teva USA during the Relevant Period. Griffin signed the ADS/Preferred and Notes Registration Statements. While at Teva, Griffin possessed the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting.

31.     Defendants Vigodman, Desheh, Olafsson, and Griffin are referred to herein collectively as the "Officer Defendants." Teva and the Officer Defendants are referred to herein collectively as the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Teva Struggles Before the Relevant Period

32.     Before the start of the Relevant Period, Teva was facing significant challenges. Investors increasingly viewed the Company's generic business with skepticism, a fact that weighed down the price of its ADS. Teva was the worst performing generics drug company compared to its peers despite being the largest. By August 14, 2013, Teva's then-CEO, Levin, acknowledged that "Generic growth in the United States [was] slowing fundamentally." Teva's U.S. generics business reported dramatically lower revues, year over year.

33.     In December 2012, the Company unveiled an ambitious plan to cut expenses in the generic division by $1.5 to $2 billion. Analysts were skeptical, but viewed it as a positive development. On January 17, 2013, Jonathan Kreizman of Clal Finance Brokerage wrote, "[m]uch depends on the success of the cost-cutting plan . . . . We cannot but avoid asking how the program can be practically implemented on the ground, at a time when both competition and regulation are intensifying . . . ."

34.     By mid-year 2013, revenues from Teva's generics segment continued to plummet. On or around October 30, 2013, Teva's Board of Directors forced CEO Levin to step down as President and CEO, with no advance notice, after just 18 months on the job. Without a replacement, the Board named Defendant Eyal Desheh, Teva's CFO, as Interim President and CEO, and formed a search committee to identify a permanent successor.

35.     In an October 30, 2013 investor call relating to Levin's firing, the then-chairman of Teva's board, Phillip Frost, and Defendant Desheh assured investors that they were focused on turning the Company around. Desheh informed the market that Teva "ha[d] decided to accelerate" the cost reduction plan and promised "to create a much better, efficient generic machine."

36.     At the beginning of 2014, Desheh continued to project optimism, announcing Teva's plan to make a major acquisition, predicting that within 12 to 24 months Teva's "stock price will go up and we'll be able to use our share as a currency . . . to fund transactions." As Defendant Vigodman took the helm as new CEO in February 2014, analysts reported that he also supported engaging in a significant acquisition.

37.     Unbeknownst to investors, Desheh and Vigodman based their confidence on a secret strategy to boost Teva's flagging revenues by jacking up the price of generic drugs. Defendants engaged in two interrelated frauds to sustain these price hikes long enough to boost the price of Teva's securities and fund the acquisition that Defendants planned. The first was to use the opacity of both Teva's reporting and the generic drug market as a whole to secretly raise prices across as many generic drugs as possible.  The second was to collude with other drug manufactures to raise the price of drugs in parallel and allocate market share (which prevented potential competition on price).

38.     Both of these strategies required total secrecy to succeed, because both were inherently risky and unsustainable, and could subject Teva to government and law enforcement scrutiny, if not prosecution. The overall price-hike strategy was unsustainable and risky because the U.S. generic drug market was designed to be extremely competitive; generic drugs are effectively a commodity, fully interchangeable and identical in every respect, except for price.

Wholesale customers solicit pricing though a "blind" RFP bidding process. Thus, if Teva increased its prices in a truly competitive market, any profits could be short -lived if other manufacturers undercut Teva's prices to secure more market share. Moreover, generic drugs are an essential part of the lives of millions of Americans.  Dramatic increases in prices would, and in fact did, garner public criticism and Congressional action that further undercut the sustainability of the strategy. Additionally, the use of collusion to maintain prices is inherently risky, as it is illegal under federal and state law.  Even if Defendants did not engage in illegal collusion, however, many of Teva's price increases occurred in tandem with competitors and such pricing behavior is indicative of a lack of competition, at minimum, and could (and did) come under intense civil and criminal law enforcement investigations.

39.     Teva's price-hike strategy was particularly well-suited for concealment. The generics industry is highly opaque. Neither Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes or amounts of revenues per drug, let alone the profits from any particular drug.

40.     Rather than attribute Teva's improving fortunes to the price-hike strategy, Defendants falsely told investors that Teva's increased profits came from ordinary business strategies, like cost cutting and new product launches. At every opportunity, in Teva's financial disclosures filed with the SEC and on conference calls, Defendants denied that Teva was engaged in price increases, let alone that those increases were driving profits.

41.     Had Teva disclosed that its core business strategy was to aggressively increase prices on generic drugs, Plaintiffs would have valued the Company very differently from one with an apparently successful strategy driven by fundamental growth and cost cutting, as Defendants falsely proclaimed.

**B.      Defendants' Price-Hike Strategy Drove Profits During the Relevant Period**

42.      Defendants' secret strategy to raise drug prices was central to the turnaround narrative that Teva touted during the Relevant Period.  The strategy was initiated in early 2013, continued until scrutiny by governments and the public made the strategy impossible. Allegations in the TSCA Complaint highlight at least 76 price increases during the Relevant Period that counsel in the TSCA has calculated generated over $2.3 billion in profits attributable solely to the price increases. *See, e.g.*, TSCA Complaint ¶¶ 2, 136, 237, and Appendix A.

43.      Defendants began to implement the price-hike strategy in July and August of 2013, and continued to rely on inflated prices to drive profits until scrutiny by various governments and the public caused the strategy to crumble starting in the fourth quarter of 2015, and finally collapse entirely over the course of 2016.

44.      According to an analysis conducted by counsel in the TSCA, the Inflated Profit generated by price hikes during this period comprised a material portion of the Company's revenue and was responsible for the Company's reported growth in profits and margins.  The below chart illustrates the central role the price-hike strategy played in the Company's purported success during the Relevant Period.[3]

---

[3] Following the completion of the Actavis acquisition, Teva no longer reported profits for the Legacy Teva generics business separately. The Q3 2016 6-K, the first after the completion of the Actavis acquisition, disclosed a YOY increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from Actavis. But, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $277 million. Teva reported an increase in profit of $461 million, which it attributed to the inclusion of Actavis and other factors, but did not report the contribution that the Actavis acquisition made to profitability.

| Quarter | Inflated Profits (in millions) | Reported YOY Change in Generics Profit (Decrease) (in millions) | ADS – High Intraday Price for the Period (NYSE) | ADS – Low Intraday Price for the Period (NYSE) |
|---------|--------------------------------|-----------------------------------------------------------------|-------------------------------------------------|------------------------------------------------|
| Q3 2013 | $103 | n/a[4] | $41.65 | $37.26 |
| Q4 2013 | $147 | $144 | $41.74 | $36.26 |
| Q1 2014 | $120 | $117 | $52.94 | $39.64 |
| Q2 2014 | $160 | $156 | $54.70 | $48.35 |
| Q3 2014 | $193 | $160 | $55.70 | $50.39 |
| Q4 2014 | $219 | $47 | $58.95 | $47.36 |
| Q1 2015 | $228 | $296 | $64.08 | $54.53 |
| Q2 2015 | $236 | $193 | $68.75 | $58.47 |
| Q3 2015 | $218 | $20 | $72.31 | $54.17 |
| Q4 2015 | $166 | $7 | $66.55 | $54.59 |
| Q1 2016 | $124 | ($215) | $65.92 | $52.62 |
| Q2 2016 | $114 | ($115) | $58.16 | $48.01 |

45.     As the above chart illustrates, the price-hike strategy not only drove Teva's growth in profitability during the Relevant Period—without it, the Generic Division would have faced shrinking profits during the period. And, indeed, when Defendants were no longer able to use it to generate excess profits, the profit growth evaporated.

46.     Despite the central role of price hikes to the Company's success, Defendants repeatedly denied that price played *any* role in growth. Rather, as discussed above and detailed in Section V, Defendants falsely attributed the profit growth to other, sustainable business strategies and developments.

**C.     Teva's Collusion with Other Drug Manufacturers**

47.     While Defendants' secret price-hike strategy was misleading whether or not it was the product of illegal collusion, there is strong evidence that Teva participated in a massive

---

[4] Teva did not report generic profits separately for Q3 2013, but noted that profits from generic medicines declined from Q3 2012 to Q3 2013.

conspiracy with its competitors in the U.S. generics industry to fix prices and allocate market share during the Relevant Period.

48.     Plaintiffs make this allegation based on information identified in: (i) Counsel's investigation on behalf of Plaintiffs; (ii) allegations in the 2018 AG Complaint and the 2019 AG Complaint; and (iii) allegations in the TSCA Complaint. The allegations in the TSCA Complaint are corroborated by allegations in the 2019 AG Complaint, which are based on a long-running investigation and discovery in the Generics MDL that included Teva's internal documents, including the full custodial file for Nisha Patel, a central actor in the price-fixing and market allocation conspiracies.[5]

### 1.     Allegations in the State AG Complaints

49.     In two separate complaints, the States AGs identify evidence culled from their long-running investigation, which began in 2014, including documents obtained pursuant to multiple subpoenas and cooperation by unidentified participants in the scheme and defendants who have settled with the State AGs, as well as documents obtained through discovery in the multi-district litigation proceeding in Pennsylvania federal court.

50.     Teva was a central player in the 2018 AG Complaint; it is the star of the 2019 AG Complaint.   In addition to providing detailed allegations about the who, what, where, when, and how of Teva's collusion, the 2019 AG Complaint identifies approximately 112 different drugs on which Teva raised prices "significantly" between July 2013 and January 2015.  Of those 112 drugs, the State AGs allege that Teva colluded with its competitors on at least 86 of them. 2019

---

[5] In a hearing in the MDL, an attorney for the State AGs explained that the 2019 AG Complaint is based on internal Teva documents from Nisha Patel's full custodial file, which "allowed the states to understand the extensive nature of the conduct and develop that complaint based almost primarily on her full custodial file." Hearing Tr. at 19:15-21:8, Sept. 24, 2019. *In re: Generic Pharmaceuticals Pricing Antitrust Litigation*, 2:16-MD-02724 (CMR) (excerpt appended hereto as Ex. 1).

AG Complaint ¶ 3.  According to the State AGs, the allegations in the 2019 AG Complaint are based in large part on internal Teva documents obtained through discovery in the Generics MDL, greatly enhancing the credibility of the allegations.

51.     In the 2018 AG Complaint, the State AGs allege how Teva and Heritage—another central player, whose executives have been cooperating with the State AGs' investigation—colluded to raise prices on seven generic drugs: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline ER.

52.     The 2019 AG Complaint provides even more detail about price increases on over 100 drugs, with significant overlap with allegations in the TSCA Complaint. Allegations regarding price increases for Fluocinonide—a drug whose price increase is also highlighted in the TSCA Complaint—provide an overview of the mechanics of the collusion.  According to the 2019 AG Complaint, Teva coordinated with competitors Taro and Sandoz to raise the WAC price of four Fluocinonide formulations by 10-17% in July 2013. 2019 AG Complaint ¶ 830. Then on June 3, 2014, Taro raised the WAC prices on the four formulations by between 206 and 754%. *Id.* ¶ 831. Teva employee Nisha Patel (a named defendant in the 2019 AG Complaint), however, was aware of the increase well in advance, and was preparing to follow with similar price increases for Teva, per an agreement with Taro. *Id.* ¶¶ 832-34.

53.     Prior to Taro's price increase, on May 14, 2014, Patel exchanged eight text messages and had one phone conversation that lasted more than four minutes with her contact at Taro.  *Id.* ¶ 833. After those communications, Patel directed another Teva employee to create a list of price increase candidates. *Id.* ¶ 834. On May 28, 2014, before Taro had informed its customers of its price increase, the colleague sent Patel a list that included several sold by Taro, and recommended increasing the price on Fluocinonide with a redacted message that the 2019

AG Complaint alleges demonstrates that Patel had knowledge of the Taro price increases. *Id.* After the price increase, Patel continued to coordinate with Taro and other competitors, and to communicate internally at Teva, to make sure that Teva did not compete with Taro for any business based on the price increase, and then to follow that price increase almost exactly on July 1, 2014. *Id.* ¶¶ 833-845.

## 2. Indices of Collusion in the Market for Generic Drugs

54. The above allegations of collusion are further corroborated by an investigation and analysis of several collusive drugs conducted by counsel on behalf of Plaintiffs. This analysis, which is appended hereto as Appendix A, demonstrates that the market for the following drugs have indicia of very large collusive price hikes by Teva: (1) Pravastatin; (2) Enalapril Maleate; (3) Cephalexin (oral suspension form); (4) Ketoconazole (tablet and cream forms); (5) Baclofen; (6) Fluocinonide (cream, ointment, and gel forms); (7) Carbamazepine (tablet and chewable tablet forms); and (8) Estradiol (tablet form). These are examples, selected to test and corroborate the above allegations. It is highly likely that discovery will confirm that there were numerous other drugs in which Teva and its competitors colluded to fix prices, set market share, allocate customers, and rig bids.

55. For these drugs, Teva was among the peer group that undertook extraordinary price increases, and did so without the price hikes having any meaningful effect on its market share. In other words, the market participants did not, as would be expected in a functioning, non-collusive market, try to undercut each other's prices to gain market share. A price hike was in the competitors' self-interests only if they all agreed to act in tandem.

**D.    Teva's Price Increases Were Approved by Senior Executives**

56.    Allegations in the TSCA Complaint and the 2019 AG Complaint demonstrate that

Teva's decisions to increase prices came from the top down. Based on conversations with former

Teva employees, the TSCA Complaint attributes the following allegations to former Teva

employees: [6]

- Using an established review and approval procedure, price increases required the Chief Accounting Officer of Teva and Teva USA CFO, Griffin, and Teva USA COO, Cavanaugh to undertake and document a careful cost-benefit-analysis to determine whether to make a price increase; they would personally approve the increases. (FE-1, FE-2) Griffin and Cavanaugh would then decide when the increases would become effective, often implementing them in batches. (FE-1, FE-2)

- Members of the Pricing Group, who would have to provide detailed reviews and documentation of price reductions, were simply told via emails or in meetings to implement a price increase with little or no justification. (FE-3) While the directions often came from the head of Teva USA's Pricing Group, Kevin Galownia, he did not have the authority to make price-increase decisions himself; those decisions came from above. (FE-3, FE-1, FE-2, FE-4) Once implemented, Teva notified its customers via a letter, and would circulate a copy to employees whose work would be impacted by the increase (e.g., customer service employees who would need to field consumer complaints following the hikes). (FE-2, FE-4) The expected profits from the price increases were then incorporated into the Company-wide Oracle database, (FE-2, FE-1, FE-3), to which Oberman, Olafsson (who joined Teva in July 2014), Cavanaugh, and Griffin each had access. (FE-1, FE-3) Oracle generated daily or weekly Scorecards that Oberman (and later Olafsson), Griffin, and Cavanaugh would receive that reported generic drug revenues, which included the

---

[6] Allegations in this subsection attributed to "FE-__" are taken from allegations attributed to former Teva employees in the TSCA. TSCA Complaint, ¶¶ 40-42, 48 (internal quotations omitted). These allegations are corroborated by facts uncovered by the State AGs, including through discovery and investigation, and alleged in the 2019 AG Complaint.

Inflated Profit, and tracked whether Teva was on schedule to meet forecasts. (FE-1, FE-2, FE-3)

- The Scorecards tracked profits against financial budgets and a long-term Work Plan which was prepared annually and contained forecasts for the coming three to five years. As to the generics segment, Oberman (and later Olafsson), Cavanaugh, and Griffin were responsible for assembling the Work Plan, and Oberman and Olafsson were responsible for presenting it to Teva's executive committee in Israel, which included Vigodman and Desheh. (FE-2; FE-1) During each quarter, a document called a Latest Best Estimate ("LBE") was prepared, with the involvement of Oberman (and later Olafsson), Cavanaugh, and Griffin, detailing whether forecasts were met, or whether there was a hole between the forecasted profits and reality. (FE-1; FE-2) The LBE reports were sent to Teva's executive committee in Israel (FE-1; FE-2)

- From the Scorecards, LBE reports, and Work Plan, executives closely tracked the impact of price increases on the Company's revenue. This reporting structure ensured that everyone would have known if there were significant price increases that generated large profits. (FE-2)

57.     The 2019 AG Complaint provides examples of Teva implementing price hikes pursuant to the above protocol.  While some details are redacted from the public complaint, these descriptions corroborate former employee allegations that the decision to raise prices came from Cavanaugh. As discussed above, the State AGs had access to internal Teva documents and the benefit of cooperating witnesses when drafting the 2019 AG Complaint.

58.     To take one example, the 2019 AG Complaint describes how Teva raised the price of Niacin Extended Release in early March 2014 when Teva lost exclusivity for the drug and a competitor sought to enter the market. In this case, the competitor, Lupin, had previously engaged in collusion with Teva.  After learning that Lupin would be the only competitor, Maureen Cavanaugh provided instructions to "K.G." on February 28, 2014—a Teva employee identified in the 2019 AG Complaint as a senior marketing employee and Nisha Patel's

20

supervisor—who forwarded the instructions to Nisha Patel. On information and belief, K.G. is Kevin Galownia, who was Senior Director of Marketing at the time of the price increase in question.  Later that same day, Patel called a contact at Lupin and spoke for almost seven minutes.  Shortly thereafter, on March 5, Patel sent an email to Teva's pricing group, and Teva informed its customers on March 6 that it was implementing a price increase on March 7. 2019 AG Complaint ¶¶ 730-33. These allegations corroborate allegations that the TSCA Complaint attributes former Teva employees, that pricing instructions came from Kevin Galownia, but originated with Cavanaugh. TSCA Complaint, ¶¶ 270-73.

59.     The 2019 AG Complaint also contains further details about Cavanaugh's approval of price increases and her knowledge of collusion.  For example, the AGs allege that "during a 2013 meeting of Teva sales and pricing personnel where Defendant Cavanaugh was present, Defendant Patel was discussing her communications with certain competitors about price increases when Defendant Cavanaugh smiled, put her hands over her ears, and pretended she could not hear what was being said."  2019 AG Complaint ¶ 1114.

**E.     The Undisclosed Price-Hike Scheme and Collusive Profits Inflated the Price of Teva's Securities**

60.     Throughout the Relevant Period, Defendants convinced investors and analysts that Teva's remarkable turnaround was fueled by good management and superior products. Based on these representations, investors drove up the price of Teva's ADS and other securities.

61.     Defendants began to implement the price-hike strategy in the third quarter of 2013.  These price increases had an immediate positive impact on the Company's earnings, generating as much as $250 million in profits in the second half of 2013.

### 1.    Teva's Turnaround Story Drives Up ADS Prices in 2014

62.    On February 6, 2014, Teva announced its fourth quarter 2013 and full year 2013 financial results in a press release. Those results improved as compared to performance prior to the price-hike strategy.  Specifically, Teva's financial disclosures touted a 14% increase in U.S. generics revenue for the fourth quarter, attributing it to "higher sales" volume, reduced expenses, and "exclusive launches" of new generic drugs, and made no mention of the price-hike strategy.

63.    During the February 6, 2014 earnings call, Desheh announced that Teva would increase its quarterly dividend by 5%, that the "U.S. generic business is highly profitable," and that "[w]e had a pretty good, even excellent second half [of 2013] in the United States [generic] business." Oberman, CEO of U.S. generics followed and explained that "at the gross profit levels that [Desheh] was talking about, [the U.S. generics business] is a very valuable business to Teva, and we see it continuing to be on a go-forward basis"; a stark contrast from Levin's assessment just months earlier that the generics business was "slowing fundamentally."

64.    The improved financial results were well received by investors and analysts. On February 6, 2014, a BMO Capital Markets analyst wrote that generic sales "came in above … our expectations and consensus"; "[w]e think 4Q results are a high-quality beat with revenue and EPS coupled with an improvement in margins year over year. . . . Teva shares should be bolstered by today's positive earnings announcement."

65.    The encouraging news triggered the beginning of a long and steep increase in Teva's ADS price that would last throughout 2014 and 2015. By early March 2014, the ADS had risen from the $30s to trade at $48. The increased price of the ADS was critical to achieving Defendants' stated motivation to use the ADS as "currency" to make a major acquisition. Desheh, on a March 4 investor conference call, explained that with "[t]he price under $40 . . . we

can't use [Teva Securities as] currency," but that, with "change[s] over the past few months," Teva was extracting itself from "a corner that was difficult to come from," bringing Teva closer to a large acquisition.

66.     By the beginning of April 2014, Teva's ADS price had increased to $54.06, or 19%, since the beginning of the Relevant Period. As a National Alliance Securities analyst concluded, Teva's ADS had "the Best YTD" 2014 performance relative to its peers, a stark contrast to how Teva had "dramatically underperformed in 2013."

67.     In April 2014, Teva secretly increased the prices of another 12 generic drugs; eight of the increases were carried out together with Teva's competitors. By the end of the second quarter, these new price hikes alone would generate as much as $50 million in Inflated Profit; and as much as $395 million by the end of the Relevant Period.

68.     On May 1, 2014, Teva reported surprisingly positive results driven by its generics segment, which reported a YOY increase of $117 million from Q1 2013 profits. Defendants falsely explained that lower expenses, a changed composition of revenues, and "new product launches" were the cause of the increase in profits. In reality, price increases had generated $120 million that quarter.

69.     Analysts reacted positively to Teva's surprising and rapid turn-around. Cowen and Company analysts wrote, "The bottom line is that this story is reversing (for the positive) much faster than previously anticipated, and the belief that 'growth' could reemerge is very real." J.P. Morgan predicted an "upside to near/longer term EPS" because of Teva "taking several steps to regain its generic leadership including … focusing more heavily on portfolio selection and management." Jefferies analysts noted that Vigodman "Impresses in His Wall

Street Debut" due to his determination to reestablish "Teva's dominance in its core generic business."

70.     By the summer of 2014, public attention to generic pricing had increased. On July 8, 2014, The New York Times published an article titled, "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," highlighting that the price of digoxin, a decades-old drug that Teva did not produce, had nearly doubled since late 2013. Within days, and as a result of this article, the Connecticut Attorney General began a non-public investigation into the companies that manufactured digoxin. The Connecticut AG issued subpoenas to Teva's competitors, Impax, on July 14, 2014, and Lannett, on July 15, 2014; each company disclosed its subpoena in an SEC filing the very next day.

71.     In this context, on July 31, 2014, Teva announced its Q2 2014 financial results, once again boasting an excellent outcome from its generics division. Profitability of the generic segment increased by $156 million from Q2 2013, again attributed to legitimate business strategies. During the earnings call, Desheh stressed that Teva's "improvement in sales this quarter was driven by the growth of our global generic business, primarily in the U.S."

72.     Analysts echoed Defendants' explanations. Jefferies analysts observed: "we continue to see signs of recovery for Teva's U.S. generic business, which posted a strong 10% Y/Y gain," "Solid Q2." Piper Jaffray increased its price target for Teva from $48 to $55 because of "meaningful growth drivers for … [the] generics businesses," and the "[s]teady performance for U.S. generics."

73.     In truth, price hikes had generated as much as $160 million in Inflated Profits, accounting for all of the YOY increase in profit reported for Teva's global generics division.

24

74.     Teva continued to report increasingly positive results driven by its U.S. generics business, even as scrutiny of certain price increases in the industry continued. The State AGs served Par Pharmaceuticals with a subpoena on August 6, 2014, which Par disclosed on August 11, 2014. Then, on October 2, 2014, Congress sent letters to Teva and 16 of its peers. The letter addressed personally to Vigodman, sought information on "the underlying causes of recent increases in the price of [Teva's] drugs." Vigodman never responded.

75.     Griffin and Cavanaugh implemented another 20 price increases on July 1 and August 28, 2014 (TSCA Complaint, Appendix A), 12 of which Teva made together with other manufacturers. These 12 price increases would generate as much as $50 million in Inflated Profits.

76.     On October 30, 2014, Teva released positive third quarter results, driven by an increase in generic segments profits of $160 million, or 40%, as compared to the third quarter of 2013. Defendants fraudulently attributed this increase to a reduction in expenses.

77.     With Congressional hearings looming, on the October 30, Q3 2014 earnings call, a UBS analyst asked Vigodman: "could you talk about Generics a little bit in the U.S.? . . . whether there were price increases in some of your base business and whether that impacted" profit. Vigodman fraudulently explained that the market was functioning normally and that prices were decreasing:

> When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business. But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business.

78.     Vigodman's statement misled investors as to the fact that Teva had, by this time, implemented the strategy by effectuating price increases on 46 drugs since July 2013 (some more than once), while not one of these 46 drugs were subject to shortages or other reported market

anomalies. In total, the systematic price hikes had yielded as much as $193 million in Inflated Profit in the third quarter of 2014.

79.     Unaware of the true facts, analysts reacted positively to Teva's financial results, and Teva's ADS price continued to climb. A Cowen & Company analyst noted, Teva's "Operations Are Improving, Cash Flows Are Accelerating." Piper Jaffray wrote, "Importantly, operating profit . . . for the generics segment during the quarter was up 40% versus the same period a year ago." Morgan Stanley increased its price target for Teva from $57 to $61, stating, "We are encouraged by progress that Teva is making on global generics under Siggi Olafsson."

80.     By November 2014, the DOJ initiated its own investigation into generic drug pricing and impaneled a grand jury in Philadelphia, Pennsylvania. The grand jury began issuing subpoenas to generic drug makers, the first on November 3, 2014 to Lannett and Impax relating to a drug Teva did not make. The companies disclosed these subpoenas days later in SEC filings, on November 6 and 7, respectively.

81.     On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing to explore "if there was a rational economic reason as to why patients saw [] huge price increases [in generic drugs] or whether it was simply a question of greed of companies who were able to raise prices to whatever level they wanted."  Teva was invited, but refused to testify.

82.     It was against this backdrop that, on December 11, 2014, the Company held a guidance call with analysts. On the call, a Morgan Stanley analyst honed in on the issue of risky price increases, asking: for "generic manufacturers, *I'm assuming that wholesalers have been seeing extraordinary price increases in recent years* and has been buying inventory ahead of tremendous price increases. . . . Are you able to control it?"

83.    In response, Olafsson flatly denied that prices had increased at all: "So first *let me correct. I have to disagree that they have experienced tremendous price increase.*" Olafsson dismissed the matter further: "There has been a lot of press about price increases on individual molecules and this has been *a hot political issue selecting a few products*."

84.    These statements were flatly belied by the facts, to which Olafsson had direct access. Teva by then had implemented 50 price increases on 46 drugs, each from 50% to as much as 1,500%; each increase was part of a concealed internal strategy and implemented pursuant to Teva's established internal practices.

### 2.    Teva's Reported Profits and Securities Prices Continue to Rise in 2015, Supporting Teva's ADS Offerings

85.    On February 5, 2015, Teva filed its fourth quarter and full year 2014 financial results with the SEC, once again announcing positive results driven by the generics segment. Fourth quarter 2014 profit for the generic segment increased $47 million, or 9%, as compared to 4Q 2013. For the full year 2014, profit from the generic segment increased $480 million from 2013.

86.    Though Defendants attributed success to cost savings and other benign factors, in Q4 2014 alone, Teva made as much as $219 million in profit from price hikes, and for the full year 2014, as much as $700 million from price hikes.

87.    Desheh bragged about the profits from Teva's generic division without mentioning the price hikes. On the February 5, 2015 earnings call, he claimed "the most notable contribution" to Teva's growth and profits "was generated by our Generic business, improving profitability by more than 500 basis points," contributing "nearly $500 million" and comprising 31% of the Company's total profit. Unaware that the profits came from price hikes, analysts focused on this success. Piper Jaffray wrote that "profitability of the generics business [is]

27

continuing to improve." Barclays focused on the trajectory of generics' success: "profitability for generics improved to 21.9% from 16.8% in 2013…. The company anticipates another 400 basis point improvement in 2015 . . . a key priority."

88.     Notably, throughout 2014 the Officer Defendants had also claimed that some portion of Teva's increasing profitability in generics was attributable to a purported $2 billion "cost cutting" program that had first been adopted in late 2012. However, only a fraction of that cost cutting program actually fell to Teva's bottom line as profit. As Defendants eventually disclosed on a December 2014 investor call, by then Teva had generated only $150 million in cumulative profit from the program since its inception. After that call, Defendants stopped emphasizing cost cutting and mentioned it only rarely again.

89.     Teva implemented another 14 price increases in January 2015 (TSCA Complaint, Appendix A), nine of which were increased together with other manufacturers. By the end of the first quarter of 2015, the 14 price increases undertaken in that quarter would generate as much as $48 million in profits; the price hikes overall would generate as much as $228 million in the quarter.

<p style="text-align:center"><strong>a)    The ADS Price Reaches Levels Sufficient to Finance an Acquisition</strong></p>

90.     These positive results boosted the ADS price to nearly $60, and Defendants' motivation to use the ADS as "currency" for a "transformational" transaction was coalescing into reality. As J.P. Morgan noted on February 5, 2015: "We believe that Teva is looking at assets of all sizes, and will not rule out transformational M&A if the opportunity presents itself." On March 10, Susquehanna took note that "TEVA is increasingly focusing attention on its financial capacity and appetite for M&A." By April 16, Barclays reported on Teva's "willingness" to

perform a "'transformational' acquisition in the generics space." That day, Leerink wrote that Teva had an "urgency to diversify via M&A."

91.     Though not disclosed at the time, by late 2014 Defendants had actually approached Allergan, although Allergan was not ready to make a deal then. Vigodman would later admit, on July 27, 2015, that Actavis "was basically the highest priority" for an acquisition.

92.     With Allergan rejecting Teva's advances, Defendants planned a hostile offer for Mylan, Teva's long-standing rival. On April 21, 2015, Defendants filed a Form 6-K with the SEC, announcing Teva's unsolicited offer to acquire all of the outstanding shares of Mylan. Mylan's board quickly rejected the offer, criticizing Teva as a "low quality stock." This rejection intensified Defendants' motive to improve the ADS price.

93.     In the face of Mylan's rebuff, on April 30, 2015, Defendants again announced excellent results stemming from Teva's generic segment, pointing to a profit increase of $296 million, or 59%, compared to the first quarter of 2014. Defendants again misleadingly attributed this increase in profits to a reduction in expenses, as well as a new product launch and higher profitability in Europe. Defendants concealed that as much as $228 million in Inflated Profits accounted for 77% of the reported generic profit increase.

94.     On the earnings call, Olafsson announced a "1,000 basis points improvement over a two years period" in "operating profit in the generic segment." He attributed this to "a significant improvement in our cost of goods. . . . portfolio offering . . . [including] when we have more of the launches . . . [and] the cost infrastructure."

95.     In the absence of the truthful and complete reasons for Teva's improved profit, analysts credited Defendants' false statements. J.P. Morgan noted, "Teva continues to make progress on generics profitability … we remain encouraged by the recovery in Teva's generic

business." Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales." Buoyed by the fraud, Teva ADSs closed at $60.42 that day, an increase of 33% since the start of Relevant Period.

b)      **Defendants Announce $40 Billion Acquisition of Actavis**

96.     Finally, on July 27, 2015, with Teva's ADS price reaching an all-time high of $72, Teva announced the transformational acquisition Defendants had been seeking—the Company had entered into a definitive agreement to acquire Allergan's worldwide generics business, Actavis, for $40.5 billion in cash and equity. In announcing the deal, Vigodman explained that the rapid and surprising turnaround in Teva's generics segment since the start of the Relevant Period was the "precondition" for making the deal.

97.     To pay for the deal, Teva would give Allergan $7 billion in ADS, and raise cash from investors through a $7 billion secondary public offering of ADS and an initial public offering of Preferred Shares in early December 2015, and $15 billion from an offering of bonds set for 2017.

98.     On July 30, 2015, following the announcement of the Actavis deal, Teva issued more glowing Q2 2015 results driven by generics; specifically, an increase in generics profit of $193 million, or 36%, compared to 2Q 2014, which Defendants misleadingly attributed primarily to reduced expenses and new product launches. That day, Desheh, boasted about "the impressive improvement in the profitability of our Generic business . . . up from around 20%, 21% a year ago to between 39.5% to 30% in the first half of 2015," and specifically the "strong focus on U.S. Generics business." Defendants concealed that price hikes contributed as much as $236 million in Inflated Profits in the second quarter alone. Without those price hikes, generic profits would have declined.

30

99.     In July 2015, Teva implemented another seven price increases, four of which were executed together with other manufacturers' price increases. By the end of the quarter, these seven price increases, together with earlier hikes, would generate as much as $218 million in Inflated Profits.

100.    Following these increases, on October 29, 2015, Defendants issued Teva's third quarter 2015 results, reporting an increase of $20 million in generics profits compared to the third quarter of 2014, again misleadingly attributing this increase mainly to lower expenses. In reality, price hikes contributed as much as $218 million, ten times the reported improvement in profit.

101.    On the earnings call, Vigodman was exuberant about the "huge opportunities in the United States" for generics. Likewise, Olafsson emphasized that "the Generic business in third quarter continued to drive growth," and that "[w]e really have been improving the profitability over time," pointing to increased margins of "16.8% in 2013, 22.1% in 2014, and year-to-date number is about 28.9%."

102.    Analysts, unaware of the truth, continued to adopt Defendants' misleading narrative. Piper Jaffray wrote, "Margins for the generics business continue to improve. . . . Though top-line growth for the generics segment has been anemic, margins have continued to expand."

c)      **Defendants Continue to Mislead Investors Despite Increased Public Scrutiny of Pricing**

103.    By the fall of 2015, however, Congressional initiatives, law enforcement actions, and public anger toward perceived abuses in drug pricing had taken hold. Legislation was introduced in Congress that would penalize generic manufacturers for increasing prices at a rate higher than inflation. The State AGs and DOJ were continuing their investigations. And,

Allergan had received a DOJ subpoena concerning generic pricing on June 25, 2015, which it

disclosed in an SEC filing on August 6, 2015.

104.    Given this landscape, during the 3Q 2015 earnings call held on October 29, 2015,

analysts posed direct questions to Defendants aimed at getting a clear answer as to whether Teva

was exposed to the potential legislation. Defendants met these specific questions with equally

specific denials.

105.    On the call, after a series of questions on the sustainability of Teva's generics

success, Vigodman reaffirmed the false premise that Teva had generated its profits solely from

sustainable, ordinary business practices, and not price:

> We're very . . . responsible in everything that portends to prices on
> the Generics side. . . . And I would even put it another way, ***all the
> improvement you see in our – in margins is not driven by price. It
> is driven by quantities and by mix and by efficiency measures.
> Not by price, 2014, 2015, and that's a very important message***.

106.    Then, when a Barclays analyst asked for management's thoughts on the proposed

legislation's "potential limit to generic drug price increases," Olafsson denied that Teva was

exposed:

> In terms of the proposed legislation on pricing control on generics,
> . . . we have told you that overall on our whole portfolio, we have a
> decline in price. ***The talk about the inflation in generics when you
> have a big portfolio is really not there.***

107.    The only price increases he acknowledged were those "due to some abnormalities

in the market," like supply shortages.

108.    Misled, analysts took explicit note. That day, UBS repeated Defendants'

fraudulent denials: "[Management] highlighted that the [generic business] improvement was not

driven by price, but by volume, mix, and efficiency."

109.    Importantly, by this time, Defendants' misstatements, which were necessary to maintain the ADS price in order to raise the cash for the Actavis deal, were concealing an ever increasing risk. Public, regulatory, and law enforcement scrutiny of the industry had begun to undermine Teva's ability to execute and sustain its price-hike strategy. Teva was finding it increasingly difficult to increase prices. In 2014, Teva made 32 increases. In 2015, Teva made a total of only 21 hikes; 14 in January, and seven in July, the final round of significant price increases implemented in a systematic fashion prior to the close of the Relevant Period. By the end of 2015, profits generated by price increases had diminished quarter over quarter for the first time since Q1 2014.

110.    With this context, and with the offering of $7 billion in ADS and Preferred Shares weeks away, Teva attended a November 19, 2015, Jefferies conference. The moderator pressed Desheh about "everyone's favorite topic the last 2 months . . . pricing, is it an issue? . . . where do you go on pricing?" Desheh acknowledged the swirl of concern over pricing and legislative actions, but claimed that "***Teva was not associated with any of that***," and specifically, with respect to legislative initiatives to cap price increases, Teva's exposure "***is as a small as anybody can have***." The opposite was true.

111.    Shortly after making these statements, on November 30, 2015, Teva filed a Registration Statement with the SEC, regarding Teva's Secondary ADS and Preferred Share Offerings, and on December 3 filed two prospectus supplements and issued the Secondary ADS and Preferred Shares. The Offering Documents included numerous false and misleading statements attributing Teva's profits to sources other than the price-hike strategy. The ADS/Preferred Offerings raised approximately $7.2 billion.

###### 3.        As the Price-Hike Strategy Collapsed in 2016, Defendants Rushed Their $20 Billion Offering

112.    As 2015 came to a close, the effects of industry-wide pressure on generics pricing spurred by the investigations and scrutiny on pricing practices came to the fore as a number of industry participants reported a new trend of downward pricing pressure. On, January 11, 2016, McKesson, one of Teva's major wholesaler customers, announced that it "now expect[ed] that operating profit from generic pharmaceutical pricing trends will be significantly weaker" through the second half of its fiscal year, ending on March 31, 2016.

113.    The same day, J.P. Morgan held a healthcare conference. With McKesson's announcement in mind, a J.P. Morgan analyst asked Olafsson to comment "on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?" Olafsson responded by fraudulently claiming that Teva was not involved in "big price increases":

> *There's a lot of headlines of examples of big price increases* in generics. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – *there is a decline*.

114.    He later fraudulently explained that, because Teva had not taken "big price increases," its generics portfolio was not exposed to price deflation:

> The generic pricing – we need to keep in mind *there's a lot of talk about inflations in generic pricing*. But what we see is there's – overall on our total portfolio of 270 products, *there is a slight decrease in pricing*. … on 95% of our portfolio, we experience price decline. And then on 5%, we might be *flat or a slight increase*….

115.    These false statements belied the truth. Teva had raised prices on 60 drugs, or 22% of the portfolio Olafsson cited, generating by that point as much as $1.7 billion.

### 4.      Fourth Quarter and Full Year 2015 Results

116.    On February 11, 2016, Teva issued its fourth quarter and full year 2015 financial results. The full year disclosures reported Teva's profit in generics in 2015 were up $500 million YOY, concealing the $848 million contribution that price hikes had made during the year.

117.    On the earnings call that day, Olafsson again touted a "$1 billion improvement in operating profit over 24 months period," pointing to generics profits going from "$1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue." He explained rhetorically: "So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures."

118.    Olafsson denied even the mere existence of price inflation, let alone having engaged in 71 price hikes: "on pricing…. [W]e and the generic industry overall *don't see price inflation of generics* as it sometimes is portrayed in the media." In truth, the concealed price hikes had generated as much as $1.5 billion in profits over the 24 months period Olafsson cited.

119.    But additional price hikes had become more difficult, if not impossible to implement. Accordingly, Teva reported that fourth quarter 2015 profit in generics increased only 1% compared to the fourth quarter of 2014. Analysts, thus, grew more concerned as more firms reported pricing pressure in the fourth quarter. Guggenheim asked: "some of your competitors have talked about pricing pressure in the generics business during the quarter. Curious if you saw that, and if so what might be driving that." Olafsson fraudulently responded:

> let me start on the pricing. *As I mentioned in the beginning, we didn't see anything change in fourth quarter.* We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.

120.    Misled, Guggenheim expressed relief in its report, stating: "[u]nlike its generic competitors, *TEVA did not experience any increase in pricing pressure this quarter, which*

35

*highlights the strength of the company's platform*, in our view." Jefferies' analysts also

believed Olafsson's false distinction between Teva and other companies reporting pricing

pressure: "Mgt noted that smaller generics players may have realized outsized gains from price

increases on individual drugs – and are thus now exposed to faster price erosion – and stressed

that its portfolio breadth and optimized supply chain/cost structure allow the co to maintain solid

profitability."

121.    The above false statements concealed from investors the true reason for the

flattening of the YOY profit growth from generics: Teva's price-hike strategy had begun to

falter. The 60 drugs on which Teva had increased price were facing renewed pricing pressure. As

such, the quarterly change in profits generated by those increases had begun to decrease, by as

much as $70 million since the second quarter of 2015, or by 30%.

### 5.    Pricing Concerns Increase, Defendants Go On The Offense

122.    As investors became increasingly concerned about the pricing environment,

Defendants continued to affirmatively deny any vulnerability to pricing pressure. At a March 8,

2016 conference, a Cowen analyst asked Olafsson to "discuss what you're seeing" on "generic

pricing." Olafsson said that "[Teva] never saw" price increases and that "inflation never really

happened in the generics business." He added, "overall the pricing hasn't changed that much,"

and was "stable," and there had been no "big changes in the pricing environment" since 2015. In

reality, Inflated Profit had fallen in the fourth quarter 2015, to $166 million, compared to $218

million in the prior quarter.

### 6.    First Quarter 2016 Results

123.    As the public and law enforcement scrutiny intensified, Teva was unable to make

significant additional price hikes, implementing only five during the entire course of 2016, all on

April 6 of that year, and all on drugs that Teva had hiked before and in markets where Teva possessed a monopoly. *See* TSCA Complaint, Appendix A.

124.    Facing declining profits, and knowing that the price-hike strategy was quickly unraveling, Defendants desperately needed to raise the $20 billion in additional cash required to close the Actavis deal through a bond offering before they disclosed the growing problems to investors. On May 9, 2016, on the Q1 2016 earnings call, Defendants unexpectedly set a new date for the $20 billion offering, moving it to September 2016.

125.    That day, Teva also announced its first quarter 2016 financial results, reporting a year-over-year decline in generic profit of $215 million. Defendants misleadingly attributed the decline to higher expenses, lower sales, lower European profit, and fewer product launches.

126.    Similarly, even as other generic drug manufacturers accurately reported poor results due to pricing pressure, Defendants continued to deny that pricing pressure had any impact on Teva. On the May 9, 2016 earnings call, Olafsson noted "the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate." However, he again denied that Teva had exposure to price deflation, and blamed other manufacturers' woes on those firms' business models:

> Throughout the ***ongoing debate*** this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors. ***Teva has not seen any fundamental change or worsening in the pricing environment***… What this boils down to is each individual company's business model.… ***Nothing has happened in the last two quarters that has changed the pricing environment***.

127.    Olafsson instead blamed Teva's decline in generic profits entirely on issues other than pricing, most prominently, the lack of new product launches. He misleadingly asserted that Teva's prior success had come from sustainable sources such as "portfolio optimization,

strengthening our capabilities in R&D, and manufacturing of complex products … and sales

force effectiveness."

128.    In reality, like its competitors, price deflation was substantially damaging Teva's

profits. Since the fall of 2015, the profits Teva harvested from its price hikes plummeted from as

much as $236 million in 2Q 2015, to $218 million in 3Q 2015, to a mere $124 million in the first

quarter of 2016.

129.    Analysts credited Olafsson's false denials. J.P. Morgan wrote, "Reassuring

Generics Outlook Ahead of [Actavis] Deal Close … ***Teva does not see any major changes in

the price environment***." Jefferies wrote "Generic pharmaceutical bellwether TEVA has ***not

witnessed a deterioration*** in the pricing environment, according to mgt. ***This directly contrasts***

with what has been stated by a number of competitors over the past few months."

130.    With Teva's debt offering scheduled to occur in the fall, and thus needing to keep

investors optimistic about Teva's prospects, Defendants continued their unrelenting flow of

fraudulent statements and denials that Teva was seeing any increase in pricing pressure:

- May 10, 2016 (Olafsson) "I know many of the competitors in the generic space … are ***talking about a lot of pricing pressure***, but it shouldn't be. ***There is nothing that has happened*** over the last two quarters which has changed fundamental the market."
- June 3, 2016 (Vigodman) "So we are very consistent. Our message was conveyed, and we will continue to convey. What we see is a 4% to 5% erosion. That's what we see. ***That's not something which is different from what we said during 2015***. By the way, we continue saying it in 2016."
- June 8, 2016 (Olafsson) "[R]eally, the ***environment hasn't changed***. When we signed that [Actavis] deal in July [2015], we talked about 4% price erosion in the US generic business. And we ***are still talking about the same number***, what we see in the base business."

131.    The undisclosed truth was that the rapid deterioration of the price-hike strategy continued into the second quarter of 2016. Inflated Profits would decline 52% YOY.

132.    Only days after Olafsson's June 8 statements, undisclosed to shareholders, on June 21, 2016, Teva received a subpoena from the DOJ seeking information relating to generics pricing. And on July 12, 2016, Teva received a subpoena from the Connecticut AG.

133.    After receiving the subpoena, Teva halted its price-hike strategy, and did not make any further price increases for the duration of the Relevant Period.

134.    On July 13, 2016, the day after receiving the subpoena from the Connecticut AG, Defendants announced that Teva was accelerating its $20 billion debt offering from the September timeframe it had announced just weeks earlier. Defendants filed the Registration Statement with the SEC that very day.

135.    To support this surprise announcement, Olafsson, Vigodman, and Desheh gave bullish guidance to investors on a call that day through 2019, and reaffirmed guidance for the remainder of 2016.  Again, with industry reports of pricing pressure in mind, a Citigroup analyst asked Olafsson on an investor call that day: "can you comment on the generics pricing assumptions that you have baked into your forecast?" Olafsson responded: "we are assuming and now forecasting for the guidance for the remainder of the year same pricing assumption as we have had for the first half of the year," because "we saw no change in the pricing. We saw a stable environment . . . from first quarter into second quarter."

136.    But far from being "stable," the pricing environment for Teva's own generics portfolio had been deteriorating. Price-hike profit was down $122 million, or 52%, for the second quarter as compared to the same period in 2015. After receiving the subpoena, Teva was

unable to offset this price deterioration with additional price increases. The pricing assumption Teva "baked into" the guidance was contemporaneously false and disprovable.

137.    At this point, however, Defendants were not only concealing the price-hike strategy, they were also concealing that they had apparently abandoned that strategy after receiving the Connecticut subpoena. As that strategy was central to Teva's generic profits, Defendants understood that abandoning it meant that Teva's generic profits would suffer. Defendants made no mention of this or the DOJ subpoenas until after the Notes Offering was complete and the Actavis deal was closed.

138.    Without the true facts, investors were falsely reassured that Teva had somehow immunized itself from the downward industry trend. Piper Jaffray noted, "management stated that it did not see further pricing pressure on the overall generics business," which "may ease recent worries regarding the near-term trajectory of the business." Morgan Stanley wrote that "pricing and LT Guidance [was] encouraging … [m]gmt sees US pricing environment as unchanged."

139.    On July 18, 2016, Teva launched the $20 billion bond offering to finance the Actavis transaction, approximately $15 billion of which were U.S. dollar denominated and sold directly to investors. The offering was made pursuant to the Notes Offering Materials, which incorporated several of the false and misleading quarterly and full year financial disclosures. Despite dozens of pages of disclosures about other investigations and litigations, neither the Notes Offering Materials, nor the documents incorporated by reference therein, disclosed the DOJ and Connecticut AG subpoenas, or their impact on the Company's future revenues.

### 7.    Teva's Security Prices Fall Back to Earth as the Fraud Unravels

140.    On August 4, 2016, Teva announced disappointing second quarter 2016 results and disclosed for the first time the receipt of the DOJ and Connecticut AG subpoenas. The financial disclosures reported $115 million less in generic profit in 2Q 2016, than in the second quarter of 2015, a decrease attributed mostly to increased expenses, the loss of exclusivity on certain products, and lower sales on products for which Teva had not taken price increases. This misleading attribution concealed that Teva earned as much as $122 million less in Inflated Profit for 2Q 2016 YOY. On the disclosure of the poor results and the subpoenas, the price of Teva Securities declined.

141.    Defendants scrambled to mitigate the bad news, making a series of false statements to reassure investors that Teva was still immune to the swelling pricing pressure. On the earnings call, the Citigroup analyst again asked whether decreased U.S. generic revenues had impacted Teva's views on pricing stability. Likewise, Olafsson once again falsely claimed that "the pricing is stable to the same degree as before . . . very stable from the first quarter." This was belied by facts that Olafsson was presented with on the daily Scorecards, and in the LBEs and Work Plan, that he shared with the other Officer Defendants, which would have revealed dramatically decreasing Inflated Profit.

142.    When a J.P. Morgan analyst asked whether Teva might increase prices following the Actavis acquisition, Olafsson fraudulently implied that Teva had never increased prices to drive profits, and that opportunities to do so were ephemeral and limited to times of shortage, stating, "***pricing comes with shortages in the market*** … if there's some kind of dysfunction in the market, there might be a ***small pricing opportunity that usually comes in and comes out***." The concealed truth was that Teva had made 76 price increases on 60 drugs, and none had

anything to do with shortages. And now, with those inflated prices under pressure, the Inflated Profit was declining.

143.    The false statements mollified unaware analysts. J.P. Morgan wrote, "[Teva's] US generics business [was] modest[ly] below expectations but generic pricing environment remains stable." Morningstar analysts similarly wrote that Teva's "Management also noted underlying price erosion remains consistent in the mid-single digits at approximately 4%."

144.    The table below reflects the change in Teva's profits as reported in the first half of 2016, as well as the change in Inflated Profits for the same period:

| 2016 ($ millions) | Q1 | Q2 | Half Year |
|---|---|---|---|
| Reported YOY Change in Generics Profit | -$215 | -$115 | -$330 |
| (Unreported) YOY Change in Inflated Profit | -$104 | -$122 | -$227 |

### 8.    Teva's Generics Day

145.    On September 9, 2016, Teva held its "Generics Day" for investors, during which Defendants touted the supposed opportunities of the combined Teva/Actavis business. Olafsson issued more misleading, categorical claims that Teva had never inflated its prices for generics drugs: "[t]here is no inflation in the generic pricing"; "people that say that … there's a big generic price inflation, are *simply wrong*." He falsely reiterated that price increases occurred only with market abnormalities like shortages: "When price increases are taken, there's some kind of abnormality in the business. There are shortages."

146.    Olafsson then falsely explained that Teva had a purported "secret sauce" that immunized the Company from pricing pressure. In reality, the "secret sauce" was price hikes and collusion, and it had run out. Teva was suffering from pricing pressure on its drug portfolio

which in reality had "big generic price inflation" from years of large price hikes made pursuant to the price-hike strategy.

### F.     Defendants' Fraud Continues to Unravel in 4Q 2016

147.    On November 3, 2016, *Bloomberg* published an article titled, "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," revealing for the first time that "according to people familiar with the matter," "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion" as the "antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs," and "the first charges could emerge by the end of the year." Moreover, "Connecticut Attorney General George Jepsen . . . is seeking to lead a group of states . . . seeking damages." The article specifically mentioned Teva as one of the companies.

148.    Accordingly, Teva was now for the first time reported as a potential target of criminal and civil liability. The price of Teva securities fell immediately upon release of this article, with its ADS price plummeting 9%.

149.    On November 15, 2016, Teva reported its third quarter 2016 results, its first post-Actavis financial report, disclosing disappointing numbers, particularly from Teva's legacy generics business. With revenues from Actavis removed, Teva's U.S. generics revenues declined $277 million YOY from the third quarter of 2015.  Defendants fraudulently attributed the decline to causes such as divestments and lost sales from certain drugs. In truth, as much as $121 million, or 44%, of the overall YOY decline, was attributable to a YOY decline in Inflated Profit as the price-hike strategy collapsed. This decline would, again, have been reflected in the

Scorecards, and the "hole" between forecasts and actual revenues long ago captured in the LBEs, and circulated to Olafsson, Desheh, and Vigodman.

150.    Olafsson, however, falsely insisted that "like previous quarters, there hasn't been any fundamental change in the US drug pricing." Indeed, Olafsson doubled down when a Wells Fargo analyst expressly asked whether the reported increase in price erosion to 7% was a "result of having to tame previous price increases, or give back some of those?" Olafsson flatly, and fraudulently, stated "No." He instead claimed the number increased because of divested drugs, and thus, that it was an anomaly limited to the quarter. A puzzled J.P. Morgan analyst pressed him, observing that "anyone that look[s] at the industry as a whole, it feels like this [is] a broader issue than [a] one-off market disruption." Olafsson adamantly insisted "***there hasn't again been any fundamental change***" in pricing.

151.    The false statements comforted analysts otherwise troubled by the poor U.S. generic results. Deutsche Bank wrote: "management continue[d] to expect mid-single digit price erosion in 4Q and over the longer term."

152.    Less than three weeks later, on December 5, 2016, Teva unexpectedly announced Olafsson's "retirement." His replacement, Bhattacharjee, immediately took over as CEO, Global Generic Medicines Group. In reality, Olafsson, only 48 years old, was fired. He is now the CEO of Hikma Pharmaceuticals PLC, and a director of other companies.

153.    Analysts readily saw through the implausible reason for Olafsson's departure, concluding that he had been terminated due to the poor performance of Teva's generics division. In truth, the sudden change in performance was the materialization of the risks associated with the price-hike strategy; Inflated Profit suddenly dropped; law enforcement was now pursuing

Teva; a price-inflated generics portfolio was increasingly susceptible to pricing pressure; and Teva could not plug the hole in its financial results with price increases.

154.    On December 14, 2016, the DOJ announced it had charged (by information) Glazer and Malek, the former CEO and the former President, respectively, of Heritage, a competitor of Teva's, for their roles in conspiracies to fix prices, rig bids, and allocate customers, including manipulating the market for Glyburide from 2013 through the end of 2015. The connection between Teva and these charges was clear; Teva controlled over 75% of the market for Glyburide during the Relevant Period.

155.    The next day, December 15, 2016, the Connecticut AG announced that he and 19 other State AGs had filed a federal lawsuit for antitrust violations against Teva USA and five other major drug companies, alleging that Teva conspired on Glyburide. The 2018 AG Complaint cited emails, calls, and documents that evince explicit collusion between Teva and Heritage's principals, Malek and Glazer. The State AGs have since filed the 2019 AG Complaint, expanding their claims against Teva to include over 100 drugs, as discussed above.

**G.    The True Nature of Teva's Business Finally Becomes Clear**

156.    In view of Olafsson's departure, on January 6, 2017, Teva provided 2017 guidance a month early, announcing a significant reduction, and surprising analysts. Vigodman attributed the reduction to previously-unannounced poor performance, and an "EBITDA gap of $1.2 billion emanating from our US generics business." Teva's legacy generics business "explain[ed] the majority of the gap." On this news, the price of Teva Securities plummeted.

157.    Vigodman concealed that the EBITDA "gap" was actually attributable largely to the collapse of Teva's price-hike strategy, and the resulting steep decline in Inflated Profit. In 2016, Teva had generated only as much as $420 million in Inflated Profit, compared to $848

million in 2015. In each quarter of 2016, Inflated Profit declined at least 45% YOY. In 2016,

Teva made only five modest (~25%) price increases.

158.    The following chart reflects the YOY reduction in Inflated Profit on a quarterly

basis from 2015 to 2016:

| Inflated Profit ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| 2015 | $228 | $236 | $218 | $166 | $848 |
| 2016 | $124 | $114 | $97 | $86 | $421 |

159.    Vigodman, for his part, continued to fraudulently claim that Teva's profitability

since 2014 was "accomplished with a strong emphasis on the cost of goods sold, product mix,

and the overall cost structure," and "not by price."

160.    On February 6, 2017, Teva announced Vigodman's termination, effective

immediately. Without a permanent replacement, Teva appointed Peterburg, its Chairman of its

Board since January 2015, as Interim President and CEO. Investors reacted negatively on this

news, and the price of Teva Securities dropped significantly. Once again, the reality was that

Vigodman was fired; the price-hike strategy had collapsed, along with all the success that

Vigodman had boasted about for years.

161.    On February 13, 2017, Teva announced its full year 2016 and fourth quarter 2016

results. Defendants disclosed that, without the Actavis revenue, Teva would have reported a

$233 million YOY decline in quarterly U.S. generics revenues, but concealed that as much as

$80 million of that YOY decline resulted from the decline in Inflated Profit.

162.    As to the full year 2016, without Actavis, Teva would have reported a YOY U.S.

generic revenue *decline* of $1.4 billion for the full year 2016, which Defendants attributed to a

loss of exclusivity, lower sales of certain drugs, and the loss of revenues from divested product,

when in fact as much as $427 million of the yearly decline resulted from the decline in Inflated Profit.

163.     Weeks later, on June 8, 2017, Teva announced the nomination of four new directors to its Board, in an attempt to assure investors that the Company was attempting to redeem itself and regain lost credibility. By June 21, 2017, Desheh was also out, leaving Teva for another job.

164.     On August 3, 2017, with Desheh, Vigodman, and Olafsson—the principal architects of Teva's price-hike strategy—finally gone, and with new Board members in place, Teva took a $6.1 billion charge against its U.S. generics business, a permanent reduction in the entire business's valuation and a dollar-for-dollar hit to the Company's bottom line. In addition, after at least thirty years of maintaining its shareholder dividend, Teva announced a 75% reduction in its payout. In reporting a dismal loss of $5.94 per share, Teva also drastically revised the guidance issued in January (which already revised the July 2016 guidance); this guidance reduction was a direct result of the complete collapse of the price-hike strategy, and evaporation of the Inflated Profits, which by this point amounted to just $53 million per quarter, with no reason to believe that the erosion would abate.

165.     On this news, the credit rating agencies, concerned about Teva's ability to service over $30 billion in debt, downgraded Teva to just one notch above "Junk" rated debt. Investors fled Teva Securities, and the price of Teva's ADS fell dramatically.

166.     Further, as the multiple government investigations and State AG lawsuits intensified, Teva repeatedly made false and misleading statements and/or failed to disclose material adverse facts regarding Teva's anticompetitive practices and involvement in the collusive scheme. For example, on August 3, 2017, Teva described the various antitrust matters

it faced, including the Connecticut AG and DOJ subpoenas and the December 2016 State AG lawsuit referenced above, and fraudulently stated that "***Teva denies having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits***."

167.    The truth about Teva's collusion further emerged with the publication of an article on December 9, 2018 in *The Washington Post*, which quoted statements from Connecticut Assistant AG Joseph Nielsen that the State AGs' investigation had expanded to at least 16 companies and 300 drugs, and exposed "the largest cartel in the history of the United States." The article also noted Teva's continued denial of engaging in any anticompetitive conduct, and its statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts."

168.    On May 10, 2019, after the market closed, the State AGs filed a 524-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy that is independently previously alleged herein. The 2019 AG Complaint alleges that Teva implemented significant price increases for approximately 112 generic drugs, including extraordinary price hikes of over 1,000%, and details Teva's price-fixing with regards to at least 86 of those generic drugs (over half of which are independently alleged and in the TSCA Complaint at Appendix A). The action details Teva's role as a "consistent participant" and a central player in the conspiracy. Further, the civil enforcement action names four Teva employees personally as defendants: Cavanaugh, Patel, Kevin Green (Teva's former Director of National Accounts), and David Rekenthaler (Teva's former Vice President, Sales U.S. Generics).

## V.     FALSE AND MISLEADING STATEMENTS AND OMISSIONS

169.     During the Relevant Period, Defendants made six types of false and misleading

statements or omissions on conference calls with investors and in SEC filings:

(a)   <u>Item 5</u> Defendants violated their statutory duty to disclose material trends under
      Item 5 of Form 20-F. Defendants failed to disclose the material trend of
      generating profit as part of the concealed price-hike strategy. They also concealed
      the trend of declining Inflated Profit, and that they could no longer make price
      increases as the strategy unraveled.

(b)   <u>False Statements Regarding Competition</u> These statements falsely indicated that
      Teva was participating in competitive and functioning markets for generic drugs.
      To the contrary, Teva made dozens of price increases in tandem with its
      competitors. Teva and these companies deliberately did not compete on price.

(c)   <u>False and Misleading Pricing Statements</u> These statements concealed Teva's
      price-hike strategy and the profits it generated. Later, the statements concealed
      that the price-hike strategy fell apart as Teva was unable to make more price
      increases or sustain Inflated Profit. These statements were particularly misleading
      as Defendants touted, and investors were highly attuned to, the sources of the
      generic segment's purported success.

(d)   <u>False Denials Of Teva's Participation in Collusive Conduct</u> These statements
      falsely denied that Teva had participated in collusive conduct, while in reality
      Teva was the central actor in an industry-wide scheme to fix prices and allocate
      customers, and four Teva executives were so extensively involved in the unlawful
      conspiracy that they were named personally as defendants in the 2019 AG
      Complaint.

(e)   <u>False Statements Regarding Actavis Acquisition</u> These statements failed to
      disclose and actively concealed the negative impact resulting from the acquisition
      and integration of Actavis on Teva's financial results and business prospects.

170.     The alleged false and misleading statements and omissions below that were made

in Teva's financial disclosures filed with the SEC, and were attributable to Defendants as

follows. Desheh was responsible for and signed each Form 20-F and 6-K. Vigodman was

responsible for each Form 20-F and 6-K filed during his tenure as Teva's CEO. Olafsson was

responsible for the reporting for Teva's generics segment in each Form 20-F and 6- K from the

third quarter of 2014 through the third quarter of 2016.

A.       **Defendants Violated Their Statutory Duty to Disclose Pricing Trends**

171.       During the Relevant Period, Defendants were under a statutory duty of disclosure

pursuant to Item 5 of Form 20-F ("Item 5"), interpreted by the SEC and courts to require the

same disclosures as Item 303 of Regulation S-K ("Item 303"). Item 303 (and Item 5) require that

a foreign issuer such as Teva must, in the Management Discussion and Analysis ("MD&A")

section of its Forms 20-F, describe any known trends or uncertainties that have had or that the

registrant reasonably expects will have a material favorable or, unfavorable impact on net sales

or revenues or income from continuing operations.   The failure to disclose a material trend or

uncertainty in violation of Item 303 is an omission that is actionable under the securities laws.

172.       According to the SEC's interpretive release regarding Item 303, disclosure is

necessary where a trend, demand, commitment, event or uncertainty is both presently known to

management and reasonably likely to have material effects on the registrant's financial

conditions or results of operations. Even if Defendants were not certain about the likely effect of

the event or trend on their future revenues, Defendants were still required under Item 303 to

disclose the manner in which that then-known trend, event, or uncertainty might reasonably be

expected to materially impact Teva's future revenues.

173.       SEC Staff Accounting Bulletin No. 104 explains this disclosure duty further,

requiring that management disclose in the MD&A section the impact of artificial or collusive

price increases, demanding that: "Changes in revenue should not be evaluated solely in terms of

volume and price changes, but should also include an analysis of the reasons and factors

contributing to the increase or decrease."

174.       During the Relevant Period, under Item 303, Defendants failed to disclose at least

two trends related to the pricing of Teva's generic drugs. First, Defendants failed to disclose the

trend that Teva's financial success was driven in a material way by the price-hike strategy. These price increases, as discussed, generated as much as $2.3 billion in Inflated Profit for Teva over the Relevant Period. Yet, the price-hike strategy and the Inflated Profits it generated were risky and unsustainable as the price-hike strategy was susceptible to actual competition, as well as public scrutiny, and scrutiny by legislatures, regulators and criminal investigators.

175.    Second, starting no later than the beginning of 2016, Defendants failed to disclose the by-then known trend that the price-hike strategy was beginning to fail. Teva could not maintain the Inflated Profits as industry-wide pricing pressure, which Defendants consistently denied, was reducing the inflated prices on Teva's generic drug portfolio. Teva was also finding it increasingly difficult, if not impossible, to make additional price increases because of the scrutiny from the public, Congress, and the DOJ and State AGs investigations; and indeed, Teva effectively could not make any price increases after the DOJ subpoena was served on June 21, 2016.

176.    SEC Release No. 33-8350 provides MD&A disclosure guidance that is a nearly perfect analogy to the facts here, requiring that:

> if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable. The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.

177.    Instead, in violation of its duties under Item 303, Teva only disclosed trends that did not bear on the issue of price inflation (through price increases), or price erosion. Teva's

failure to disclose the pricing trends was particularly misleading given that (i) price increases were a core but concealed business strategy; (ii) management concurrently denied that pricing had impacted Teva's bottom line and that the Company made price increases simply for profit, management consistently minimized the positive impact of price increases on Teva's profits, management consistently denied that price increases had resulted in price inflation, and management denied that price deflation was materially affecting Teva, even as its revenues from the former price increases cratered.

**B.    Defendants' False and Misleading Statements That Teva Operated in a Competitive Market with Respect to Price**

178.    Throughout the Relevant Period, on conference calls and in Teva's SEC filings, Defendants made materially false and misleading statements concerning purported "intense" or "fierce" competition on price in the U.S. market for generic drugs. These statements gave investors the false impression that the markets for generic drugs were functioning as intended. Given that their products are undifferentiated commodities, the only way that generics manufacturers can compete is on the price of their products. Such competition is the very purpose of the generics market, which was created to drive the price of generic drugs towards their marginal cost of production, opening access for patients to life-saving medicines.

179.    Defendants' statements about supposed competition on price by generics manufacturers were false and misleading because Teva was not in fact competing on price. Instead, Teva and its competitors regularly colluded to raise prices in tandem and allocate market share to prevent price competition.  In addition, as alleged in the TSCA Complaint, Teva and its competitors raised their prices in tandem on at least 48 occasions, often in very large amounts of well over 100%, rather than use lower prices to increase market share. TSCA Complaint, ¶ 175 and Appendix A.  Teva would also raise the price of drugs on which it had a monopoly, while

other generics manufacturers stayed on the sidelines instead of entering the market. Teva was profiting from a lack of competition, not from thriving in a competitive market environment. The markets for generic drugs were not functioning competitively; rather than compete, generic drug manufacturers would deliberately and intentionally avoiding competition.

### 1. False Statements on Conference Calls

180. July 27, 2015 Conference Call On Teva's investor call to discuss the Actavis acquisition, Olafsson responded to a question concerning the competitive landscape of the generic drug market, stating:

> *the U.S. generic market is very competitive … [T]here's fierce competition on most of the portfolio, if not all of the portfolio*.

181. On that same conference call, Vigodman added:

> we promise to do everything in our power to basically take the company to be able to continue the improvement that we have been witnessing here. *We believe in competition, and we'll do what is needed in order to win in all the markets we operate*.

182. October 29, 2015 Earnings Call On the earnings call relating to Teva's Q3 2015 financial results, Olafsson similarly falsely stated:

> *So on the pricing, I think pricing is obviously based on the competition. We have talked about that the overall pricing trend is down.*

183. November 19, 2015 Conference Call Desheh, on an additional investor conference call, again falsely stressed that Teva was fiercely competing in generics markets:

> Generic prices. There is – there are no – *I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States* … *So it is a highly competitive environment with players coming from all over the world with a very fierce price competition*. The price of generic went down 50% over the past 10 years .… So *we're playing a competitive game. We're playing it fairly. We of*

*course play by the book and by the rule … And we are in short
playing in a very competitive market.*

184.    These statements were false and misleading.  Contrary to Olafsson's July 27,

2015 statement, by that time there was not "fierce competition on most of . . . if not all of"

Teva's generic drug portfolio. Since July 2013, Teva had made, pursuant to the price-hike

strategy, 61 price increases without any competitor competing on price. At least 48 of those price

increases were made in tandem with Teva's supposed competitors. Vigodman's July 27, 2015

statement that "we believe in competition" was also false as a result, and the fact that the Officer

Defendants had adopted and participated in the price-hike strategy, the success of which

depended on a lack of competition. Olafsson's October 29, 2015 declaration that "pricing is

obviously based on competition" was false because, by then, the opposite was true: pricing for

the drugs subject to the price-hike strategy was based on a distinct lack of competition. Desheh's

November 19, 2015 statements that Teva was "playing a competitive game…by the rule" in the

generics markets was false and misleading for all the reasons that the other statements were.

Each of these statements was particularly misleading given the importance of the concealed price

increases to Teva's bottom line, and because the profits from this concealed source were in fact

the centerpiece of Teva's supposed turn-around and its success.

### 2.    False Statements in Teva's SEC Filings

185.    In each of the Forms 20-F that Teva filed for the years 2013, 2014, and 2015,

Defendants made substantively identical false and misleading statements (adopted by reference

in each quarterly filing) that (i) warned investors that "intense" competition was a primary risk

Teva faced in the U.S. generic drug market, and that competition would force the price of

generic drugs down, as would be expected; and (ii) described how Teva's competitive advantage

was a "competitive pricing strategy" and the ability to launch new generics:

Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals. In the United States, we are subject to intense competition in the generic drug market from other domestic and foreign generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

186. Each of these statements was materially false and misleading because, while Defendants represented that the U.S. generic drug market was working effectively as designed by forcing rival generic drug manufacturers to compete for market share by underbidding each other on price, the opposite was true. Teva was actively colluding with competitors. Teva had made dozens of price increases over this time, including dozens in tandem with competitors. The statements to the effect that that "price typically declines, often dramatically" because of competition, resulting in "margin pressure," and that Teva's means to combat the purported effects of competition were through launches and a "competitive pricing strategy," were false and misleading because they concealed that in 2013, 2014, and 2015 Teva implemented the price-hike strategy and undertook, respectively, 18, 31, and 18 systematic increases of generic drug prices to generate billions in Inflated Profits, by deliberately taking advantage of markets that lacked competition.

### C.   False and Misleading Statements and Omissions Regarding Pricing

187.   Defendants made numerous statements to conceal their price-hike strategy and its

effects. Those false and misleading statements fall into four general categories:

(1)   Statements in SEC filings that attribute the YOY changes in Teva's generic
segment profit and U.S. generic revenues to sources other than the YOY changes
in Inflated Profit from price hikes, which are misleading half- truths. Once
Defendants spoke on these subjects, they had a duty to fully and accurately
describe the source of Teva's profits.

(2)   Flat denials that Teva had engaged in and derived material financial benefit from
price increases.

(3)   False claims of limited price hikes asserting that Teva only raised prices on a
select few generic drugs when there was a shortage or other abnormality in the
market of that drug, when in fact none of the dozens of price increases the
Company made were accompanied by a shortage.

(4)   Denials of pricing pressure even as Teva could not maintain the Inflated Profit
from price increases or implement new price increases.

### 1.   Fourth Quarter and Full Year 2013 False and Misleading Financial Disclosures

188.   On February 6, 2014, Teva filed a press release disclosing its fourth quarter 2013

("Q4 2013") financial results (the "Q4 2013 Press Release") and held an investor earnings

conference call (the "Feb. 6, 2014 Earnings Call"). On February 10, 2013, Defendants filed

Teva's annual report with the SEC on Form 20-F (the "2013 20-F"), reporting Teva's full-year

2013 financial results.

189.   Q4 2013 Press Release The Q4 2013 Press Release announced U.S. generics

revenues of $1.2 billion for the fourth quarter, a YOY increase of $144 million, or 14%, with the

attribution that the increase:

> [r]esulted mainly from the exclusive launches of [niacin ER and
> temozolomide] … in the third quarter of 2013, and launches of
> [duloxetine and tobramycin] … in the fourth quarter of 2013, as
> well as higher sales of budesonide inhalation.

190.    The statements were false and misleading because, having attributed the source of the revenue increase, Defendants had a duty to disclose, but concealed the full truth that the price-hike strategy, whereby Teva made at least 18 systematic price hikes in July and August 2013, contributed materially to the results. These price increases generated as much as $147 million in Inflated Profit in Q4 2013, comprising the entire YOY increase in U.S. generic revenues.

191.    <u>2013 20-F</u> The 2013 20-F disclosed a YOY decline in generic profit of $400 million, or 20%, "primarily" attributed to:

> "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses," and "by sales of higher profitability products in the United States."

192.    The statements were false and misleading because, while Defendants attributed the sources offsetting the decline, they had a duty to disclose but concealed the full truth that the price-hike strategy, whereby Teva made at least 18 systematic price hikes in July and August 2013, contributed materially to the results. These price increases generated as much as $250 million in Inflated Profit in 2013 and, without that Inflated Profit, Teva would have reported a $650 million YOY decline in generic profit, or a 32% decrease, rather than the 20% decline reported by the 2013 20-F. The contribution of the Inflated Profit was significant, particularly in comparison to the attributed reduced S&M expenses, which declined only $26 million compared to 2012.

## 2.    First Quarter 2014 False and Misleading Financial Disclosures

193.    On May 1, 2014, Teva held an investor earnings conference call ("May 1, 2014 Earnings Call"). On May 2, 2014, Teva filed its first quarter 2014 (the "Q1 2014") financial statements on Form 6-K with the SEC (the "Q1 2014 6-K").

194.    The Q1 2014 6-K disclosed a YOY increase in generic profit of $117 million, or 31%, which was purportedly "primarily" due to:

> "[H]igher revenues, higher gross profit and a reduction in selling and marketing expenses," with higher gross profit attributed to "the change in the composition of revenues in the United States and Europe, mainly products launched during the first quarter of 2014 and in the United States in the second half of 2013."

195.    During the May 1, 2014 Earnings Call, Desheh attributed the growth in U.S. generic revenues to "new product launches":

> Teva's generics division "experienced significant growth in the United States market, with 17% year-over-year growth, to a total of $1 billion with a number of new product launches."

196.    The statements were false and misleading because, having attributed the sources of the increases, Defendants had a duty to disclose but concealed the full truth that the price-hike strategy, whereby Teva made at least 18 systematic price hikes implemented in July and August 2013, contributed materially to the results. The price increases generated as much as $120 million in Inflated Profit in Q1 2014 that accounted for all of the increase in generic profit, and nearly all of YOY growth in U.S. generic revenues. The Inflated Profit amounted to nearly three times the $42 million YOY reduction in S&M expenses.

### 3.    Second Quarter 2014 False and Misleading Financial Disclosures

197.    On July 31, 2014, Teva filed its second quarter 2014 ("Q2 2014") financial statements on Form 6-K with the SEC ("Q2 2014 6-K"), and held an investor earnings conference call ("July 31, 2014 Earnings Call").

198.    The Q2 2014 6-K disclosed a YOY increase in generic segment profit of $156 million, or 41%, "primarily" attributed to:

> "[A] significant reduction in selling and marketing expenses,
> higher revenues and higher gross profit," which was attributed to
> "higher revenues in the United States, specifically of products
> launched during the first half of 2014 and in the second half of
> 2013, and higher revenues in Canada as well as … the change in
> the composition of revenues in Europe."

On the July 31, 2014 Earnings Call, Desheh similarly attributed the "better results" in Teva's generic segment to:

> The launches of "generic Xeloda in March and generic LOVAZA
> this quarter in the U.S. market."

199.    The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the price-hike strategy, whereby Teva made at least 30 systematic price hikes since July 2013, 12 of which were made in April 2014, contributed materially to the results. These price increases generated as much as $160 million in Inflated Profit in Q2 2014 that comprised all of the YOY increase in generic profit, and amounted to more than one and a half times the $101 million YOY reduction in S&M expenses to which Defendants attributed the generic profit increase.

### 4.    Third Quarter 2014 False and Misleading Financial Disclosures

200.    On October 30, 2014, Teva filed its third quarter 2014 ("Q3 2014") financial statements on Form 6-K with the SEC (the "Q3 2014 6-K"), and held an investor earnings conference call (the "Oct. 30, 2014 Earnings Call").

201.    The Q3 2014 6-K disclosed a YOY increase in generic profit of $160 million, or 40%, which was purportedly "primarily" from:

> "[H]igher gross profit and a significant reduction in selling and
> marketing expenses," with higher gross profit attributed to "lower
> expenses related to production, higher revenues from our API
> business as well as higher gross profit due to the change in the
> composition of revenues."

202.    During the Oct. 30, 2014 earnings call, Vigodman also attributed Teva's results to new products:

> "I think overall, we have a good revenue of the new launches this year – capecitabine, the generic Lovaza, Omega-3 and entecavir. Entecavir was a new launch for us in the quarter. I think all these three products have been very significant contributors to the year."

203.    The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the price-hike strategy, whereby Teva made at least 50 systematic price hikes since July 2013, 20 of which were made in Q3 2014, contributed materially to the results. These price increases generated as much as $193 million in Inflated Profit in Q3 2014, a YOY increase of $90 million. That YOY increase of as much as $90 million accounted for over half of the YOY increase in generic profit, and was more than the entire $81 million YOY reduction in S&M expenses to which Defendants attributed the generic profit increase.

204.    <u>Oct. 30, 2014 Earnings Call</u> By this time, Congress had sent a letter to Vigodman requesting information regarding price increases, Lannett and Impax had both disclosed subpoenas from the Connecticut AG, and articles had highlighted increased drug prices on certain drugs Teva did not sell. In this context, on the Oct. 30, 2014 earnings call, the UBS analyst asked "could you talk about Generics a little bit in the U.S. … whether there were price increases in some of your base business and whether that impacted some of Teva's financial performance?"

205.    Vigodman denied that Teva was engaged in any price increases, particularly any that had resulted in hundreds of millions of dollars in Inflated Profit:

> I think that pricing – I've said it before, there's never a price increase on the base business as a whole. Like any other business, if there's a pricing opportunity that comes in the market, we look

for that. But the base business itself has been eroding overall
because of the consolidation of the customers.

206.    Vigodman then explained that the market was functioning under normal

conditions, *i.e.*, that prices increase only where there are shortages or market dynamics:

> When there's an opportunity, when there is a shortage in the
> market, we obviously look for pricing like any other business. But
> overall, as I've said many times before, the base business itself is
> slowly eroding, the overall of the base business.

207.    Vigodman's statements were false and misleading because, far from price

increases only occurring when there are shortages or market dynamics so dictate, Teva had

adopted the price-hike strategy. Vigodman concealed that Teva had increased prices on 50 drugs

and that those concealed increases—the very subject of the UBS analyst's question—resulted in

as much as $720 million in Inflated Profit reported since the start of the Relevant Period, and as

much as $193 million in Q3 2014 alone, on drugs for which there were no shortages.

### 5.    December 11, 2014 False and Misleading Statements

208.    On December 11, 2014, Teva held a guidance call to discuss Teva's 2015

business outlook (the "Dec. 11, 2014 Guidance Call"). On the call, and in light of increased

reports of price hikes on generic drugs, the Morgan Stanley analyst asked: "with respect to

generic inventory in the channel, both for Teva and for other generic manufacturers, I'm

assuming that wholesalers have been seeing extraordinary price increases in recent years and has

been buying inventory ahead of tremendous price increases?"

209.    Olafsson flatly denied even the existence of price increases, and minimized the

possibility that Teva had engaged in large price increases:

> So first let me correct. I have to disagree that they have
> experienced tremendous price increase. I think, overall, the pricing
> in the U.S. of generics has been flat to a slight down. There has

61

been a lot of press about price increases on individual molecules
and this has been a hot political issue selecting a few products.

210.    The statements were false and misleading because, in responding to a direct

question regarding price hikes, Olafsson had a duty to disclose but concealed the full truth that

the price-hike strategy, whereby Teva made at least 50 systematic price hikes since July 2013,

with 32 in 2014, contributed materially to the results. Far from a limited issue involving "a few

products," by Q3 2014, Teva's dozens of increases generated a total of as much as $720 million

in pure profit, which would increase to as much as $943 million by the end of 2014. Olafsson's

statement that pricing had been "flat to a slight down" across the U.S. generics market concealed

the full truth that Teva's business model since 2013 had generated 30% of Teva's overall profit

from drastic price increases on generics drugs.

### 6.    Fourth Quarter and Full Year 2014 False and Misleading Financial Disclosures

211.    On February 5, 2015, Teva filed a press release with the SEC that reported the

Company's fourth quarter 2014 ("Q4 2014") and full year 2014 ("FY 2014") financial results

(the "Q4 2014 Press Release"). Also that day, Teva filed its 2014 20-F with the SEC (the "2014

20-F") reporting the Company's FY 2014 financial results, and held an investor earnings

conference call (the "Feb. 5, 2015 Earnings Call"). The false statements in the 2014 20-F are also

incorporated by reference into the ADS/Preferred Registration Statement that Vigodman,

Desheh, and Griffin signed, the ADS Final Prospectus, and the Preferred Final Prospectus.

212.    Q4 2014 Press Release The Q4 2014 Press Release disclosed a YOY increase in

generic profit of $47 million, or 9%, attributed "primarily" to: "[O]ur lower S&M expenses and

lower R&D expenses." The statement was false and misleading because, having attributed the

source of the profit increase, Defendants had a duty to disclose but concealed the full truth that

the price-hike strategy, whereby Teva made at least 50 systematic price hikes since July 2013, 32 of which were made in 2014, contributed materially to the results. These price increases generated as much as $219 million in Inflated Profit in Q4 2014, a YOY increase of as much as $72 million. That $72 million YOY increase accounted for the entire YOY increase in generic profit. In contrast, Defendants attributed the increased generic profit to a $113 million YOY reduction in S&M expenses, and an $8 million YOY reduction in R&D expenses.

213.    <u>2014 20-F</u> The 2014 20-F disclosed a YOY increase in generic profit of $480 million, or 29%, attributed to:

> "lower S&M expenses and higher gross profit," which was purportedly "mainly a result of higher revenues in the United States, specifically of products launched during 2014 and in the second half of 2013, and higher revenues in Canada, which led to higher gross profits, as well as higher gross profit from API sales to third parties."

214.    The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the price-hike strategy, whereby Teva made at least 50 systematic price hikes since July 2013, 32 of which were made in 2014, contributed materially to the results. These price increases generated as much as $693 million in Inflated Profit in 2014, a YOY increase of as much as $443 million, which increase accounted for nearly the entire YOY increase in generic profit, and was more than the entire $337 million reduction in S&M expenses to which Defendants attributed the increase in generic profit.

215.    The table below reflects Teva's improved profits as reported in 2014, as well as the YOY change in Inflated Profits for the same period:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $117 | $156 | $160 | $47 | $480 |

| (Unreported) YOY Change in Inflated Profit | $120 | $160 | $90 | $72 | $443 |
|---|---|---|---|---|---|

### 7.    First Quarter 2015 False and Misleading Financial Disclosures

216.    On April 30, 2015, Teva filed its first quarter 2015 ("Q1 2015") financial statements on a Form 6-K with the SEC (the "Q1 2015 6-K"), and held an investor earnings conference call (the "April 30, 2015 Earnings Call"). The false statements in the Q1 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

217.    The Q1 2015 6-K disclosed a YOY increase in generic profit of $296 million, or 59%, attributed "primarily" to:

> "higher gross profit and lower selling and marketing expenses as well as lower research and development expenses," with higher gross profit purportedly "mainly a result of the launch of esomeprazole in the United States during the quarter and improved profitability of our European business."

218.    On the April 30, 2015 Earnings Call, Olafsson similarly concealed the impact of the price-hike strategy when discussing the sources of the improvements in generic profitability since the beginning of 2014. On the call, the Bank of America analyst asked, "[H]ow much more potential exists to increase generic segment margins purely from organic gains and operational efficiency?" Olafsson claimed that the "1,000 basis points improvement over a two years period" in "operating profit in the generic segment" was attributable to:

> [P]robably three or four things. First of all, … significant improvement in our cost of goods… the next thing is the portfolio offering … [including] exclusive complex generics of offering … [as] when we have more of the launches, it will drive up the market. The third thing is the cost infrastructure.

219.    The statements were false and misleading because, having attributed the source of

the profit increase, Defendants had a duty to disclose but concealed the full truth that the price-

hike strategy, whereby Teva made at least 64 systematic price hikes since July 2013, 14 of which

were made in January 2015, contributed materially to the results. These price increases generated

as much as $228 million in Inflated Profit in Q1 2015, a YOY increase of as much as $108

million, which increase accounted for over a third of the YOY increase in generic profit. The

Inflated Profit increase also amounted to more than double the $43 million YOY reduction in

S&M expenses, and nine times the $12 million YOY reduction in R&D expenses, to which

Defendants attributed the increased generic profit. Olafsson's statements on the call were also

misleading because they concealed that the price-hike strategy was a fundamental part of Teva's

improvement. By the end of Q1 2015, Teva had generated as much as $1.1 billion in Inflated

Profit on the price increases since July 2013.

### 8.    June 11, 2015 False and Misleading Statements

220.    As investors, analysts, and Defendants were focused on Teva's outstanding offer

to acquire Mylan, during a June 11, 2015 Goldman Sachs conference, Vigodman touted "the

profound change in the generic business," since 2014, stating:

> These "are things that are not confined to numbers, but maybe
> numbers tell the story: 16.7% operating profit, 2013; 21.9%
> operating profit, 2014," and attributing this success solely to "[t]he
> execution of the cost reduction program: $600 million net savings,
> 2014; $500 million, 2015," and a "[f]ull transformation of our
> operational network," claiming that "[w]e closed or divested 11
> plants during the last 12 months[;] [w]e centralized
> procurement…. So everything that was done during 2014 was
> based on organic … moves only."

221.    The statements were false and misleading because, having attributed the source of

the profit increase, Vigodman had a duty to disclose but concealed the full truth that the price-

hike strategy, whereby Teva made at least 64 systematic price hikes since July 2013, which generated over $1.1 billion in Inflated Profit by the close of Q1 2015, contributed materially to the results. Strikingly, the excess profit of as much as $1.1 billion generated by the price increases accounted for all of the improved operating profit that Vigodman touted.

### 9.    Second Quarter 2015 False and Misleading Financial Disclosures

222.    On July 30, 2015, Teva filed its second quarter 2015 ("Q2 2015") financial statements on a Form 6-K with the SEC (the "Q2 2015 6-K"), and held an investor earnings call regarding the financial results and the Actavis transaction (the "July 30, 2015 Earnings Call"). The false statements in the Q2 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

223.    The Q2 2015 6-K disclosed a YOY increase in generic profit of $193 million, or 36%, attributed "primarily" to:

> "[H]igher gross profit as well as lower selling and marketing expenses," while claiming that higher gross profit was "mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses."

224.    The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the price-hike strategy, whereby Teva made at least 64 systematic price hikes since July 2013, contributed materially to the results. These price increases generated $236 million in Inflated Profit in Q2 2015, a YOY increase of $76 million, which increase accounted for 39% of the YOY increase in generic profit, and amounted to over one and a half times the $53 million YOY reduction in S&M expenses to which Defendants attributed the increased generic profit.

### 10.    Third Quarter 2015 False and Misleading Financial Disclosures

225.    On October 29, 2015, Teva filed its third quarter 2015 ("Q3 2015") financial statements on a Form 6-K with the SEC (the "Q3 2015 6-K"), and held an investor earnings call (the "Oct. 29, 2015 Earnings Call"). The false statements in the Q3 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

226.    The Q3 2015 6-K disclosed a YOY increase in generic profit of $20 million, or 4%, attributed "primarily" to:

> "[L]ower selling and marketing expenses, partially offset by lower gross profit," which in turn was partially offset "by higher gross profit of our API business."

227.    The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the price-hike strategy, whereby Teva made at least 71 systematic price hikes since July 2013, seven of which had been implemented in July 2015, contributed materially to the results. These price increases generated as much as $218 million in Inflated Profit in Q3 2015, a YOY increase of $25 million, which accounted for all the YOY increase in generic profit.

228.    During the Oct. 29, 2015 Earnings Call, Vigodman disavowed that any of the improvement in Teva's results over the previous years were driven by generic pricing:

> We're very – and are very responsible in everything that portends to prices on the Generics side and on the Specialty side. And I would even put it another way, all the improvement you see in our – in margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message.

229.    The statements were false and misleading because, by this time, Teva had

increased prices on at least 71 drugs since July 2013 as part of its price-hike strategy, often by

well over 100%, generating over $1.6 billion in Inflated Profit over that time, including as much

as $690 million in 2014 and as much as $680 million in the first three quarter of 2015 alone.

Thus, the Inflated Profit contributed significantly to improving Teva's generic profit margin, as

that Inflated Profit was devoid of any material corresponding costs, directly contradicting

Vigodman's statements.

230.    In light of recent legislative proposals that would penalize generic manufacturers

for raising prices above the rate of inflation, an analyst from Barclays asked for management's

thoughts on "the potential limit to generic drug price increases." Olafsson minimized the extent

and effect of Teva's practice of increasing prices and implied that Teva was not dependent on

such profit and, thus, was immune to the effects of the proposed legislation:

> In terms of the proposed legislation on pricing control on generics,
> first of all we don't really know what it's going to be. But let me
> give you an example. So Teva has the largest portfolio on the U.S.
> market. We are offering approximately 275 products. And we have
> told you that overall on our whole portfolio, we have a decline in
> price. The talk about the inflation in generics when you have a big
> portfolio is really not there. 95% of our portfolio is declining due
> to the consolidation of the customers I talked about. There might
> be 5% of the portfolio that is either flat or increasing in pricing due
> to some abnormalities in the market.

231.    The statements were false and misleading because, by this time, Teva had made at

least 71 systematic price hikes, seven of which Teva implemented on July 29, 2015, and many of

which were increased by more than 100%. The 60 drugs subject to these price increases made up

22% of Teva's generic drug portfolio, and none of these price increases were due to "some

abnormalities in the market" like a shortage or an increase in demand. By the end of Q3 2015,

Defendants' price-hike strategy had generated over $1.6 billion in Inflated Profit.

### 11.   November 19, 2015 False and Misleading Statements

232.   On November 19, 2015, Jefferies held a conference, at which Desheh was pressed

by the Jefferies analyst, who asked, "[L]et's talk about everyone's favorite topic the last 2

months, pricing and specialty pharmacy. Could you just give us your 20,000 foot view on

pricing, is it an issue? Your particular products, where do you go on pricing?"

233.   Desheh minimized the extent of Teva's policy and practice of making price

increases and its financial dependence on profit therefrom:

> Now there's a lot of noise around pricing issues. Some of it's
> coming from politicians who are driving agenda, which is very,
> very legitimate. Our exposure to all these things is very minimal
> …. And Teva was not associated with any of that. So we're
> playing a competitive game. We're playing it fairly. We of course
> play by the book and by the rule. And we believe that our exposure
> to any initiative on price reduction in the United States is as a
> small as anybody can have.

234.   This statement was false and misleading because Teva was critically dependent

on Inflated Profit from price increases, and the ability to make additional price increases to

increase profits, to fill any holes in its financial projections. Thus, Defendants' price-hike

strategy was greatly exposed to any initiative that addressed generic drug pricing, such as those

which would grant Medicare the ability to negotiate prices, which could lead to price deflation.

Without the benefit of the price-hike strategy, Teva could not generate additional Inflated Profit

or fill financial holes, while Teva's past practice of generating massive profits through inflated

prices left it very exposed to any efforts that would cause price deflation of those already-

increased drugs. Relatedly, these statements implied to investors that Teva was not engaging, and had not engaged, in any practice of increasing prices, which was simply untrue.

### 12.   Teva's Registration Documents for Its Secondary ADS and Preferred Share Offerings Contained False and Misleading Statements

235.   On November 30, 2015, Teva filed a Registration Statement on Form F-3, signed by Vigodman, Desheh, and Griffin, with the SEC (the "ADS/Preferred Registration Statement"), as well as two preliminary prospectus supplements, filed pursuant to Rule 424(b)(5), which disclosed certain details regarding Teva's intention to offer additional ADS and newly created Mandatory Convertible Preferred Shares ("Preferred Shares") to the public.

236.   Also on November 30, 2015, Teva filed with the SEC a Form 6-K and press release, announcing that it was commencing two concurrent public offerings totaling approximately $6.75 billion. These offerings consisted of approximately $3.375 billion of its ADS and approximately $3.375 billion of its Preferred Shares, and were announced pursuant to a prospectus and related prospectus supplements constituting the "ADS/Preferred Registration Statement".  Each ADS represents one ordinary share of Teva, and each Preferred Share automatically converted on December 15, 2018 into 13.3333 to 16 ADS, subject to anti-dilution adjustments.

237.   On December 3, 2015, Teva filed with the SEC a Form 6-K, announcing the pricing of the ADS/Preferred Offerings. That same day, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the final ADS Prospectus (the "ADS Final Prospectus") and final Preferred Prospectus (the "Preferred Final Prospectus"), and, pursuant to Rule 433, a free writing prospectus and pricing term sheet, all dated December 2, 2015.

238.   The ADS Offering and the Preferred Offering are referred to collectively as the "ADS/Preferred Offerings." The ADS/Preferred Registration Statement, along with the base and

preliminary prospectus and related prospectus supplements constituting part of the ADS/Preferred Registration Statement, including the ADS Final Prospectus and the Preferred Final Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "ADS/Preferred Offering Materials."

239.    The ADS/Preferred Registration Statement, the ADS Final Prospectus, and the Preferred Final Prospectus each incorporated by reference various documents that Teva had previously filed with the SEC. Specifically, each of those Final Prospectuses incorporated by reference Teva's 2014 20-F, Q1 2015 6-K, Q2 2015 6-K, and Q3 2015 6-K.  The incorporated 2014 20-F and Q1, Q2, and Q3 2015 Forms 6-K contained false and misleading financial disclosures, as discussed above.

### 13.    January 11, 2016 False and Misleading Statements

240.    At a January 11, 2016 J.P. Morgan conference, a J.P. Morgan analyst asked Olafsson, "McKesson this morning announced some maybe challenging pricing on the generics side or an expectation of that going forward. Could you just comment a little bit on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?"

241.    In answer to this question, Olafsson responded:

> The generic pricing – we need to keep in mind there's a lot of talk about inflations in generic pricing. But what we see is there's – overall on our total portfolio of 270 products, there is a slight decrease in pricing. It's low single digit, but year on year we see a low single-digit decrease because on 95% of our portfolio, we experience price decline. And then on 5%, we might be flat or a slight increase. So, overall, we see that in the business. There's a lot of headlines of examples of big price increases in generics. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – there is a decline.

242.     The statements were false and misleading because they minimized the impact of price increases – which by the end of Q3 2015 had generated as much as $1.7 billion in Inflated Profit – on Teva's bottom line since July 2013, and, thus, Teva's potential exposure to price deflation that its competitors and wholesalers were already reporting. By this time, Teva had increased the prices of 60 of its generic drugs, three of which Teva had recently increased the prices on July 29, 2015, and many of which were increased by more than 100%. These drugs made up 22% of Teva's generic drug portfolio, flatly contradicting Olafsson's claim that 5% of Teva's generic portfolio "might be flat or a slight increase." The context is particularly important because McKesson was one of Teva's major wholesalers and, thus, would presumably be experiencing issues in pricing similar to those faced by Teva.

**14.     Fourth Quarter and Full Year 2015 False and Misleading Financial Disclosures**

243.     On February 11, 2016, Teva filed with the SEC a press release reporting the Company's fourth quarter 2015 ("Q4 2015") and full year 2015 ("FY 2015") financial results ("Q4 2015 Press Release"). The same day, Teva filed its Form 20-F for the fiscal year ended December 31, 2015 with the SEC (the "2015 20-F") reporting the Company's FY 2015 financial results, and held an investor earnings conference call (the "Feb. 11, 2016 Earnings Call") The false statements in the 2015 20-F are also incorporated by reference into the Notes Registration Statement that Vigodman, Desheh, and Griffin signed, and the Notes Final Prospectus.

244.     Q4 2015 Press Release The Q4 2015 Press Release disclosed a YOY increase in generic profit of $7 million, or 1%, attributed "primarily" to:

> "[T]he reduction in S&M expenses, partially offset" by, in part,
> "lower sales of budesonide (Pulmicort®) in the United States."

245.     The statements were false and misleading because Defendants explained that

profits were offset by reduced sales, while they had a duty to disclose but concealed the full truth

that Inflated Profit had declined from as much as $219 million in Q4 2014 to $166 million in Q4

2015, a decline of $53 million or 24%. This decline occurred because the price-hike strategy was

unsustainable and under increasing investigation by governmental agents and, thus, Teva's

ability to make further increases was reduced.

246.     2015 20-F The 2015 20-F disclosed a YOY increase in generic profit of $500

million, or 24%, attributed "primarily" to:

> "[L]ower S&M expenses and higher gross profit," which was
> purportedly "mainly a result of higher revenues from new products
> launched in the United States during 2015, lower other production
> expenses and higher gross profit from API sales to third parties."

247.     The statements were false and misleading because, having attributed the source of

the profit increase, Defendants had a duty to disclose but concealed the full truth that the price-

hike strategy, whereby Teva made at least 71 systematic price hikes since July 2013, contributed

materially to the results. The price increases generated as much as $848 million in Inflated Profit

in 2015, a YOY increase of $155 million that amounted to 31% of the YOY increase in generic

profit.

248.     The table below reflects Teva's improved profits as reported in 2015, as well as

the YOY change in Inflated Profits for the same period:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $296 | $193 | $20 | $7 | $516 |
| (Unreported) YOY Change in Inflated Profit | $108 | $76 | $25 | -$53 | $155 |

249.   Feb. 11, 2016 Earnings Call  In his opening statements, Olafsson touted "2015 was a very good year for Teva Generics," while explicitly denying that pricing had played any role in that supposed success, stating:

> We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue. This is $1 billion improvement in operating profit over 24 months period. So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures.

250.   The statements are false and misleading because they are directly contradicted by the empirical data showing that Teva had, in 2014 and 2015, made as much as over $1.5 billion in Inflated Profit from price increases – more than the $1 billion improvement touted by Olafsson.

251.   Later in the call, and repeated in his slide presentation, Olafsson minimized Teva's participation in price increases, and thus their impact on the Company's bottom line:

> Briefly, on pricing. As I've previously stated, we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media. On the contrary, for 2015, we saw a mid- single-digit price decline for the overall business.

252.   The statements are false and misleading because Teva had taken at least 71 price increases since July 2013, many for over 100% or more. The Inflated Profit from the increases implemented as part of Defendants' price-hike strategy was a necessary foundation of Teva's purported financial success over that time.

253.   Olafsson denied that Teva was seeing any change in its pricing environment:

> In the US, our largest market, we saw approximately 4% price erosion…. We expect to see the same in 2016. Nothing today points to a significant change in the generic pricing environment.

254.    A Guggenheim Securities analyst asked: "some of your competitors have talked about pricing pressure in the generics business during the quarter. Curious if you saw that, and if so what might be driving that." Olafsson responded:

> As I mentioned in the beginning, we didn't see anything change in fourth quarter. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.

255.    The slides Olafsson presented during the call echoed these statements:

> Also do not see the sharp drop in prices other competitors have seen recently[;] Mid-single digit decrease in 2015[.]

256.    The statements were false and misleading because, while Defendants claimed not to have seen any changes in the pricing environment, (i) internally, Teva's profits from price increases had decreased precipitously, from as much as $236 million in Q2 2015, to $218 million in Q3 2015, to $166 million in Q4 2015, a decline of $70 million, or 30%, in two quarters, and (ii) Teva was increasingly unable to implement further price increases, as it had in the past.

**15.    March 8, 2016 False and Misleading Statements**

257.    During a March 8, 2016 Cowen conference, Olafsson touted the increased profitability of Teva's generics segment, attributing it to sources other than price increases:

> In terms of growing the profitability, from 2013 to 2015, we grew the operating profit of the generic business from 17% in 2013, and we exited for the full year of 2015 we were at 28.1%. So it's about 1,100 basis points we improved the profitability on approximately $10 billion in revenue. So it was a significant improvement over a 24-month period. Part of that was due to the improvement in our cost of goods sold, very important in consolidation of plants and looking for the money there. But also part of it was due to portfolio selection and the cost infrastructure.

258.    The statements were false and misleading because, once Olafsson chose to speak on this subject and having attributed the source of the profit increase, Olafsson had a duty to

disclose but concealed the full truth that Teva had by then generated over $1.7 billion in profit from price increases on dozens of generic drugs from 2013 through 2015, pursuant to the price-hike strategy; far more than the $1.1 billion in improved generic profit touted by Olafsson.

259.     Later on the call, a Cowen analyst asked Olafsson: "Can you discuss what you're seeing," in generics pricing, "what you're observing, and then maybe in the context of what you're hearing from others, both US and ex-US?" In response, Olafsson declared:

> So we came out in our fourth quarter results, and told the market
> that we had seen approximately 4% price decline in the US market
> in 2015.… I think overall the pricing hasn't changed that much.
> There was a lot of talk about inflation in generic pricing. But we
> never saw that.… [I]nflation never really happened in the generic
> business.… I don't see any big changes in the pricing environment.
> It's relatively stable. 4% is worse than maybe two years ago. But
> it's similar to what we saw in 2014.

260.     The statements were false and misleading because the truth was that the price-hike strategy, whereby Teva had inflated the prices on 60 base-business generic drugs from July 2013 through Q1 2016, had generated well over $1.7 billion in Inflated Profit from the beginning of the Relevant Period through the end of 2015. The Inflated Profit generated by the price-hike strategy, however, had drastically fallen. Thus "the pricing" had changed and was not like it had been in 2014; Teva implemented at least 32 price increases that year alone, while, in 2016, it would make only five, all of which were on prices of drugs that had been previously increased.

### 16.     First Quarter 2016 False and Misleading Financial Disclosures

261.     On May 9, 2016, Teva filed its first quarter 2016 ("Q1 2016") financial statements on Form 6-K with the SEC (the "Q1 2016 6-K"), and held an investor earnings call (the "May 9, 2016 Earnings Call") (collectively, May 9, 2016 Statements"). The false statements

in the Q1 2016 6-K are also incorporated by reference into the Notes Registration Statement that

Vigodman, Desheh, and Griffin signed, and the Notes Final Prospectus.

262.   <u>Q1 2016 6-K</u> The Q1 2016 6-K disclosed a YOY decline in generic profit of $215

million, or 27%, attributed "primarily" to:

> [L]ower gross profit, as well as higher R&D expenses," while
> lower gross profit was purportedly "mainly a result of lower sales
> of high gross profit products in the United States, higher
> production expenses and lower gross profit in our European
> markets.

263.   The statements were false and misleading because, having attributed the source of

the profit decline, Defendants had a duty to disclose but concealed the full truth that Inflated

Profit declined from as much as $228 million in Q1 2015 to $124 million in Q1 2016, a decline

of $104 million or 46%. That YOY decline in Inflated Profit comprised as much as 48% of the

YOY decline in generic segment profit, and was more than four times the $25 million YOY

increase in R&D expenses to which Defendants attributed the results. It further concealed that

the price-hike strategy was unsustainable, as the Inflated Profit was drastically declining, and

Teva was increasingly unable to make more hikes.

264.   <u>May 9, 2016 Earnings Call</u> In his opening remarks, Olafsson explained away the

decline in generic profit margin by blaming it on issues other than pricing:

> When compared to first quarter 2015, the operating profit declined
> by 360 basis points, fully explained by the exclusive launch of
> generic Nexium, esomeprazole, in the first quarter 201[5].
> Excluding the exclusivity period of esomeprazole in first quarter,
> the profit margin of the generic segment was 24.4%.

265.   The statements were false and misleading because they excluded entirely the

decline in Teva's Inflated Profit from the unsustainable price-hike strategy, including the steep

decline of $42 million in Inflated Profit from Q4 2015 to Q1 2016, and the $104 million YOY

decline compared to Q1 2015. That YOY decline comprised 48% of the decline in YOY generic

profit that Olafsson attributed to a decline in sales of generic Nexium, reflecting that Defendants

could no longer maintain the Inflated Profit generated by the increases implemented since July

2013, nor could they make further price increases.

266.    Also on that call, Olafsson, while asserting he would "do my best to provide you

with as much color as possible," claimed that Teva was immune from downward pricing trends:

> Teva has not seen any fundamental change or worsening in the
> pricing environment – something we have been consistent about
> telling investors all year. Teva experienced approximately 4%
> price erosion in the United States last year, and our guidance for
> this year is that it will remain the same.… From where I sit today,
> there is nothing that changes my mind about that. Nothing has
> happened in the last two quarters that has changed the pricing
> environment. What this boils down to is each individual
> company's business model…

267.    The slides presented by Olafsson during the conference call echoed Olafsson's

statements:

> "What has changed in the US pricing environment since Q4 2015?
> The short answer is…nothing[.]… There is no change in the
> pricing environment[.]   It all comes down to each company's
> business model…. Why is Teva generics performance better than
> most Gx companies? Portfolio optimization …. [and] [n]ew
> products…."

268.    The statements were false and misleading because, far from not seeing "any

fundamental change or worsening in the pricing environment," Teva's price-hike strategy of

generating billions in profits from price increases was collapsing. In Q3 2015 Teva earned as

much as $218 million in Inflated Profit from price increases, while in Q1 2016 it earned $124

million; and while, in 2015, Teva made 21 price increases on generic drugs, in 2016 it would

implement only five, all of which were on prices of drugs which had previously been increased.

269.    During the May 9, 2016 earnings call, Olafsson also offered the supposed reasons why Teva's generics division had achieved success over several years, and thus was differently positioned compared to its competitors who were reporting increased pricing pressure:

> We have taken a significant step to transform our generic business, solidify our foundation, increase our profitability, and to better position us to generate sustainable long-term growth. These many steps have included portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products, regaining a leading position in submission on first-to-files, enhancing our go-to-market, and sales force effectiveness capabilities, and much, much more. These are the very capabilities that companies must possess in order to thrive at the global level. We have created a unique and differentiated platform, positioned to extract significant value in the global growing generic space.

270.    The statements were false and misleading because, while attributing Teva's supposed past success to other factors, Olafsson had a duty to disclose but concealed the full truth that Teva had generated as much as $1.9 billion in Inflated Profit from price hikes reported since the start of the Relevant Period. The Inflated Profit, however, had begun to dry up due to the unsustainability of the price-hike strategy, and the materialization of the risks concealed by Defendants—recently reported by Teva's competitors—namely the risk of increased pricing pressure due to increased public, Congressional, and regulatory scrutiny of generic drug price increases, which would result in increased competition and the inability to take further price increases.

**17.    False and Misleading Statements on Conference Calls Before The $20 Billion Debt Offering**

271.    On May 10, 2016, Olafsson participated in a Bank of America conference, and claimed that Teva was immune from pricing pressure:

> [T]here's nothing I have seen which shows a worsening pricing
> environment. We saw a price erosion in the US last year of
> approximately 4%. …
> I know many of the competitors in the generic space, and in the
> specialty space, are talking about a lot of pricing pressure, but it
> shouldn't be. There is nothing that has happened over the last two
> quarters which has changed fundamental the market. And I feel
> that we are blaming the environment on individual company's
> business model more than anything else because as long as you
> have the right portfolio, you have had the right investment in
> R&D, you really have a strong opportunity.

272.    During a June 3, 2016 Sanford C. Bernstein conference, in response to an analyst
question regarding pricing pressure, Vigodman stated Teva was not facing increased pricing
pressure:

> So we are very consistent. Our message was conveyed, and we will
> continue to convey. What we see is a 4% to 5% erosion. That's
> what we see. That's not something which is different from what we
> said during 2015. By the way, we continue saying it in 2016. I
> think our results in Q1 demonstrated that.

273.    Then, during a June 8, 2016 Goldman Sachs Global Healthcare Conference,
Olafsson conveyed a similar response to a question from a Goldman Sachs analyst regarding
pricing pressure:

> But really, the environment hasn't changed. When we signed that
> deal in July, we talked about 4% price erosion in the US generic
> business. And we are still talking about the same number, what we
> see in the base business.

274.    The statements were false and misleading because Teva was experiencing a
drastic decline in Inflated Profit from price increases, the inability to make additional price
increases, and, in the past two quarters, the acceleration of the deterioration of the pricing
environment. Thus, the price-hike strategy was proving to be unsustainable, with Inflated Profit
declining by $104 million in Q1 2016 as compared to Q1 2015, as the risks concealed by

Defendants' strategy began to materialize, namely increased pricing pressure and the inability to take further price increases due to increased public, legislative, and regulatory scrutiny of generic drug price increases, which resulted in increased competition.

### 18.   False July 13, 2016 Guidance Assumption

275.   In a July 13, 2016 call held by Defendants to announce the acceleration of Teva's debt offering, including the Notes Offering, to the end of July, which, on the May 9, 2016 investor call, had been scheduled to occur in September 2016 or in Q4 2016, a Citigroup analyst asked about pricing: "[C]an you comment on the generics pricing assumptions that you have baked into your forecast? Following on that, Siggi, maybe you could just comment on the generics pricing environment, more broadly, that you are currently seeing in the marketplace."

276.   In response Olafsson indicated that Teva had still not seen any change in the pricing environment, and that this stable pricing was baked into the assumptions underlying Teva's guidance and projections:

> Our assumption and what we assume is basically approximately 5% organic growth that we see year on year.… In terms of generic pricing in the second quarter, we saw no change in the pricing. We saw a stable environment, as we talked about, from first quarter into second quarter. Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. The pricing has remained stable.… Our assumption for the rest of the year is basically assuming the same pricing erosion. It is difficult to say; but as I'm sitting here today, with the information I have in hand, we are assuming and now forecasting for the guidance for the remainder of the year same pricing assumption as we have had for the first half of the year.

277.   These statements were false and misleading at the time because Teva's price erosion assumption was not based on "stable" pricing in which there was "no change" in the second quarter or the "first half of the year." In truth, Teva was at that time experiencing a

drastic decline in Inflated Profit from price increases, the inability to make additional price increases, and, over the past year, the acceleration of the deterioration of the pricing environment. Teva generated $10 million less in Inflated Profits from the first quarter of 2016 to the second quarter of 2016, which was part of a trend of steep decline. Teva generated $122 million less Inflated Profit in the second quarter 2016 than it had in the second quarter of 2015. In the first two quarters of 2015, Teva made as much as $464 million in Inflated Profit. In the first two quarters of 2016, Teva made $238 million. In the first half of 2015, Teva had made 14 price increases. In the first half of 2016, Teva only made five, generating less than $12 million by the end of the Relevant Period.

### 19.   The False and Misleading Notes Registration Statement and Prospectus

278.   On July 13, 2016, Teva filed with the SEC a Post-Effective Amendment No. 1 to Form F-3, which was signed by Vigodman, Desheh, and Griffin, (the "Notes Registration Statement"). On July 15, 2016, Teva filed with the SEC, under Rule 424(b)(5), a preliminary prospectus supplement for the Notes Offering dated July 18, 2016.  On July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final prospectus for the Notes Offering (the "Notes Final Prospectus").

279.   On July 21, 2016, Teva consummated, through Teva Finance, its special purpose finance subsidiary, the offering of an aggregate of $15 billion of debt securities comprised of (i) $1,500,000,000 of 1.400% Senior Notes due 2018; (ii) $2,000,000,000 of 1.700% Senior Notes due 2019; (iii) $3,000,000,000 of 2.200% Senior Notes due 2021; (iv) $3,000,000,000 of 2.800% Senior Notes due 2023; (v) $3,500,000,000 of 3.150% Senior Notes due 2026; and (vi) $2,000,000,000 of 4.100% Senior Notes due 2046 (collectively, the "Notes" and the "Notes Offering"). The payment of principal and interest was unconditionally guaranteed by Teva. After

underwriting discounts and estimated offering expenses payable by the Company, Teva's net proceeds from the Notes Offering were approximately $14.9 billion.

280.    The Notes Final Prospectus incorporated by reference various documents that had previously been filed with the SEC. Specifically, the Notes Final Prospectus incorporated by reference the 2015 20-F and the Q1 2016 6-K. The incorporated 2015 20-F and Q1 2016 6-K contained material misstatements and omissions concerning (i) the price-hike strategy and the benefits and risks stemming therefrom; (ii) the purported competitiveness of the U.S. generics market and Teva's relationship to that market; (iii) material trends that were not disclosed under Item 5 of Form 20-F; and (iv) misstatements and omissions concerning subpoenas issued to the Company by the DOJ and the State AGs, as well as other topics discussed below in Section VIII.A. The statements and omissions contained in the 2015 20-F and the Q1 2016 6-K and the reasons why they are materially misleading are described in this Section.

### 20.    Second Quarter 2016 False and Misleading Financial Disclosures

281.    On August 4, 2016, Teva filed its second quarter 2016 ("Q2 2016") financial statements on Form 6-K with the SEC (the "Q2 2016 6-K"), and held an investor earnings conference call (the "Aug. 4, 2016 Earnings Call").

282.    The Q2 2016 6-K disclosed a YOY decline in generic profit of $115 million, or 16%, attributed "primarily" to:

> "[L]ower gross profit," which in turn was purportedly "mainly a result of loss of exclusivity on certain products as well as increased competition on other products in the United States … and higher production expenses…"

283.    During the Aug. 4, 2016 Earnings Call, Desheh attributed the poor performance of the Company's generic segment to factors other than a decrease in Inflated Profit:

> Revenues of our US generics business was impacted by
> competition to our Aripiprazole, Esomeprazole, and Budesonide
> which were the major drivers of our generic business in the US in
> the second quarter last year.

284.    The statements were false and misleading because, having attributed the source of

the profit decline, Defendants had a duty to disclose but concealed the full truth that Inflated

Profit declined from as much $236 million in Q2 2015 to $114 million in Q2 2016, a decline

of $122 million or 52%. That YOY decline in Inflated Profit comprised nearly all of the YOY

decline in generic profit. The statements further concealed that the price-hike strategy was

unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable

to implement further hikes.

285.    Also during that call, and in response to a Citigroup analyst's inquiry regarding

pricing stability, Olafsson denied seeing any change in the pricing environment:

> [T]he pricing is stable to the same degree as before. We saw
> approximately in the US, 4% price erosion in the business, in a
> way very stable from the first quarter. And the global pricing
> impact we saw in the business, in the generic business was
> approximately 5%. So we are pleased with the environment.

286.    Olafsson then reiterated the same false and misleading sentiment later in the call:

> So overall, the business itself is fairly stable. As I mentioned in the
> beginning, we are seeing exactly the 4% price erosion…. 4% price
> erosion in the US.

287.    The statements were false and misleading because, in Q2 2016, Teva suffered a

$122 million YOY reduction in Inflated Profit from price increases compared to Q2 2015, and

Teva was increasingly unable to implement further price hikes, implementing only five,

immaterial increases during 2016, compared to 21 in 2015, and 32 in 2014, during the height of

the strategy.

288.     In response to a question from a J.P. Morgan analyst regarding whether Teva could implement price hikes following the Actavis acquisition, Olafsson stated:

> I think the pricing comes with shortages in the market. If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out. But overall, the size, and being a combined company doesn't play into that.

289.     These statements were false and misleading because they minimized Teva's price-hike strategy when, in reality, Teva took 76 price increases on 60 drugs, most of which were for 100% or more, that were not associated with any such shortage or dysfunction. This left Teva very exposed to the pricing pressure facing the industry at the time.

### 21.     In the Third Quarter 2016, Defendants Continue to Deny Price Inflation and Increased Pricing Pressure in Statements to Investors

290.     On September 7, 2016, Desheh participated in a Wells Fargo conference where he was asked by the Wells Fargo analyst, "Teva has said during this whole, the last couple years, that you're not really seeing the same generic erosion, pricing erosion that some of the other companies have mentioned or blamed.  Is that still the case?"  Desheh responded by claiming that Teva was not experiencing increased pricing pressure:

> Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there.… [Y]ou don't see -- there you don't see the erosion. Where we see erosion is … [when] you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down. But when we look at the base, there's no – there's no pressure on prices.

291.     On Teva's September 9, 2016 Generic Medicines Business Overview call with analysts, the slides presented echoed that Teva was not experiencing a change in pricing pressure:

> Price erosion is nothing new. . . . Diverse portfolio and competitive
> cost structure allows for long-term value creation.

292.    The statements were false and misleading because, while Desheh claimed that

Teva's base business was experiencing "no pressure on prices," and the slides claimed that

"price erosion is nothing new," Teva was suffering massive declines in Inflated Profit and the

inability to implement further hikes due to increased pricing pressure that was itself the

materialization of the risks concealed by Defendants. Most recently, in Q2 2016, Teva suffered a

massive $122 million YOY reduction in Inflated Profit from price increases compared to Q2

2015, and Teva implemented only five immaterial hikes in 2016, compared to 21 in 2015, and 32

in 2014, demonstrating the unsustainability of the price-hike strategy.

293.    During the September 9, 2016 call, Olafsson categorically denied Teva had

increased prices on its generic drugs, stating: "There is no inflation in the generic pricing, which

I will talk about."

294.    Later during that same call, in response to a Bank of America analyst's question

regarding the impact of specialty drug pricing on generics, Olafsson responded:

> [S]o first of all, we need to differentiate generics from branded
> pricing. And people that say that the generic – there's a big generic
> price inflation, are simply wrong.

295.    Olafsson even claimed that Teva had a "secret sauce" that immunized the

Company from price fluctuations. These statements were false and misleading because each of

these statements minimized (i) Teva's practice of making price increases pursuant to the price-

hike strategy, often by raising the price over 100% above the pre-inflation price, on 60 drugs or

22% of its portfolio; (ii) the importance of the Inflated Profit from those price increases to the

Company, (iii) the unnatural price inflation in Teva's book of generic drugs caused by those

increases and the attendant risks associated with such inflation; and (iv) that Teva was at the time

experiencing a dramatic drop in Inflated Profit from those price increases and an inability to implement further increases as a result of the materialization of the risks concealed by Defendants.

296.    During the September 9, 2016 call, Olafsson also responded to a question as to whether Teva would be taking price increases following the Actavis acquisition, stating:

> So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics. When price increases are taken, there's some kind of abnormality in the business. There are shortages.

297.    The statements were false and misleading because they implied that because Teva only increased prices in limited circumstances, it was not exposed to price deflation. The truth was that Teva had raised the prices of 60 drugs, or 22% of its portfolio, via 76 price increases frequently by more than 100% of the original price, and thus had enormous price inflation in its portfolio; none of the price increases related to shortages.

### 22.    Third Quarter 2016 False and Misleading Financial Disclosures

298.    On November 15, 2016, Teva filed its third quarter 2016 ("Q3 2016") financial statements on Form 6-K with the SEC (the "Q3 2016 6-K"), and held an investor earnings conference call (the "Nov. 15, 2016, Earnings Call").

299.    The Q3 2016 6-K disclosed a YOY increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from Actavis. But, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $277 million, or 27%. In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues were:

> partially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in

> sales of budesonide … due to increased competition and the loss of
> exclusivity on esomeprazole.

300.    The statements were false and misleading because, having attributed the sources

offsetting the increased revenues from Actavis, Defendants had a duty to disclose but concealed

the full truth that Inflated Profit declined from as much as $218 million in Q3 2015 to $97

million in Q3 2016, a decline of $121 million or 56%. That YOY decline in Inflated Profit

comprised as much as 44% of the YOY decline in U.S. generic revenue from Teva's legacy

business, excluding the impact of Actavis. It further concealed that the price-hike strategy was

unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable

to implement further hikes.

301.    During the Nov. 15, 2016 Earnings Call, a Credit Suisse analyst asked, "[Y]ou

mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the

mid single-digits going forward…. [W]hat's going to happen in the coming quarters [that] will

be different than what you saw this quarter?" Olafsson responded:

> Let me start on the drug pricing, so overall, like previous quarters,
> there hasn't been any fundamental change in the US drug pricing.
> And what we saw in the difference between the 5% or mid single-
> digit we guided for going into it, versus exiting at 7%, was the
> impact of the pricing impact on the divested product.

302.    Olafsson doubled down on this explanation when pressed by an incredulous

analyst from J.P. Morgan, who asked how Teva was sure that the decline was not the same

pricing pressure seen throughout the market. Olafsson reiterated:

> [W]here I sit here today, experiencing the market, there hasn't
> again been any fundamental change.

303.    The statements were materially false and misleading because Teva was in fact

experiencing a sustained and material decline in the pricing environment, particularly with

regard to the drugs whose price Teva had previously raised pursuant to the price-hike strategy, in direct contradiction to Olafsson's specific denials. These flat denials in answer to specific questions on the matter, in the face of contrary empirical evidence that Teva had inflated prices on 60 drugs, profited by as much as over $2.1 billion since the start of the Relevant Period, and was now suffering from drastic YOY reductions in Inflated Profit generated from those price hikes and an inability to implement more, were particularly misleading.

304.    During the same Nov. 15, 2016 Earnings Call, a Wells Fargo analyst asked whether the stated 7% price erosion experienced that quarter was a "result of having to tame previous price increases, or give back some of those?" Olafsson denied the existence of a pricing trend beyond that caused by Actavis-acquisition related divestitures:

> No, basically, the main reason … was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it. What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio. So there was an instability that happened in the market during the month of August, when the new owners were taking market share. It didn't change the fundamental of the market. It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

305.    The statements were false and misleading because the Inflated Profit from price hikes had declined drastically, contributing just $97 million in Q3 2016, a YOY reduction of $121 million, or 56%. The sharp decline in Inflated Profit was a result of the materialization of the risks that Defendants concealed as they implemented their price-hike strategy, namely increased pricing pressure resulting from increased public, legislative, and regulatory scrutiny of

generic drug pricing, which in turn resulted in increased competition and the inability to

implement further price hikes. Those were not single-quarter issues related to divested products,

as suggested by Olafsson, but a long-term trend with no end in sight.

### 23.    The January 6, 2017 Guidance Call

306.    During a December 8, 2016 Citi Global Healthcare Conference, Vigodman

announced that Teva would provide 2017 guidance early in January 2017. During the call,

Vigodman claimed Teva's past success was not due to Inflated Profit from price hikes, stating:

> Since the start of 2014, one of our greatest priorities has been to
> increase the profitability of our generics business. In the first three
> years of this great effort, we have been able to improve
> significantly the margins of Teva's standalone generics business.
> This has been accomplished with a strong emphasis on the cost of
> goods sold, product mix, and the overall cost structure.

307.    The statement was false and misleading because, having attributed the source of

the profitability increases, Vigodman had a duty to disclose but concealed that the price-hike

strategy, whereby Teva made at least 76 systematic price hikes since July 2013, many of which

were in excess of 100% of the prior price, contributed over $2.2 billion to Teva's profit from the

start of the Relevant Period through the end of 2016.

### 24.    Fourth Quarter and Full Year 2016
### False and Misleading Financial Disclosures

308.    On February 13, 2017, Teva filed with the SEC a press release ("Q4 2016 Press

Release") reporting the Company's fourth quarter 2016 ("Q4 2016") and full year 2016 ("FY

2016") financial results, and held an investor earnings conference call (the "Feb. 13, 2017

Earnings Call"). Two days later, on February 15, 2017, Teva filed its Form 20-F for the fiscal

year ended December 31, 2016 with the SEC (the "2016 20-F") reporting the Company's FY

2016 financial results (collectively, the "Q4 and FY 2016 Statements").

309.     2016 20-F The 2016 20-F disclosed a YOY decline in U.S. generic revenues of
$200 million, or 5%. When removing the impact of Actavis' $1.168 billion in U.S. generic
revenues, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $1.4
billion, or 29%. Per the 2016 20-F this decline purportedly:

> "resulted mainly from the loss of exclusivity on esomeprazole …
> and aripiprazole …, a decline in the sales of budesonide … due to
> increased competition, loss of revenues following our divestment
> of certain products in connection with the Actavis Generics
> acquisition and the decline in sales of capecitabine."

310.     The statements were false and misleading because, having attributed the source of
the increased revenues, Defendants had a duty to disclose but concealed the full truth that
Inflated Profit declined from as much as $848 million in 2015 to $421 million in 2016, a decline
of $427 million or 50%. That YOY decline in Inflated Profit comprised 31% of the YOY decline
in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis. Even
giving Teva the benefit of Actavis' 2016 revenues, the YOY decline in Inflated Profit was more
than double the $200 million YOY decline in U.S. generic revenues. It further concealed that the
price-hike strategy was unsustainable, as Inflated Profit was drastically declining, and Teva was
unable to implement more hikes.

**D.     False and Misleading Statements Regarding Actavis Acquisition**

311.     Teva's Q3 2016 6-K asserted that the Actavis acquisition "had a significant
impact on our generic medicines segment, expanding our product portfolio, R&D capabilities,
product pipeline, and global operational network."

312.     In the press release announcing the Q3 2016 results, Defendant Vigodman stated:

> This has been a year of transition for Teva, underscored this
> quarter by the close of our strategic acquisition of Actavis
> Generics, which had significant contribution to our results. Actavis

> will continue to contribute in a meaningful way to the future
> growth of our generics business through the strengthened R&D
> capabilities and complementary pipeline and portfolio, and
> enhance our leadership in an increasingly evolving industry.

313.    During the Nov. 15, 2016, earnings call the same day, Teva made the following

false and misleading statements concerning the financial impact of the Actavis acquisition and

integration on the Company's business prospects and reported financials:

> [Vigodman:] The completion of the Actavis acquisition
> strengthens and broadens our R&D capabilities, and highly
> complements our product pipeline, product portfolio, geographical
> footprint and operational network. It enhances Teva's leadership in
> an evolving competitive landscape and massive consolidation
> across our customer base. In addition, our integration plans with
> the Actavis generics business are on track.
>
> *        *        *
>
> [Olafsson:] On August 2, we completed the strategic acquisition of
> Actavis generics. The result is a much stronger, more competitive
> Teva that is best positioned to thrive in an evolving global generics
> marketplace.

314.    In response to a question about the Actavis transaction, Defendant Olafsson

stated:

> The closing of the Actavis transaction has gone very smoothly
> since day one with no operational disrupter. While we were
> disappointed at the delays with antitrust review, the time allows the
> integration teams at Teva and Actavis Generics to work diligently
> to plan for integration of the two companies in order to ensure that
> combined company would be fully operational immediately as on
> closing of the transaction. As a result, Teva was able to begin
> capitalizing immediately on the benefits offered by the acquisition
> of Actavis Generics. This included optimizing our R&D activities,
> harmonizing our customer contracts and relationships, and
> realizing economies of scale with our purchase.

315.   On December 5, 2016, Teva filed a report on Form 6-K with the SEC, which included the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> Erez Vigodman, Teva's President and [CEO stated:] ... "As we continue to focus on integrating and realizing the value of the Actavis Generics transaction, which is progressing according to plan, Dipankar and his team will focus on generating organic growth through new launches and replenishing the pipe line through our industry-leading R&D, and drive efficiencies across the generics organization       "
> . . . [Dipankar] Bhattacharjee[, Teva's President and CEO, Global Generic Medicines Group stated:] "With the integration of Actavis proceeding on schedule and the complementary U.S. distribution capabilities provided by our recent acquisition of Anda, we have a matchless opportunity to add value in the U.S. healthcare system, and in the fast-changing global generics marketplace."

316.   On February 13, 2017, Teva filed with the SEC the Q4 2016 Press Release. In the Feb. 13, 2017 earnings call the same day, Defendants Peterburg and Desheh made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> [Peterburg:] The Company's priorities continue to be extracting all synergies related to the Actavis generic acquisition, successfully launching the key generic and specialty products we have planned for 2017, and generating significant cash flow to rapidly pay down our existing debt to maintain a strong balance sheet.
> We are reiterating our guidance for 2017, including our earnings per share of $4.90 to $5.30. We are very committed to this EPS range, and the management team and I will do what it takes to protect it, including additional cost reduction if necessary.
>                        *     *     *
> [Desheh :] The increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction.
>                        *     *     *

> Total sales were $93 billion, with significant growth in goodwill
> and intangible assets, resulting from the progress made on the
> Actavis acquisition versus price allocation.

317.   On February 15, 2017, Teva filed the 2016 20-F. In the 2016 20-F, Teva made the

following false and misleading statements concerning the financial impact of the Actavis

acquisition and integration on the Company's business prospects and reported financials:

> In August 2016, we completed the Actavis Generics acquisition.
> Our strong legacy generics business, combined with the Actavis
> Generics business, has a world-leading product portfolio,
> comprehensive R&D capabilities, robust product pipeline and an
> efficient global operational network. The combined generic
> business has a wide-reaching commercial presence, as the market
> leader in the United States and a top three leadership position in
> over 40 countries, including some of our key European markets.
> The combined business benefits from a leading and diverse
> pipeline of products, which will help us continue executing key
> generic launches and further expand our product pipeline, focusing
> on both large and small opportunities. We expect that a larger
> number of smaller but more durable launches will help offset
> expected price erosion while diversifying our revenue stream.
>                         *        *        *
> In August 2016, we completed our acquisition of Allergan plc's
> worldwide generic pharmaceuticals business ("Actavis Generics").
> At closing, we paid Allergan consideration of approximately $33.4
> billion in cash and approximately 100.3 million Teva shares. The
> acquisition significantly expanded our generics product portfolio
> and pipeline, R&D capabilities and global operational network.
>                         *        *        *
> Significant highlights of 2016 included:
> - In August 2016, we completed our acquisition of
>   Actavis Generics. The acquisition had a significant
>   impact on our generic medicines segment, expanding
>   our product portfolio and pipeline, R&D capabilities
>   and global operational network.

318.   The 2016 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act

of 2002 by Defendants Peterburg and Desheh, stating that the financial information contained in

the 2016 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

319.    On May 11, 2017, Teva filed a report on Form 6-K with the SEC reporting the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 6-K").

320.    In the Q1 2017 6-K, Teva made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> On August 2, 2016, Teva consummated its acquisition of Allergan plc's ("Allergan") worldwide generic pharmaceuticals business ("Actavis Generics"). At closing, Teva transferred to Allergan consideration of approximately $33.4 billion in cash and approximately 100.3 million Teva shares. The acquisition significantly expanded Teva's generics product portfolio and pipeline, R&D capabilities and global operational network.

321.    In a conference call the same day, Defendants Peterburg and Desheh made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> [Peterburg:] As it relates to our first priority, I'm pleased to report the synergies related to the Actavis Generics acquisition and additional cost reduction, which the company has identified, is now on track to realize cumulative net synergies and cost reduction of approximately $1.5 billion by the end of 2017.
>
> *       *       *
>
> Turning to generics. It has been 2 full quarters since the completion of our acquisition of Actavis Generics. The acquisition has provided us with many benefits, especially much stronger and broader R&D capabilities, which we believe are the engine for any substantial generic business. This is essential in today's world when we are operating across such an evolving competitive

landscape and ongoing consolidation across our customer base. We are very confident that the global business we have built will allow Teva to thrive in the long-term future as a leader in the generics industry.

[Desheh:] The increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction.

322. The statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Teva's business, financial results and operations by, in addition to the reasons set forth above, failing to disclose and actively concealing the negative impact resulting from the acquisition and integration of Actavis on the Company's financial results and business prospects, which (among other things) exacerbated the risky and unsustainable nature of the price-hike strategy, which collapsed shortly after the closing of the Actavis acquisition in August 2016.

## VI.  ADDITIONAL ALLEGATIONS OF SCIENTER

323. Together with the above-alleged facts, Defendants each acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements identified herein.

### A. Defendants Were Motivated to Use Teva's ADS as "Currency" for a "Transformational" Acquisition

324. As alleged above, Defendants were motivated to make false statements to inflate the price of Teva Securities in order to complete a "transformational" acquisition. By January 2014, once the price-hike strategy was fully implemented and had generated material profits toward fourth quarter 2013 results, Desheh announced this motivation, stating that, "the stock price will go up and we'll be able to **use our share as a currency** . . . **to fund transactions**."

96

Upon his hiring in February 2014, Vigodman was reported to also favor significant M&A activity.

325.    When Teva announced the $40 billion acquisition of Actavis on July 27, 2015, Vigodman explained that the improvement in generics was a "***precondition***" for accomplishing the deal. Indeed, without the inflated securities as a "currency," Teva did not have the cash; the $40 billion price tag was roughly twenty years of Teva's average annual income from 2013 to 2015. They raised the cash from investors, such as Plaintiffs.

326.    By the second quarter 2015, however, the price-hike strategy had peaked. Teva began to experience pricing pressure on its generic drugs, and was increasingly unable to make additional large price increases. As analysts questioned the deteriorating pricing environment and Teva's weakening financials, Defendants flatly denied Teva was making profits from price increases, or that Teva was facing pricing pressure.

327.    It was not until Defendants had completed over $27 billion in public offerings by July 28, 2016, and closed the deal on August 2, 2016, that they disclosed negative results in the generic business, and that it was the subject of government subpoenas. Soon after that, the truth began to leak into the marketplace, and the fraud fell apart.

### B.    Conscious Misbehavior or Recklessness

#### 1.    Implementation and Concealment of the Price-Hike Strategy

328.    Teva's systematic implementation of a strategy to hike prices on generic drugs, while publicly denying that price increases played any role in the Company's reported results, supports a strong inference of scienter. As discussed above, allegations in both the TSCA Complaint and the 2019 AG Complaint—which corroborate one another—detail how Teva adopted a strategy of systematically raising prices on generic drugs just before the Relevant

Period, how the strategy was adopted with the full knowledge of senior executives, and how senior executives reviewed and approved price increases. TSCA Complaint, ¶¶ 270-74; 2019 AG Complaint ¶¶ 1111-1114. The TSCA Complaint attributes these allegations to former Teva employees, and the State AGs draw their allegations from a long-running investigation as well as party discovery in the Generics MDL, including Teva's full custodial file for Nisha Patel, a central player in Teva's collusion.

329.    The fact that senior executives reviewed and signed off on price increases supports an inference of scienter. The TSCA Complaint includes allegations that Teva employees would provide a list of potential price increases to Maureen Cavanaugh and Deborah Griffin, who approved the timing and amounts of the price increases. TSCA Complaint ¶ 282.

330.    The 2019 AG Complaint corroborates these allegations with detailed descriptions of the systematic approach taken to price increases. For example, the 2019 AG Complaint describes how, shortly after joining Teva, Patel began to rank competitors on their "quality"—meaning their willingness to collude—and, with approval from her supervisor "K.G." (Galownia, on information and belief, as discussed above), she used this list to identify price-hike candidates. K.G. forwarded the list of price increases, which was based on information obtained from competitors, to Cavanaugh, who approved them, and allegedly understood the source of the information. 2019 AG Complaint ¶¶ 1111-1114. The 2019 AG Complaint walks through numerous other examples where Patel and other Teva employees would follow this process for subsequent price increases—identifying candidates in collusion with competitors, and then forwarding to senior executives for approval.

331.    Given this formalized process involving Griffin and Cavanaugh, there is a strong inference that Defendants were aware of, or at least recklessly disregarded, the more than 76

price increases, ranging from 50% to 1500%, over the course of over three years, that generated

over $2 billion in Inflated Profit.

### 2. Continuous Access to Documents and Information Tracking Profits from Price Increases

332. According to the TSCA Complaint, Defendants were provided reports that

tracked the financial impact of the price-hike strategy against the detailed revenue goals for

Teva's U.S. generics business, as often as on a daily basis, and had access to a database that

tracked pricing at a granular level.  TSCA Complaint ¶¶ 288-291. Given the close attention paid

to revenue and its sources, and the readily available information concerning these topics, there is

a strong inference that Defendants knew or recklessly ignored that billions of dollars in Inflated

Profit were generated through the price-hike strategy, and that its collapse caused the later

short-falls in profits.

### 3. Defendants Spoke Repeatedly About the Pricing of Generic Drugs

333. Defendants repeatedly claimed that they had accurate knowledge of the sources of

Teva's generics profitability.

334. Defendants claimed to have intimate knowledge of whether Teva had taken price

increases and whether those price increases contributed to the increased profitability of Teva's

generics division. For example, on October 29, 2015, Vigodman claimed awareness that "all the

improvement . . . in our . . . margins is not driven by price. It is driven by quantities and by mix

and by efficiency measures. Not by price, 2014, 2015." Similarly, on February 11, 2016,

Olafsson claimed he knew that the "$1 billion improvement in operating profit over 24 months

period," was achieved "[n]ot by pricing but by portfolio mix, new products, and efficiency

measures." On November 19, 2015, when asked about industry price increases, Desheh claimed

that "Teva was not associated with any of that."

335.    Defendants also claimed knowledge of when Teva would take price increases, limiting them to instances with shortages. For example, on October 30, 2014, Vigodman claimed he knew that Teva looked for pricing only "when there is a shortage in the market." On August 4, 2016, Olafsson claimed that Teva would increase prices only where there were "shortages in the market," then "there might be a small pricing opportunity."

336.    Defendants further claimed they were aware of the rate of pricing decline that Teva was experiencing in 2016, and how it compared to prior years. For example, on June 3, 2016, Vigodman asserted he knew that "[w]hat we see is a 4% to 5% erosion.… That's not something which is different from what we said during 2015." Earlier, on May 9, 2016, Olafsson asserted awareness that despite "a tougher pricing environment or price deflation," "Teva has not seen any fundamental change or worsening in the pricing environment . . . . What this boils down to is each individual company's business model. . . . Nothing has happened in the last two quarters that has changed the pricing environment." Similarly, on September 7, 2016, Desheh claimed that the pricing environment for Teva's base generic business was "very stable," and that "there's no pressure on prices."

337.    Defendants also claimed knowledge of whether Teva was competing in a functional and competitive generics market. For example, on July 27, 2015, Olafsson asserted that he knew that "there's fierce competition on most of [Teva's] portfolio, if not all the portfolio." During that same call, Vigodman added, "We believe in competition, and we'll do what is needed in order to win all the markets we operate." On November 19, 2015, Desheh claimed he knew that Teva was "playing a competitive game . . . . playing it fairly . . . . by the book and by the rule."

100

338.     This self-proclaimed personal involvement by Defendants supports a strong

inference that they possessed knowledge of the true state of affairs of the business, and thus had

knowledge that their representations were misleading, or were reckless in not knowing.

### 4.     Defendants' and Analysts' Focus on Generics

339.     The fact that Defendants touted Teva's generics segment, fueled by its U.S.

division, as driving the Company's turnaround during the Relevant Period supports a strong

inference of scienter. For example, on May 13, 2015, Desheh described the turn-around in

generics as "nothing short of a revolution." On June 10, 2015, Olafsson touted improvement of

the "generic business by … $1 billion [] in 14 months, 16 months." That same day, Vigodman

touted "the profound change in the generic business," citing increased operating profit from 2013

to 2014.

340.     Analysts accordingly focused on Teva's generics businesses, and particularly its

U.S. division, as a financial driver for the Company, further supporting a strong inference of

scienter. For example, in a February 5, 2015 report, Piper Jaffray noted that "the profitability of

the generics business [is] continuing to improve." On April 30, 2015, J.P. Morgan wrote: "Teva

continues to make progress on generics profitability . . . we remain encouraged by the recovery

in Teva's generic business." The same day Cowen and Company noted that Teva's

"outperformance was a result of better than expected U.S. generic sales."

341.     Similarly, when industry pricing pressure damaged Teva's competitors, analysts

peppered Defendants with questions about pricing pressure over the course of several months,

which were met with detailed answers: For example, on February 11, 2016, Guggenheim asked

Olafsson about "pricing pressure in the generics business," with Olafsson claiming to know that

"on the pricing … we didn't see anything change in fourth quarter." On September 7, 2016,

Wells Fargo asked whether Teva was "seeing the same generic erosion, pricing erosion that some of the other companies" had, to which Desheh asserted he knew that "the base [generics] business . . . the prices are very stable there."

### 5.   The Magnitude, Importance, and Duration of the Fraud

342.   The fact that the price-hike strategy generated as much as $2.3 billion in Inflated Profit supports a strong inference of scienter. Indeed, the Inflated Profits drove Teva's reported financial turnaround throughout the Relevant Period. In 2014 and 2015, Inflated Profits comprised an increasingly large portion of Teva's overall net income. As to the generic segment's profits, the Inflated Profits accounted for 15% of segment profits in 2013; 32% in 2014; and 32% in 2015. The Inflated Profits accounted for an even larger portion of the Company's overall net income: in 2013, Inflated Profits accounted for 20% of net income; in 2014, 23%; in 2015, 54%, and in 2016, more than all of Teva's overall profit. The strong inference is that Defendants knew of the source of these profits.

343.   Likewise, in 2016, the price-hike strategy deteriorated as Teva began to experience significant pricing pressure and accelerated price erosion, and was no longer able to implement additional price hikes; as a result Teva's generic drug profits plummeted. Indeed, Teva's deteriorating financial condition in 2017 called into question whether it could service its massive $35 billion debt, and forced the Company to take a $6.1 billion impairment charge to its generics business, and reduce its dividend. The stronger inference by far is that Defendants were aware of the source of this decline, or were reckless in not knowing.

### 6.      Contemporaneous Red Flags

344.     Contemporaneous red flags alerted Defendants to the possibility that their statements were false and misleading. At a minimum, Defendants recklessly failed to review or check information that they had a duty to monitor under these circumstances.

345.     <u>Congressional Inquiry</u>: On October 2, 2014, Congress sent Vigodman a personal letter seeking answers to "the underlying causes of recent increases in the price of [Teva's] drugs." This should have placed Defendants on alert to discover whether Teva had taken price increases and to what extent. Despite this, on October 30, 2014, Vigodman, when faced with an analyst question on the subject, denied that Teva derived revenues from price increases. Similarly, Congress invited Teva to testify at a November 20, 2014 hearing on whether "there was a rational economic reason as to . . . huge price increases." Again, this should have sparked an internal inquiry from Teva's executives. Yet, on December 11, 2014, when faced with the assertion from an analyst that wholesalers were seeing large price increases, Olafsson flatly denied that Teva was involved in those practices.

346.     <u>The State AG and DOJ Investigations</u>: The fact that the DOJ and the State AGs began investigations into Teva's competitors related to their pricing practices also supports a strong inference of scienter. The fact of those investigations should have triggered an internal inquiry at Teva into the facts of its own pricing practices, including the dozens of price increases that Teva made in tandem with its competitors. Indeed, as set forth below, Teva has produced over one million documents to the DOJ.

347.     <u>GAO Report</u>: On September 12, 2016, the GAO, which Congress had commissioned over two years earlier, publicly released its report on "Generic Drugs Under Medicare," documenting its audit of Medicare Part D data from June 2015 to August 2016. The

GAO found hundreds of unexplained "extraordinary price increases," defined as the price of a particular drug increasing over 100% within a 12-month period, and that some drug prices increased more than 1,000%. Teva had numerous drugs that showed extraordinary price increases in the GAO report. The facts of the GAO report support the inference that Defendants spoke the alleged false statements with scienter.

### 7.     Officer Terminations Support Scienter

348.    That three of the Officer Defendants—Olafsson, Vigodman, and Desheh—resigned from Teva or had their employment with Teva terminated at a critical time, as the Company's price-hike strategy was deteriorating and Teva was in regulators' crosshairs, further supports scienter. There is a strong inference that the termination of Olafsson was connected to his fraudulent cover-up of the price-hike strategy and the subsequent decline in Teva's profits as the strategy collapsed.  The explanation for his termination as "retirement" was false, and the first charges from the DOJ and State AGs regarding their pricing investigations were released only days later. There is a similarly strong inference regarding Vigodman's termination. He was fired without a replacement just one month after Teva significantly revised its 2017 guidance downwards, resulting in part from increased price erosion and dwindling generic profits, and one week before Teva reported disappointing financial results for Q4 2016. Finally, less than two months after Desheh left Teva, and in the very first reporting period after all Defendants were gone, Teva took a staggering $6.1 billion charge against its U.S. generics business, and announced a radical 75% reduction in dividend payments to shareholders. This supports an inference that it was these Defendants who were blocking the true financial state of the Company from coming to light.

**8.      Evidence of Collusion Supports a Strong Inference of Scienter**

349.      Teva's collusion supports a strong inference of scienter. Given the information available to them, each Defendant knew, or recklessly disregarded, that in order for the price-hike strategy to generate the high level of Inflated Profits apparent in data regularly available and reported to them, Teva would likely have had to, and did, coordinate, communicate, and potentially reach illegal agreements with other manufacturers.

350.      As discussed above, the 2019 AG Complaint provides detailed allegations about Teva's collusion with other drug manufacturers to raise prices and/or allocate market share for over 100 drugs just before and during the Relevant Period. Moreover, the State AGs have alleged that, before and during the Relevant Period, Teva adhered to a widespread code of conduct among generic drug manufacturers that allowed them to fix prices and allocate markets to suppress competition. According to the State AGs, the code's objective was to attain a price equilibrium where manufacturers had no incentive to compete for additional market share by lowering price. Under that code, competitors would agree collectively to raise or maintain drug prices, dictating that a competitor should not underbid the competitor who raised prices. Manufacturers also entered into collusive fair share market allocation agreements by making knowingly uncompetitive bids, refusing to bid, or readjusting market share by walking away from customers. 2019 AG Complaint ¶¶ 18, 132-133.

351.      The State AGs have stated that evidence they have secured shows that executives at the highest levels of Teva conceived and directed many of the schemes. This and other allegations corroborate the allegations in the TSCA Complaint, including that Cavanaugh and Griffin were involved in pricing decisions, and Olafsson and Oberman would have received and reviewed reports and forecasts reflecting the Inflated Profit generated thereby.

105

352.     Teva's price increase approval processes necessarily involved senior management. As discussed above, Teva's senior management and executives, including Griffin and Cavanaugh, approved price increases and were aware of the impact of the increases on Teva's financial results, which was over $1 billion just for the drugs discussed in the TSCA Complaint.

353.     With the knowledge gained from these reports and data, Teva's executives and the generic segment CEO (Oberman and then Olafsson), Teva CAO and CFO of Teva USA (Griffin), and COO of Teva USA (Cavanaugh) could see when price increases were effective for an abnormally long time, or whether an abnormal quantity of price increases remained effective in contravention of rational economics.

354.     Finally, Oberman, Olafsson, and Cavanaugh personally attended numerous trade shows and conferences during the relevant period, affording them the opportunity to interact with individuals responsible for pricing and marketing decisions at other manufacturers. *See* TSCA Complaint, Appendix C.

### 9.     Other Facts Supporting Scienter

355.     <u>The Receipt of the Subpoenas</u>: Teva's receipt of subpoenas from the DOJ and the Connecticut AG on June 21, 2016 and July 12, 2016, respectively, and the Defendants' actions in response, support a strong inference of Defendants' scienter. Particularly, after receiving the subpoena from the Connecticut AG, Defendants abruptly announced the next day that they would be moving forward the Notes Offering.  Defendants failed to disclose them in the mandatory SEC disclosures filed in conjunction with the Notes Offering and Notes Offering materials, but then disclosed them approximately two weeks after completing the Offering. The failure to disclose receipt of the subpoenas until the Notes Offering was completed supports

scienter. Moreover, those subpoenas triggered a legally mandatory duty to inquire into Teva's pricing practices. Yet, Defendants thereafter made materially false and misleading statements about their exposure to price erosion, including during Teva's September 9, 2016 Generics Day.

356.    Further, Defendants did not take any further collusive price increases after receiving the subpoenas. The fact that the Company implemented dozens of price increases each year prior to receiving the subpoenas, suggests that Teva made a conscious decision not take any further price increases in light of the subpoenas.

357.    Bloomberg Article: The November 3, 2016 Bloomberg article revealed that Teva was the subject of the DOJ criminal inquiry, and that the DOJ and State AGs could bring charges later in the year. Despite this, Vigodman, almost two weeks later, on November 15, 2016, claimed that he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation." The State AGs' suit and the DOJ charges against Glazer and Malek soon followed, and, subsequently, those investigations have expanded massively. The close proximity of Vigodman's statement to the announcement of the charges diminishes the plausibility of innocent explanations or denials from Defendants.

358.    Teva's Further Denials of Liability: Despite its purported investigation of the facts, Teva repeatedly denied any involvement in collusive conduct during the Relevant Period, and continues to do so. For example, on November 7, 2019, Defendant Schultz stated during an investor earnings conference call: "We have, of course, shared more than 1 million documents with [the DOJ]. We have not found any evidence that we were in any way part of any structured collusion or price fixing." Such statements underscore that Defendants knew Teva was a central actor in collusive conduct, or at a minimum, recklessly failed to review or check information they had a duty to monitor that would have revealed that fact.

### C.     Corporate Scienter

359.    Teva possessed scienter by virtue of the fact that the Officer Defendants, who acted with scienter, as set forth above, had binding authority over the Company. In addition, certain allegations herein establish Teva's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature. It can also be inferred from the above allegations that senior corporate executives at Teva possessed scienter such that their intent can be imputed to the Company.

## VII.   LOSS CAUSATION

360.    In addition to the allegations herein, Defendants' fraudulent conduct directly and proximately caused Plaintiffs to suffer substantial losses as a result of purchasing Teva Securities at artificially inflated prices during the Relevant Period.

361.    Defendants, through each category of false and misleading statements and omissions, concealed the truth about Teva's core business strategy that materially contributed to Teva's financial and operational success during the Relevant Period, as well as Teva's collusive conduct.  By concealing, among other things, the price-hike strategy, that Teva was not competing on price, that the strategy was driving known material trends, that as the strategy failed and pricing competition increased Teva's financial condition was deteriorating, that Teva was in fact engaged in collusion and the central actor in an industry-wide conspiracy, and the negative impact of the Actavis acquisition and integration of the acquired business on Teva's financial results and business prospects, Defendants also concealed the numerous and related risks associated with their false statements and omissions, including but not limited to, the risks that:

- the strategy was highly risky and not sustainable, and as the strategy failed, Teva's profits would collapse;

- by their nature, especially when done in tandem with competitors, price hikes might appear to arise from anti-competitive and/or collusive conduct and, thus, draw the attention of government investigators and law enforcement agencies, precipitating possible legal actions, civil liabilities, and criminal sanctions;

- should the price-hike strategy come under public, legislative, or law enforcement scrutiny, the viability of sustaining the Inflated Profits and/or implementing new price hikes would be severely undermined, and would thereby undercut a major driver of the generic segment's profit;

- if pricing pressure or competition increased, Teva would be far more susceptible to a rapid and material decline in Inflated Profits, resulting in poor financial results and undercutting reported and forecasted profits;

- upon the failure of the price-hike strategy, the Company could be further disrupted by the termination of the senior managers who were responsible for the strategy, and by any increased difficulty in hiring qualified replacements; and

- as the price-hike strategy in fact failed over time, Teva's Inflated Profits declined, and Teva was prevented from making additional price increases, those trends would continue.

The concealed risks bore directly on Teva's ability to generate and sustain its profits and its ability to service the over $30 billion in debt.

362.    Beginning in August 2016, the concealed risks began to materialize through a series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of Defendants' Relevant Period statements and omissions. Despite these partially corrective events and disclosures, Teva Securities' prices remained artificially inflated and were prevented from declining to their true value by Defendants continuing to make materially false and misleading statements that had the effect of, at least temporarily, concealing their fraud. As the relevant truth leaked out into the market from August 2016 to August 2017, Plaintiffs suffered losses, which were foreseeable and caused by the materialization of the risks that Defendants' fraudulent conduct concealed from investors, as set forth below.

A.     **August 4-5, 2016**

363.     After the close of trading on August 4, 2016, Teva filed its Q2 2016 6-K, reporting 2Q 2016 results, which announced: (i) poor generics segment earnings, including a $115 million YOY decline in profits for the generics segment; and (ii) that "[o]n June 21, 2015 [sic], Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products" and "[o]n July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."

364.     On this news, the prices of Teva Securities declined. For example, between the close of trading on August 4, 2016 and on August 5, 2016, the price of Teva's ADS fell $1.24 or 2.24% to close at $54.21; the Preferred Share price fell $12.00 or 1.32% to close at $895.

365.     This marked the beginning of the relevant truth leaking out, as Teva's price-hike strategy had begun to collapse and Teva lost its ability to profit from the 76 historic price hikes or to implement new increases in 2016. The disclosure of the subpoenas was a materialization of the risks: (1) that Teva's collusive conduct would lead to potential enforcement actions, and (2) that after nearly two years of ongoing investigations, the DOJ and State AGs would seek evidence from Teva in connection with Teva's pricing practices.

B.     **November 3, 2016, December 13-16, 2016**

366.     On November 3, 2016, during the trading day on the NYSE, Bloomberg published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," describing the DOJ's "sweeping" two-year investigation related to the soaring prices of generic

drugs and how executives from more than a dozen generic pharmaceutical manufacturers, including Teva, were suspected of colluding to raise the prices of generic drugs. The article broke the news that the first criminal charges against executives of those companies could emerge by the end of the year, and that State AGs were seeking to bring claims against generic manufacturers.

367.    On this news, the prices of Teva Securities declined once again. For example, between the close of trading on November 2, 2016 and the close of trading on November 3, 2016, Teva's ADS price fell $4.13 or 9.53% to close at $39.20; the Preferred Share price fell $56.50 or 7.36% to close at $711.00; and the prices of Teva's 2023, 2026, and 2046 Notes fell $12.93 or 1.31%, $11.19 or 1.15%, and $27.94 or 3.02%, respectively.

368.    In a November 3, 2016 article titled "News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling," The New York Times reported that the price of Teva's securities had declined significantly in response to reports that the DOJ and State AGs' investigations found serious evidence of criminal conduct. On November 4, 2016, S&P Capital IQ lowered its rating of Teva ADS from "buy" to "hold" and lowered its 12-month price target by $34 to $50 per share, noting that "[w]e think this could pose yet another challenge to an industry that has been hit hard by charges of high drug prices and will be an overhang on the shares." In its November 4, 2016 analyst report, HSBC downgraded Teva from "buy" to "hold" and lowered its price target from $66 per share to $44 per share, noting "US DOJ investigation into alleged US generic drug price collusion creates significant uncertainty" for Teva and for investors. In a November 10, 2016 article titled "DOJ's price-fixing investigation could lead to sizable liabilities, analyst says," Fierce Pharma reported that analysts tracking the generic drug

industry believed that liability from the investigations could have a sizeable financial impact on Teva, estimated at $700 million.

369.    Within weeks, the expected governmental actions materialized. On December 13, 2016, the DOJ, by means of an Information, charged Malek and Glazer, the top two executives at Heritage, with two felony counts of violating Section 1 of the Sherman Act partly for fixing the price of Glyburide, a drug for which Teva held 75% of the market.

370.    On December 14, 2016, led by the Connecticut AG, the State AGs filed their lawsuit against Teva and several of its peers for civil violations of the antitrust laws, accusing Teva of conspiring to allocate the markets for, and fix the prices of, generic drugs, including for Glyburide, and of participating in a larger market-wide collusive conspiracy. Forbes reported the next day, in an article titled "State Attorneys General Accuse Six Generic Companies of Fixing Drug Prices," that the State AG's complaint revealed new information regarding Teva's potential exposure, made "clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing," and also noted that Glazer and Malek were cooperating.

371.    On the news of the DOJ charges and the filing of the State AGs' complaint, the prices of Teva Securities continued to decline. For example, between the close of trading on December 13 and December 16, 2016, the ADS price fell $1.15 or 3% to close at $36.51, and the Preferred Share price fell $28.00 or 4% to close at $645.00; the price of the Company's 2046 Notes also declined $17.54, a drop of 2.5%.

   **C.    November 15, 2016**

372.    On November 15, 2016, before trading opened on the NYSE, Teva filed a press release with the SEC reporting its Q3 2016 financial results, which were well below consensus expectations, largely due to poor sales in Teva's generics divisions, including a $277 million

YOY decline in revenue in Teva's "legacy" U.S. generics segment (*i.e.*, in the pre-Actavis-transaction portion of Teva's U.S. generics business). In the Company's November 15, 2016 earnings call, the Company also revised downward its 2016 guidance, and disclosed for the first time that the rate of price erosion for its generic drugs had increased from 5% to 7%, although Olafsson falsely claimed that the increase was the result of divestitures from the Actavis transaction, and thus was limited to one quarter.

373.    On this news, the prices of Teva Securities continued to decline. For example, between the close of trading on November 14 and 15, 2016, the ADS price fell $3.43 or 8.36% to close at $37.60; the Preferred Share price fell $38.01 or 5.22% to close at $689.99.

374.    Analysts responded negatively to the new information concerning the Company's disappointing financial results. That day, in a report titled, "Are The Wheels Coming Off? Sure Feels That Way," Piper Jaffray lowered its price target from $57 per share to $43 per share, noting that "it appears to us that Teva painted an overly sanguine picture of its generics business at its investor event in September [during the Generics Day]," and describing Q3 2016 as a "credibility-damaging quarter," because, in the face of Olafsson's explanation that the price erosion would be limited, it was "difficult for us to take that assertion at face value." Also that day, Deutsche Bank wrote "TEVA reported 3Q revenue that was below our estimate on lower generic sales … the company saw higher than expected price erosion in 3Q …" and, as a result, lowered its price target for the Company from $68 per share to $54 per share on "lower growth assumptions for generics." Likewise, in a November 16, 2016 report, Morgan Stanley lowered its price target for the Company from $63 per share to $42 per share, as a result of the lower than expected generics growth and worse than expected price erosion.

### D.    December 5-6, 2016

375.    After the close of trading on December 5, 2016, Teva filed a Form 6-K announcing that Olafsson would be stepping down as President and CEO of the Company's Global Generic Medicines Group and that, effective immediately, he would be replaced by Bhattacharjee. Teva offered no explanation for Olafsson's departure, instead claiming he was "retiring" even though he was only in his late 40s and quickly obtained other employment.

376.    On this news, on December 6, 2016, the prices of Teva Securities continued to decline. For example, between the close of trading on December 5 and on December 6, 2016, the ADS price fell $2.01 or 5.43% to close at $35.03; the Preferred Share price fell $26.26 or 4.00% to close at $630.75; the price of Teva's 2046 Notes fell $17.01 or 1.95%.

377.    Analysts tied Olafsson's termination to the disappointing results in Teva's generics segment and concerns over pricing pressure. On December 6, Morningstar reported: "Teva's announcement [that it] will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence. *Recent pricing pressure* in the generic drug market … remain[s] significant near-term challenge [] for Teva, which makes the abrupt leadership change a *concerning development at a critical time* for the company." A December 5 BTIG report noted "[w]ithout Siggi Olafsson at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained *focused on price erosion for the [company's] base generic business*" and that "the departure of Mr. Olaffson [sic] creates more uncertainty as we head into 2017."

### E.    January 6, 2017

378.    On January 6, 2017, before the beginning of the trading day on the NYSE, Teva filed a press release on Form 6-K announcing a significant reduction in the 2017 guidance

previously released on July 13, 2016. In the investor conference call that day, Vigodman claimed

the "significantly" reduced guidance resulted from "significant headwinds" faced by "[t]he entire

healthcare sector" to which Teva "ha[d] not been immune," and "some issues specific to Teva"

resulting in "an EBITDA gap of $1.2 billion emanating from our US generics business." In

addition to the materialization of the concealed risks described herein, this was the

materialization of the risk of Defendants using an "assumption" for price erosion in the July 13,

2016 guidance that was empirically false at the time; specifically, Defendants assumed a pricing

environment that was "stable"— *i.e.*, 4%-5% erosion rate disclosed in prior years and quarters—

when, in fact, pricing pressure was causing a more rapid decline.

379.    As a result of this new negative information, the prices of Teva Securities

continued to decline. For example, between the close of trading on January 5 and January 6,

2017, the ADS price fell $2.86 or 7.53% to close at $35.10; the Preferred Share price fell $47.00

or 6.91% to a close at $633.00; and the prices of Teva's 2026 and 2046 Notes declined $10.96 or

1.17% and $17.75 or 2.01%, respectively.

380.    Analysts tied this disclosure to the fact that the prior guidance was "inflated" as a

result of understating generic drug price erosion. In a report dated January 6, 2017, Evercore ISI

conducted its own price erosion analysis for the Company and noted that, as a result of its lower

than expected revenues and EPS, "I think it's ***pretty clear that mgmt's prior expectation for

2017 were very inflated***." Similarly, the same day, Maxim Group downgraded its rating of the

Company from "buy" to "hold" and its price target for the Company from $49 per share to $41

per share and noted "challenges in the near term to the core generic . . . business are becoming

bigger issues." In a January 8, 2017 report, Piper Jaffray stated that "Teva once again provided

disappointing guidance, further eroding what in our view was already *limited management credibility*."

## VIII.   ADDITIONAL SUBSEQUENT DEVELOPMENTS CONTINUE TO REVEAL THE TRUTH

### A.   February 6-7, 2017

381.    On February 6, 2017, after the close of trading on the NYSE, in a Form 6-K filed with the SEC, Teva announced the termination of Vigodman as CEO, effective immediately and without a permanent replacement, and the conclusion of his service on the Board of Directors.

382.    On this news, the prices of Teva Securities continued to decline. For example, between the close of trading on February 6 and on February 7, 2017, the ADS price fell $2.16 or 6.29% to close at $32.19; the Preferred Share price fell $29.00 or 4.57% to close at $605.00; Teva's 2026 Notes fell $13.69 (1.51%); the 2046 Notes fell $32.33 (3.76%).

383.    Analysts tied Vigodman's abrupt departure to the Company's poor financial performance in its generics business, as well as sustained difficulties for the generics business ahead. For example, in a February 6, 2017 report titled "CEO Transition Adds Further Uncertainty to Story," J.P. Morgan reported "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges. With Teva facing headwinds across both its generics (incremental competition, pricing headwinds) and branded business … we continue to believe a near-term recovery in the company's business is unlikely." Similarly, that day, Wells Fargo concluded that "more investors will be uneasy with the uncertainty of an unexpected and abrupt CEO departure."

**B.      August 3-7, 2017**

384.      On August 3, 2017, before the NYSE opened, Teva filed a press release on a Form 6-K announcing lower-than-expected Q2 2017 financial results, which it attributed its poor financial results to poor performance in its U.S. generics business (with reported profits of only $691 million, far below analyst expectations) and "accelerated price erosion." The Company also disclosed it would take a $6.1 billion accounting charge permanently writing-down the value of the generics business and imposed a 75% reduction in the Company's long- standing dividend. The Company also significantly lowered its guidance for 2017, revising downward its earlier-reported guidance from January 2017 for the Company's net revenues, operating income, EBITDA, EPS, and cash flow. On the Company's earnings conference call held that day, Defendant McClellan, Teva's interim CFO, explained that the poor results and reduced guidance were partly the result of increased price erosion and price pressure. Importantly, Bhattacharjee further noted the "impact of the shelf stock adjustments that [Teva has] done," as a "key element" of the revised outlook. Shelf stock adjustments are contractual provisions that require charge backs to customers when prices decline. It was highly foreseeable that prices would decline on at least the 60 drugs subject to the price-hike strategy, drugs for which Teva had increased price by at least 50%, and as much as 1543% over the Relevant Period. Teva's $6.1 billion permanent impairment charge directly reduced Teva's bottom line dollar-for- dollar. During the August 3, 2017, earnings call, Defendant Peterburg stated that the $6.1 billion charge was "to reduce goodwill associated with our U.S. Generics business unit, which includes both the Teva legacy business and the Actavis Generics business."

385.      Analysts reacted harshly. That day, J.P. Morgan wrote, "Teva reported weaker-than-expected results but more importantly lowered in 2017 sales and EPS guidance … and cut

its dividend by 75%.... U.S. **generic weakness appears to be at the heart of these reductions**." Jefferies wrote, "Mgt Had Effectively No Choice but to Cut the Dividend; Maintaining Debt Covenants a Key Concern." Oppenheimer noted, "it may be difficult for Teva's board to attract top talent (meaningful pharma CEO experience) given the company's ongoing challenges," as the CEO and CFO positions remained unfilled. Analysts were further concerned about Teva's ability to sustain its debt and debt rating. Jefferies wrote: "Can It Get Any Worse?," noting that "[a]t present, Teva has a debt covenant that requires a minimum leverage of 4.25 x (net debt/EBITDA) by YE17 … If mgt's ever-shrinking EBITDA guidance . . . erodes much further, **it is possible Teva may not meet the [debt] obligation**." The reality was that Teva's poor results, guidance reduction, and the risk that it could not satisfy its debt obligations were the materialization of the risks associated with the price-hike strategy and its ultimate demise. There was no realistic prospect that the strategy could be revived, or that it could again generate the same Inflated Profits. The result was the write down of the generics business by $6.1 billion, and Teva cutting its dividend by 75%.

386.   With the true financial condition of the Company more evident, credit rating agencies immediately issued rating downgrades. On August 3, 2017, Moody's downgraded Teva's debt rating to Baa3 (one step above "junk"), with a negative outlook, reflecting slower-than-anticipated deleveraging "as Teva contends with weakness in its US generics business." Likewise, on August 4, Fitch Ratings also downgraded Teva to BBB- (one step above "junk"), with a negative outlook.

387.   As investors digested the news, the prices of Teva Securities dropped. For example, between the close of trading on August 2 and the close of trading on Monday, August 7, 2017, the price of Teva's ADS fell $12.66 or 40.51% to close at $18.59; the Preferred Share

price fell $184.50 or 32.92% to close at $376.00; the price of the 2018, 2019, 2021, 2023, 2026, and 2046 Notes fell $7.76 (.78%), $12.45 (1.25%), $30.10 (3.05%), $38.72 (3.95%), $40.88 (4.20%), and $57.51 (6.34%), respectively.

**C.      November 2, 2017**

388.    On November 2, 2017, Teva filed a press release on a Form 6-K announcing lower-than-expected Q3 2017 financial results, including a 9% decline in U.S. generic quarterly revenues compared to Q3 2016. The Company attributed the decrease to "pricing declines resulting from customer consolidation and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product."

389.    As a result of this new negative information, the prices of Teva Securities continued to decline. For example, between the close of trading on November 1 and on November 2, 2017, the ADS price fell $2.79 or 19.90% to close at $11.23; the Preferred Share price fell $48.44 or 16.82% to close at $239.57; and the price of the 2018, 2019, 2021, 2023, 2026, and 2046 Notes fell $0.16 (.16%), $1.05 (1.07%), $2.61 (2.76%), $2.32 (2.52%), $4.62 (5.13%), and $1.85 (2.3%), respectively.

390.    Analysts reacted negatively. For example, RBC Capital Markets stated that the results were even "below our cautious expectations," and that the "magnitude of weakness in the US generics business in both revenue and margins was surprising." Wells Fargo found Teva's results "especially disappointing."

**D.     February 8, 2018**

391.    On February 8, 2018, Teva filed a press release on a Form 8-K announcing Q4 2017 and FY 2017 financial results, including a staggering $17.1 billion goodwill impairment, of which $10.4 billion related to Teva's U.S. generics business. Teva stated that the $10.4 billion write-down was based in part on "further deterioration in the U.S. generics market"—including "[p]ricing challenges due to government regulation"—and Teva's resulting expectation of "larger pricing declines" than previously anticipated.

392.    As a result of this new negative information, the prices of Teva Securities continued to decline. For example, between the close of trading on February 7, 2018 and the close of trading on February 8, 2018, the price of Teva's ADS fell $2.21 or 10.6% to close at $18.64; the Preferred Share price fell $8.25 or 2.29% to close at $352.00; and the price of the 2023, 2026, and 2046 Notes fell $0.75 (0.85%), $0.86 (1.07%), and $1.75 (2.33%), respectively.

393.    Analysts reacted negatively. Wells Fargo noted that Teva had missed consensus expectations "by a significant margin," pointed to "commentary about generic pricing worsening in 4Q," and concluded that investors "should see [Teva's $17.1 billion impairment] as reflective of how challenging the situation is." IBI Brokerage noted that the impairment charge was "almost entirely for the generics business in the US," and that Teva's 2018 guidance was "way below market expectations."

**E.     December 7-10, 2018**

394.    On December 9, 2018, an article in The Washington Post quoted statements from Connecticut Assistant AG Joseph Nielsen that the State AG investigation had expanded to at least 16 companies and 300 drugs, and exposed "the largest cartel in the history of the United States." While the article noted Teva's continued denial of engaging in any anticompetitive

conduct, and its statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts," the price of Teva Securities dropped substantially with the disclosure of the State AGs' expanded investigation.

395.    For example, between the close of trading on December 7, 2018 (the last trading day before the announcement) and the close of trading on December 10, 2018, the price of Teva's ADS fell $0.97 or 5% to close at $18.44; the Preferred Share price fell $16.40 or 4.43% to close at $353.40; and the price of the 2019, 2023, 2026, and 2046 Notes fell $0.11 (0.11%), $0.38 (0.44%), $1.13 (1.39%), and $1.70 (2.43%), respectively.

**F.    May 10-13, 2019**

396.    On May 10, 2019, after the market closed, the State AGs filed a 524-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy. The May 2019 complaint details Teva's price-fixing with regard to at least 86 different generic drugs, compared to just 7 drugs in the previously filed action. The complaint further asserts that the Company implemented significant price increases for approximately 112 generic drugs, including extraordinary price hikes of over 1,000%, and details Teva's role as a "consistent participant" and a central player in the conspiracy. Further, the May 2019 complaint names four Teva employees personally as defendants: Cavanaugh, Patel, Kevin Green (Teva's former Director of National Accounts), and David Rekenthaler (Teva's former Vice President, Sales U.S. Generics).

397.    On this news, the price of Teva's ADS declined by 14.83%, from a closing price of $14.36 on May 10, 2019, to a closing price of $12.23 on May 13, 2019; and the price of the 2019, 2021, 2023, 2026, and 2046 Notes fell $0.09 (0.09%), $0.65 (0.68%), $1.37 (1.51%), $1.78 (2.14%), and $2.16 (3.00%), respectively.

398.    Analysts were surprised by the revelations in the State AGs' May 10, 2019 complaint. For example, Bernstein warned that "the price-fixing lawsuit is worse than we expected" and "there seem to be specific cases in the lawsuit that are going to be hard to explain away." J.P. Morgan stated that "[w]e were open to the majority of price spikes being 'explainable' by way of shortages, limited competition (only two or three competitors), and price 'signaling,' a grey area of antitrust law. So we were sorely disappointed by the nature of the direct quotes attributed to Teva employees in the expanded complaint."

## IX.    RELIANCE

### A.    Plaintiffs' Reliance

399.    During the Relevant Period, Plaintiffs directly relied on the Defendants' materially false and misleading statements and omissions alleged herein when purchasing and holding the relevant Teva Securities, including Teva ADSs and call options on Teva ADSs, and were damaged as a result.

400.    During the Relevant Period, Plaintiffs' investments were managed by their investment adviser, the Fir Tree Adviser, which employed a research-driven investment strategy when selecting securities to purchase, hold, and sell on behalf of its managed funds and accounts, including Plaintiffs.

401.    Specifically, the Adviser made the decisions whether to buy, sell, or hold Teva Securities based on analysis provided by its employees, including research analysts. Factors considered by the Adviser in deciding whether to purchase, sell, or hold the at-issue Teva Securities included, among other things, qualitative and quantitative analyses of the Company and evaluations of relative risk/reward, including statements from the Defendants about Teva's

compliance with applicable laws, and a review of the Company's strengths, weaknesses, and opportunities.

402.    Throughout the Relevant Period, the Adviser, on behalf of Plaintiffs, undertook comprehensive qualitative and quantitative analyses and performed rigorous independent research regarding the Company, including reading and relying upon publicly available information concerning Teva from the following sources, among others: (i) Teva's periodic securities filings with the SEC and NYSE, including every Form 20-F issued by Teva during the Relevant Period; (ii) Teva's public statements, plans, and news releases; (iii) Teva's corporate website and materials posted on its website; (iv) securities analysts' reports; (v) other regulatory filings and reports regarding Teva; (vi) conferences, conference calls, and  transcripts of conferences and conference calls regarding Teva; and (vii) meetings and calls with Teva and the Fir Tree Adviser, including meetings and calls on or around April 6-7, 2016 and May 13, 2016.

403.    In particular, and among other things, the Adviser read and relied on statements from the foregoing sources—including Teva's Forms 20-F and other securities filings with the SEC, and the statements that certain Defendants made during small group meetings attended by, and one-on-one calls directly with, the Fir Tree Adviser—concerning competition and generic drug pricing, and Teva's performance, outlook, and compliance with applicable laws.

404.    Defendants' false and misleading statements alleged herein had a material influence and were a substantial factor in bringing about the Adviser's and therefore Plaintiffs' investment decisions with respect to Teva Securities. Plaintiffs and the Adviser did not know, and in the exercise of reasonable diligence could not have known, of Defendants' false and misleading statements alleged herein when deciding that the Plaintiffs should purchase, sell, or

hold the relevant Teva Securities during the Relevant Period, including between February 6, 2014 and January 11, 2017.

**B.      Presumption of Reliance and Fraud-On-The-Market Doctrine**

405.      Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine. At all relevant times, the market for Teva's ADS, Preferred Shares, and Notes was efficient for the following reasons, among others:

(a)      Teva's ADS met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)      The average weekly trading volume of Teva Securities was significant;

(c)      As a regulated issuer, Teva filed public reports with the SEC and the NYSE;

(d)      Teva was eligible to file simplified SEC filings;

(e)      Teva regularly communicated with the public through established market communication channels, including through the regular dissemination of news releases on major newswire services, through communications with the financial press, and through other wide-ranging public disclosures; and

(f)      Numerous securities and credit analysts followed Teva and wrote reports that were published, distributed, and entered the public domain.

406.      Accordingly, the markets for Teva Securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Teva Securities. Under these circumstances all purchasers of Teva

Securities during the Relevant Period suffered similar injury through their purchases at artificially inflated prices. A presumption of reliance therefore applies.

407.    In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

## X.    INFLATED PROFIT ANALYSIS

408.    Teva did not disclose profits, revenues, or pricing for individual generic drugs, nor was that information otherwise public. To track and calculate the profits yielded by Defendants' price-hike strategy, counsel in the TSCA engaged econometric experts. According to the TSCA Complaint:

(a)    The investigation comprised multiple distinct econometric analyses, including regression analyses that ultimately took into account thousands of data points.

(b)    The analysis screened Teva's entire generic drug portfolio during the relevant period to identify Wholesale Acquisition Cost ("WAC") increases of at least 50%. The data was accessed via private, subscription-only databases costing tens of thousands of dollars annually. Next, any price increases plausibly connected to supply shortages or other economic anomalies were removed from the set.

(c)    To isolate Inflated Profit for each drug, the analysis first determined the drug's price per unit had Teva not made the increase. To do so, the drug's specific pricing history was analyzed using a regression analysis that determined the price through the relevant period had prevailing drug-specific pricing trends continued. The analysis further took into account CPI inflation for prescription drugs and empirical measures of the trend in average pricing for prescription drugs over the five year period preceding the analysis.

(d)    Calculating Inflated Profit, *i.e.*, the difference between Teva's actual revenues (with the price increase) and the revenues that would have been earned at each drug's price without the increase, involved accounting on a month-by-month basis for (i) Teva's sales quantities; and (ii) the discounts and rebates, unique to each drug, that Teva would provide to customers, which varied over time.

(e)     Sales volumes were derived by reference to figures reported in a subscription database. Through another regression analysis, it was confirmed that the price and volume for each drug exhibited no statistically meaningful relationship, meaning that as pricing changed, volume of sales did not change.

(f)     Teva's discounts and rebates were unavailable. Thus, the level of discounts and rebates was determined by analyzing, on a month-by-month basis over the relevant period, multiple data points from a number of subscription and other industry datasets that reflected average pricing and sales volume data. This analysis was unique for each drug and captured fluctuations over time.

## XI.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

409.     The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed or were purported to exist at the time the statements were made.

410.     To the extent any of the untrue or misleading statements alleged herein can be construed as forward-looking, they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements; the generalized risk disclosures Teva or other Defendants made were not sufficient to shield Defendants from liability.

411.     To the extent the statutory safe harbor otherwise would apply, Defendants are liable under the Exchange Act for any untrue or misleading forward-looking statement complained of herein because the person who made each such statement knew that the statement was untrue or misleading when made, or because each such statement was approved by an executive officer who knew that the statement was untrue or misleading when made.

412.     Specifically as to the alleged false and misleading guidance issued on July 13, 2016, and January 6, 2017, that guidance incorporated an assumption grounded on historically-inaccurate data. Namely, the assumption was that pricing was declining at the same rate as it had during 2015 and the first half of 2016 because, as Olafsson puts it on Teva's July 13, 2016 Preliminary Outlook call, Teva was "assuming . . . [the] same pricing assumption as we have had for the first half of the year," because Teva "saw no change in the pricing. We saw a stable environment . . . from first quarter into second quarter." Teva's pricing erosion was not, however, "stable." Teva's Inflated Profits had declined by $10 million from Q1 2016 to Q2 2016, and had declined over $100 on YOY basis from Q1 2015 due to an increasingly adverse pricing environment. Moreover, because Teva had received the DOJ and State AG subpoenas, it would be unable to mitigate these declines, as it had in the past, by taking additional price increases.

## XII.    CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

413.     Plaintiffs incorporate ¶¶ 1-412 by reference as if fully set forth herein.

414.     During the Relevant Period, Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

415.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

   (a)     Employed devices, schemes, and artifices to defraud;

(b)   Made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)   Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of Teva Securities during the Relevant Period.

416.   Plaintiffs have suffered damages in that, in reliance on Defendants false and misleading statements and omissions and/or the integrity of the market, they paid artificially inflated prices for Teva Securities. Plaintiffs would not have purchased Teva Securities at the prices they paid, or at all, if they had been aware that the market prices of those securities had been artificially and falsely inflated by Defendants' misleading statements.

417.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Teva securities during the Relevant Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### (Against All Defendants)

418.   Plaintiffs incorporate ¶¶ 1-412 by reference as if fully set forth herein.

419.   During the Relevant Period, Defendants acted as controlling persons of Teva within the meaning of § 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about Teva, the Officer Defendants had the power and ability to control the actions of Teva and its employees. Teva controlled the Officer Defendants and its other officers and employees. By reason of such conduct, Defendants are liable pursuant to § 20(a) of the Exchange Act.

## COUNT III
### Violation of Section 11 of the Securities Act
**(Against Teva Pharmaceutical Industries Ltd., Vigodman, Desheh, and Griffin)**

420.    For this claim against the Securities Act Defendants, Plaintiffs incorporate by reference ¶¶ 1-412 as if fully set forth herein except that for the purposes of this count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

421.    Plaintiffs bring this count pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against the Securities Act Defendants for Plaintiffs' purchase of Teva ADS pursuant and traceable to the ADS/Preferred Offerings, and were damaged by the acts alleged herein.

422.    Teva was the issuer, within the meaning of Section 11 of the Securities Act, pursuant to the ADS/Preferred Offering Materials.

423.    The ADS/Preferred Offering Materials, at the time when the relevant parts became effective, contained (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state) material facts required to be stated therein or necessary to make the statements therein not misleading.

424.    Defendants named in this Count issued or disseminated, caused to be issued or disseminated, or participated in the issuance or dissemination of the Offering Materials.

129

425.     As the issuer of the ADS/Preferred Offering, Teva is strictly liable for the actionable statements and omissions in the ADS/Preferred Offering Materials.

426.     The other Defendants named in this Count acted negligently, in that none of them conducted a reasonable investigation to ensure, or had reasonable grounds to believe at the time the relevant parts became effective, that the statements contained in the ADS/Preferred Registration Statements were true and that there was no omission of material fact required to be stated therein or necessary to make the statements therein not misleading. These Defendants are liable for the actionable statements and omissions in the ADS/Preferred Registration Statement in that, among other things:

427.     Vigodman, Desheh, and Griffin each signed the ADS/Preferred and Notes Registration Statements as a senior officer and/or director of Teva;

428.     Vigodman was a director of the Company at the time of the filing of the relevant parts of the ADS/Preferred and Notes Registration Statements with respect to which their liability is asserted; and,

429.     Griffin is the Authorized U.S. Representative of Teva Finance.

430.     When they acquired the securities in, pursuant to, and traceable to the ADS/Preferred Offerings, Plaintiffs and their Adviser did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the ADS/Preferred Offering Materials.

431.     Plaintiffs suffered damages in connection with the purchase or acquisition of the securities in, pursuant to, and traceable to the ADS/Preferred Offerings.

**COUNT IV**
**Violation of Section 12(a)(2) of the Securities Act**
**(Against Teva Pharmaceutical Industries Ltd., Vigodman, Desheh, and Griffin)**

432.    For this claim against the Securities Act Defendants, Plaintiffs incorporate by reference ¶¶ 1-412 as if fully set forth herein except that for the purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

433.    Plaintiffs bring this claim pursuant to Section 12(a)(2) of the Securities Act against Teva, Vigodman, Desheh, and Griffin for their purchases of Teva ADS pursuant to and traceable to the ADS/Preferred.

434.    The Defendants named in this Count offered, sold, and/or solicited the purchase of, (or assisted in the offer, sale, or solicitation of the purchase of) the securities, within the meaning of the Securities Act, by means of a prospectus or oral communication.

435.    The Defendants named in this Count assisted in the planning of the Offerings and actively participated in decisions regarding, among other things, the price of sale of the securities and the information contained in the respective prospectuses.

436.    The prospectuses included (and/or by incorporation by reference) untrue statements of material fact and/or omitted to state (and/or incorporated by reference documents

that omitted to state) material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

437.    The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure that the prospectuses did not include untrue or misleading statements or omissions of material fact.

438.    When they acquired the securities directly from the Defendants named in this Count, Plaintiffs did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the ADS/Preferred Offering Materials.

439.    Plaintiffs suffered damages in connection with the purchase or acquisition of the securities in, pursuant to, and traceable to the Offerings.

440.    By reason of the foregoing, the Defendants named in this Count are liable to Plaintiffs for either (i) the consideration paid for the securities with interest thereon, less the amount of any income received thereon, upon tender of such securities; or (ii) damages as to the securities no longer owned.

### COUNT V
### Violation of Section 15 of the Securities Act
### (Against Defendants Teva, Vigodman, Desheh, and Griffin)

441.    For this claim against the Securities Act Defendants, Plaintiffs incorporate by reference ¶¶ 1-412 as if fully set forth herein except that for the purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional,

reckless or otherwise fraudulent intent, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

442.    This Count is brought pursuant to Section 15 of the Securities Act against Defendants Vigodman, Desheh, and Griffin in connection with the ADS and Preferred Offerings on behalf of Plaintiffs, who purchased or otherwise acquired the securities pursuant and/or traceable to the ADS/Preferred Offering Materials and were damaged thereby.

443.    During their tenures as officers and/or directors of the Company, Vigodman, Desheh and Griffin were controlling persons of Teva within the meaning of the Securities Act.

444.    The Defendants named in this Count, by virtue of their positions of control and authority and their direct participation in and/or awareness of Teva's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Teva and its employees, or cause Teva to issue, offer, and/or sell securities pursuant to the defective Offering Materials.

445.    The Defendants named in this Count had the power to, and did, control the decision-making of Teva, including the content and issuance of the statements contained (and/or incorporated by reference) in the Offering Materials; they were provided with or had unlimited access to copies of the Offering Materials (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they signed the ADS/Preferred Registration Statements and Notes Registration Statement (and/or certain of the Company's SEC filings incorporated by reference therein) and were directly involved in or responsible for providing false or misleading

133

information contained in the Offering Materials (and/or documents incorporated by reference therein) and/or certifying and approving that information.

446. The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the ADS/Preferred Offering Materials were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make to the statements therein not misleading.

447. Plaintiffs suffered damages in connection with the purchase or acquisition of the securities in, pursuant to, and/or traceable to the ADS/Preferred Offerings.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a) Awarding Plaintiffs damages against all Defendants, jointly and severally, in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest;

(b) Awarding rescission or a rescissory measure of damages;

(c) Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees; and

(d) Awarding equitable/injunctive or further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: May 15, 2020

Respectfully submitted,

/s/ David A. Slossberg
**HURWITZ, SAGARIN, SLOSSBERG &
KNUFF, LLC**
David A. Slossberg (CT13116)
Jeffrey P. Nichols (CT29547)

147 Broad St.
Milford, CT 06450
Telephone: (203) 877-8000
Facsimile: (203) 878-9800
dslossberg@hssklaw.com
jnichols@hssklaw.com

**LABATON SUCHAROW LLP**
Serena P. Hallowell (*pro hac vice* forthcoming)
Eric J. Belfi (*pro hac vice* forthcoming)
Thomas W. Watson (*pro hac vice* forthcoming)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0447
shallowell@labaton.com
ebelfi@labaton.com
twatson@labaton.com

*Counsel for Plaintiffs*

APPENDIX A

### 1.      Pravastatin

Counsel's investigation indicates that price hikes in 2013 by Teva for its generic Pravastatin were the result of collusion among market participants.

Pravastatin is among the class of lipid-lowering compounds known as statins, which reduce the biosynthesis of cholesterol.

According to Symphony data for July 2017, Pravastatin was among Teva's top-50 generic drugs, both in terms of revenues and units sold.

During the Relevant Period, the main competitors in the market for generic Pravastatin were Teva, Glenmark Pharmaceuticals Inc. ("Glenmark"), and Apotex Corp. ("Apotex"). Manufacturers with lesser shares of the market included Zydus Pharmaceuticals (USA), Inc. ("Zydus"), and Lupin Pharmaceuticals, Inc. ("Lupin"). A repackager, International Laboratories, LLC ("International Labs") was responsible for selling a significant number of units as well. Together, over the past four full years these entities were responsible for 99% (2013), 99% (2014), 97% (2015), and 94% (2016) of the generic Pravastatin sold in the United States (as measured in terms of Symphony Units).

In mid-2013, just as Teva was experiencing a sharp downward trend in its U.S. generics business, Teva and its competitors dramatically raised the list prices of their Pravastatin products. As detailed in the graph below, the competitors' dramatic increases in the list prices of generic pravastatin were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings:



Data from the NADAC survey, captured in the graph below, shows that the Pravastatin competitors' WAC increases were correlated with real market-pricing impact, that the average

cost of generic Pravastatin quickly grew by six times, jumping over the course of just four months from ten to nearly sixty cents for a typical (volume-weighted average strength) tablet, and that at least a portion of this increase continued to have material revenue impact from mid-2013 through at least the end of 2016.



Counsel's investigation reveals that manufacturers' relative shares of the market for generic Pravastatin became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

During the Relevant Period, despite the massive price hikes, no competitor successfully undercut the price-increasing competitors in order to seize market share. Each manufacturer retained substantially the same market share.

Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion. There was no shortage of raw materials or supply (*see* FDA, Current and Resolved Shortages Reported to FDA) or unexpected increase in demand.

## 2. Enalapril Maleate

Counsel's investigation has indicated that price hikes in 2013 and 2014 by Teva for its generic Enalapril Maleate were the result of collusion among market participants.

Enalapril Maleate is among the class of antihypertensive compounds known as angiotensin-converting enzyme ("ACE") inhibitors, used to treat high blood pressure, and by extension heart and kidney disease.

During most of the Relevant Period, the main competitors in the market for generic Enalapril were Teva, Mylan, Taro, Legacy Pharmaceuticals International ("Legacy"), and Wockhardt. Taro did not possess significant market share until 2014, and Teva substantially

exited the market in 2016. Together, over the past four full years these entities were responsible for 90% (2013), 100% (2014), 99% (2015), and 91% (2016) of the generic Enalapril Maleate sold in the United States (as measured in terms of Symphony Units).

In mid-2013, just as Teva was experiencing a sharp downward trend in its U.S. generics business, Teva and its main competitors raised the list prices of their Enalapril Maleate products. As detailed in the graph below, the competitors' increases in the list prices of generic Enalapril Maleate were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings:



Data from the NADAC survey, captured in the graph below, shows that the Enalapril Maleate competitors' WAC increases were correlated with real market-pricing impact. The data also show that in 2013 the average cost of generic Enalapril Maleate quickly grew by five times, jumping over the course of just four months from three to 15 cents for a typical (volume-weighted average strength) tablet; in 2014 this now-higher average itself tripled to 45 cents, resulting in a per-tablet cost roughly fifteen times more than the prices that had prevailed in early 2013. At least a portion of these increases continued to have material revenue impact from mid-2013 through at least the end of 2016.



Counsel's investigation reveals that manufacturers' relative shares of the market for generic Enalapril Maleate became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

During the Relevant Period, despite the massive price hikes, no competitor successfully undercut the price-increasing competitors in order to seize market share. Each manufacturer retained substantially the same market share.

Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion. There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

### 3.    Cephalexin Oral Suspension

Counsel's investigation has indicated that price hikes in 2014 by Teva for the oral suspension form of its generic Cephalexin were the result of collusion among market participants.

Cephalexin is a semisynthetic antibiotic that can treat a number of bacterial infections, including streptococcal pharyngitis, bone and joint infections, pneumonia, cellulitis, and urinary tract infections. It is among the "Key Access Antibiotics" on the World Health Organization's Model List of Essential Medicines necessary for a basic and functional healthcare system.

During the Relevant Period, the main competitors in the market for generic Cephalexin were Teva and Lupin Pharmaceuticals, Inc. Together, over the past four full years Teva and Lupin were responsible for 94% (2013), 99% (2014), 96% (2015), and 89% (2016) of the generic Cephalexin oral suspension sold in the United States (as measured in terms of Symphony Units). Karalex Pharma, LLC also sold Cephalexin before October 2013 and after July 2015, but not in

4

between. During the times that it sold the drug, Karalex was responsible for between 10% and 20% of the market share.

In late 2013 and early 2014, respectively, Lupin and Teva – which already had established identical pricing structures – made identical increases in their prices for Cephalexin oral suspension. As detailed in the graph below, the competitors' increases in the list prices of generic Cephalexin oral suspension were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.



Data from the NADAC survey, captured in the graph below, shows that the Cephalexin oral suspension competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic Cephalexin oral suspension quickly grew by roughly three times, jumping over the course of just two months from five to fifteen cents for a typical (volume-weighted average strength) dose, and that at least a portion of this increase continued to have material revenue impact from early 2014 through at least the end of 2016.



Counsel's investigation reveals that manufacturers' relative shares of the market for generic Cephalexin oral suspension became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

During the Relevant Period, despite the massive price hikes, no competitor successfully undercut the price-increasing competitors in order to seize market share. Indeed, when Karalex re-entered the market, it matched the price of Teva and Lupin rather than compete on price.

Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion. There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

### 4.     Ketoconazole Tablets and 2% Cream

Counsel's investigation has indicated that price hikes in 2014 by Teva and its competitors for generic Ketoconazole tablets and 2% cream were the result of collusion among market participants.

Ketoconazole is a synthetic imidazole antifungal drug primarily used to treat fungal infections.

The markets for Ketoconazole tablets and 2% cream are highly concentrated with all three major manufacturers being previously identified together in other drug price-fixing cases. During the Relevant Period, the main competitors in the market for both tablets and 2% cream were Teva and Taro; in each market, a third competitor – Mylan with respect to tablets and Fougera Pharmaceuticals Inc., a part of the Sandoz division of Novartis AG ("Fougera/Sandoz") with respect to 2% cream – held a smaller portion of the market. In or around July 2015, Teva exited the market for Ketoconazole 2% cream. Together, over the past four full years, in the

markets for both forms of the drug at issue, the top-three competitors controlled the entire market (as measured in terms of Symphony Units).

On April 4 and April 18, 2014, respectively, Teva and Taro dramatically raised the price of Ketoconazole tablets and 2% cream. The remarkable similarity in timing and scale of Taro and Teva's price increases is evident in the graph below, which also shows that the Ketoconazole competitors' price increases occurred in close proximity to several industry gatherings:



Data from the NADAC survey, captured in the graph below, shows that the Ketoconazole competitors' WAC increases were correlated with real market-pricing impact, and that the average cost of generic Ketoconazole cream quickly tripled, jumping over the course of just two months from twenty to sixty cents for a typical (volume-weighted average strength) dose, and rising to nearly one dollar per dose prior to Teva's exiting the market. With respect to the tablet form, the average cost immediately tripled, and eventually settled at a price seven to eight times the prevailing price prior to the WAC increases. At least a portion of these increases continued to have material revenue impact from early 2014 through Teva's exiting the market with respect to the cream form, and through at least the end of 2016 with respect to the tablet form.

APPENDIX A



Counsel's investigation reveals that manufacturers' relative shares of the market for generic Ketoconazole became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

During the Relevant Period, despite the massive price hikes, no competitor undercut the price-increasing competitors in order to seize market share.

The price increase was maintained through at least July 2015, when Taro and Fougera/Sandoz again raised their prices. Although Teva did not raise its WAC price at the time, it soon exited the market altogether. The timing of Teva's exit coincides approximately with the FTC's review of Teva's purchase of Actavis.

Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion. There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

**5.    Baclofen**

Counsel's investigation has indicated that price hikes in 2014 by Teva for its generic Baclofen tablets were the result of collusion among market participants.

Baclofen – a structural analog of the inhibitory neurotransmitter gamma-aminobutyric acid ("GABA") – acts as a muscle relaxant and an antispastic agent.

According to Symphony data for July 2017, Baclofen is one of Teva's top fifty generic drugs in the United States market, both in terms of revenue and in terms of quantity of units manufactured.

8

During the Relevant Period, the main competitors in the market for generic Baclofen tablets were Teva, Qualitest Pharmaceuticals Co. (now part of Par), and Upsher-Smith Laboratories ("Upsher-Smith"). Together, over the past three full years these entities were responsible for 90% (2013), 90% (2014), 95% (2015), and 84% (2016) of the generic Baclofen tablets sold in the United States (as measured in terms of Symphony Units).

In early 2014, Teva and Upsher-Smith increased their WAC list price, in equal or nearly equal amounts. As detailed in the graph below, the competitors' increases in the list prices of generic Baclofen were remarkably similar in terms of scale and timing and occurred in close proximity to several industry gatherings.



Data from the NADAC survey, captured in the graph below, shows that the Baclofen competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic Baclofen quickly grew by roughly five times, jumping over the course of just three months from five to twenty-five cents for a typical (volume-weighted average strength) dose, and that at least a portion of this increase continued to have material revenue impact from early 2014 through at least the end of 2016.



Counsel's investigation reveals that manufacturers' relative shares of the market for generic Baclofen became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

During the Relevant Period, despite the massive price hikes, no competitor successfully undercut the price-increasing competitors in order to seize market share. Thus each manufacturer retained substantially the same market share.

Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion. There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

**6.      .05% Fluocinonide**

Counsel's investigation has indicated that price hikes in 2014 by Teva for its generic .05% Fluocinonide cream, ointment, and gel were the result of collusion among market participants. For purposes of this Complaint, unless otherwise noted, references to ".05% Fluocinonide" encompass the cream, ointment, and gel forms of .05%-strength generic Fluocinonide.

Fluocinonide is a high-potency topical corticosteroid widely used to reduce the swelling, itching, and redness associated with a variety of skin conditions such as psoriasis, eczema, dermatitis, and vitiligo.

During the Relevant Period, the main competitors in the combined market for generic .05% Fluocinonide were, as with Ketoconazole, Teva, and Taro. Actavis/Mayne, which manufactures only the cream form of .05% Fluocinonide, had a lesser share of the market and did not enter in any material way until June 2014. Together, over the past four full years, these

entities were responsible for 98% (2013), 99% (2014), 100% (2015), and 99% (2016) of the .05% Fluocinonide cream, ointment, and gel sold in the United States (as measured in terms of Symphony Units).

In mid-2014, Taro and Teva made massive, and identical, increases in WAC list prices. As detailed in the graph below, the competitors' increases in the list prices of generic Fluocinonide were remarkably similar in terms of scale and timing and occurred in close proximity to several industry gatherings.



Data from the NADAC survey, captured in the graph below, shows that the .05% Fluocinonide competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic .05% Fluocinonide quickly grew by three times, jumping over the course of just one month from approximately $0.62 to approximately $1.86 for a typical (volume-weighted average form/strength) dose, and that at least a portion of this increase continued to have material revenue impact from mid-2014 through at least the end of 2016.



Counsel's investigation reveals that manufacturers' relative shares of the market for generic Fluocinonide became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

During the Relevant Period, despite the massive price hikes, no competitor successfully undercut the price-increasing competitors in order to seize market share. Thus each manufacturer retained substantially the same market share.

Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion. There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

### 7.    Carbamazepine Tablets And Chewable Tablets

Counsel's investigation has indicated that price hikes during 2014 by Teva for its generic Carbamazepine tablets and chewable tablets (*cf.* sustained release tablets) were the result of collusion among market participants.

Carbamazepine is an anticonvulsant, used primarily in the treatment of epilepsy and neuropathic pain.

During the Relevant Period, the main competitors in the market for generic Carbamazepine tablets and chewable tablets were, as with Ketoconazole and .05% Fluocinonide, Teva and Taro. Torrent Pharmaceuticals Ltd. ("Torrent") and Apotex held smaller shares of the market (Apotex did not compete in the chewables market). Together, over the past four full years these entities were responsible for 100% (2013), 99% (2014), 99% (2015), and 100% (2016) of the combined market for generic Carbamazepine tablets and chewable tablets sold in the United States (as measured in terms of Symphony Units).

12

In mid-2014, the four competitors in Carbamazepine tablets and three competitors in chewable tablets all increased WAC list prices for Carbamazepine tablets and chewable tablets. The remarkable similarity in timing and scale of the competitors' price increases is evident in the graph below, which also shows that the Carbamazepine competitors' price increases occurred in close proximity to several industry gatherings:



Again, the market participants went into 2014 at different price points, but the new WAC prices established in mid-2014 established largely identical pricing structures.

Data from the NADAC survey, captured in the graph below, shows that the Carbamazepine competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic Carbamazepine tablets quickly grew by fifteen times, jumping over the course of just two months from roughly five to more than seventy-five cents for a typical (volume-weighted average form/strength) dose, and that at least a portion of this increase continued to have material revenue impact from mid-2014 through at least the end of 2016.



Counsel's investigation reveals that manufacturers' relative shares of the market for generic Carbamazepine became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

During the Relevant Period, despite the massive price hikes, no competitor successfully undercut the price-increasing competitors in order to seize market share. Thus each manufacturer retained substantially the same market share.

Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion. There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

## 8.    Estradiol Tablets

Counsel's investigation has indicated that price hikes in 2015 by Teva for its generic Estradiol tablets were the result of collusion among market participants.

Estradiol, a naturally occurring steroid hormone, is a form of the primary female sex hormone estrogen. Estradiol is used mainly in hormone replacement therapy (HRT) where the body does not naturally produce sufficient estrogen. It is also used in hormonal contraception and sometimes in the treatment of hormone-sensitive cancers like prostate cancer.

From 2013 through the present, Teva has dominated the market for Estradiol with annual market shares ranging from 74% to 85%. As of early 2015, Teva's largest competitor in the Estradiol tablets market was Actavis, which held approximately 10% of the market until Teva and Actavis merged in August 2016. Teva and Actavis together were responsible for 96% of units sold in 2014 and 95% in 2015. In 2016, Teva and Actavis, now combined, controlled 87% of the market (as measured in terms of Symphony Units). Before 2013, Mylan was a significant

14

competitor, but its market share dropped significantly in July 2013, before re-emerging in 2016 and 2017.

In early 2015, Teva dramatically raised the list WAC of its Estradiol tablets by 90% across the board. Actavis matched this new pricing structure. The scale and timing of these price increases are evident in the graph below:



Data from the NADAC survey, captured in the graph below, shows that the Estradiol tablets competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic Estradiol tablets quickly grew by a factor of roughly 1.6, jumping over the course of just one month from roughly eight to more than thirteen cents for a typical (volume-weighted average strength) dose, and that at least a portion of this increase continued to have material revenue impact from mid-2015 through at least the end of 2016.

APPENDIX A



During the Relevant Period, despite the massive price hikes, no competitor successfully undercut the price-increasing competitors in order to seize market share. Thus each manufacturer retained substantially the same market share.

Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion. There was no shortage of supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

EXHIBIT 1

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                    .    Case No. 2:16-MD-02724 (CMR)
                          .
GENERIC PHARMACEUTICALS   .
PRICING ANTITRUST         .    U.S. Courthouse
LITIGATION                .    601 Market Street
                          .    Philadelphia, PA 19106
                          .
                          .    September 24, 2019
. . . . . . . . . . . . ..     11:17 a.m.

              TRANSCRIPT OF CIVIL HEARING
        BEFORE HONORABLE CYNTHIA M. RUFE and JURY
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

Defense Liaison Counsel        JAN P. LEVINE
                               PEPPER HAMILTON LLP
                               3000 TWO LOGAN SQ
                               18TH & ARCH STS
                               PHILADELPHIA, PA 19103-2799

Direct Purchaser Plaintiffs    ROBERTA D. LIEBENBERG
PSC                            FINE, KAPLAN AND BLACK
                               ONE SOUTH BROAD ST SUITE 2300
                               PHILADELPHIA, PA 19107

State Attorneys General        W. JOSEPH NIELSEN
Plaintiffs                     ATTORNEY GENERAL'S OFFICE - ELM
                               55 ELM ST
                               HARTFORD, CT 06106

                               ANGELINA M. WHITFIELD
                               STATE OF ILLINOIS ATTORNEY
                               GENERAL'S OFFICE
                               Antitrust Bureau
                               100 W Randolph
                               CHICAGO, IL 60601

                               LAURA JOHNSON MARTELLA
                               ATTORNEY GENERAL'S OFFICE- ELM
                               55 ELM ST
                               HARTFORD, CT 06106

                               RACHEL O DAVIS
                               OFFICE OF THE ATTORNEY GENERAL
                               55 ELM STREET, FOURTH FLOOR
                               HARTFORD, CT 06106
```

```
                                    TIMOTHY M. FRASER
                                    FL OFFICE OF THE ATTORNEY
                                    GENERAL
                                    PL-01 THE CAPITOL
                                    TALLAHASSEE, FL 32399

                                    Special Master
David H. Marion                     DAVID H. MARION
                                    WHITE AND WILLIAMS LLP
                                    1800 ONE LIBERTY PLACE
                                    1650 MARKET STREET
                                    PHILADELPHIA, PA 19103

                                    Special Master
Bruce P. Merenstein                 BRUCE P. MERENSTEIN
                                    SCHNADER HARRISON SEGAL & LEWIS
                                    1600 MARKET STREET
                                    SUITE 3600
                                    PHILADELPHIA, PA 19103-7286

                                    Special Master
Daniel L. Regard                    DANIEL L. REGARD
                                    iDISCOVERY SOLUTIONS
                                    3000 K STREET ST NW SUITE 330
                                    WASHINGTON, DC 20007


Audio Operator:

Transcriber:                        UBIQUS REPORTING, INC.
                                    61 Broadway, Suite 1400
                                    New York, NY 10006
                                    212-346-6666
                                    Email: infousa@ubiqus.com


               Proceedings recorded by electronic sound
         recording, transcript produced by transcription service.
```

3

# **I N D E X**

                                                                      **PAGE**


**PRELIMINARY JURY INSTRUCTIONS**


**OPENING STATEMENTS**                                                  **4**


**WITNESS FOR THE PLAINTIFF**



**EXHIBITS**                                                    **ID.    EVD.**

1          COURTROOM DEPUTY:  All rise.  The Court is now in

2    session for the United States District Court for the Eastern

3    District of Pennsylvania.  The Honorable Cynthia M. Rufe

4    presiding.

5          THE COURT:  Good morning, everyone.

6          THE COURTROOM:  Good morning, Your Honor.

7          THE COURT:  Please be seated.  So, we started early

8    this morning with a conference with liaison counsel and we're

9    now ready to address remaining issues on the agenda and I would

10   like to know who... since I have a sign-in sheet, I believe

11   there's also counsel on the telephone?  Do I have a list of

12   them?

13         FEMALE VOICE 1:  - - .

14         THE COURT:  So, if you wish to speak and you're on

15   the telephone, you must identify yourself, please, when that

16   happens.  I don't know which of these pages...

17         MR. WILLIAM STEWART:  Hi, this is Bill Stewart from

18   Schneider Wallace on the line.

19         THE COURT:  Hello?  Who else is on the phone?  I

20   believe we have our Special ESI Master--

21         MS. NIKOLE BROCK:  [Interposing] - - Attorney

22   General's Office on the line.

23         THE COURT:  Would you repeat that, please?

24         MS. BROCK:  Nikole Brock from the Pennsylvania

25   Attorney General's Office.

```
 1                  THE COURT:  Thank you.  Who else?

 2                  MR. FRANK DELEON:  Frank DeLeon [phonetic] from the

 3    Montana Attorney General's Office, Your Honor.

 4                  THE COURT:  Thank you.  Anyone else?

 5                  MS. LEEANNE APPLEGATE:  LeeAnne Applegate, Kentucky

 6    Attorney General's Office.

 7                  THE COURT:  Thank you.  Who else, please?

 8                  MS. LAURA MARTELLA:  Laura Martella from the

 9    Connecticut Attorney General's Office.

10                  THE COURT:  Thank you.  Anyone else--?

11                  MS. RACHEL DAVIS:  [Interposing] Rachel Davis from

12    the Connecticut Attorney General's Office.  I do not intend to

13    speak.

14                  THE COURT:  I did not hear that.

15                  MALE VOICE:  That was Rachel Davis from the

16    Connecticut Attorney General's.

17                  MR. TIMOTHY FRASER:  Timothy Fraser, Florida AG's

18    Office.

19                  THE COURT:  And who was that?

20                  MALE VOICE:  Tim Fraser from the Florida Attorney

21    General's.

22                  THE COURT:  All right.  Anyone else?

23                  MR. DANIEL REGARD:  This is Dan Regard, the Special

24    Master for ESI discovery.

25                  THE COURT:  Thank you, Mr. Regard.  I did try to
```

1    introduce you a moment ago and thank you for joining us this

2    morning.

3             MR. REGARD:  Yes, ma'am.

4             THE COURT:  Anyone else on the phone?

5             MS. JUDITH ZAHID:  Your Honor, it's Judith Zahid and

6    Eric Buetzow for United HealthCare Services, Inc.

7             THE COURT:  Thank you.

8             MS. ELIN ALM:  Elin Alm from the North Dakota

9    Attorney General's Office.

10            THE COURT:  Thank you.  Might that--

11            MS. HUGHES:  [Interposing] - - Hughes on behalf of

12   Nisha Patel.

13            THE COURT:  Okay.  Thank you.

14            MR. RYAN:  - - Ryan on behalf of Jay Nesta

15   [phonetic].

16            THE COURT:  Thank you, sir.

17            MR. ROBERT CONLEY:  Robert Conley [phonetic] on

18   behalf of James Grosson [phonetic].

19            THE COURT:  Thank you.

20            MR. JOHN SELDEN:  John Selden, Alabama Attorney

21   General's Office.

22            THE COURT:  Thank you, sir.

23            MS. ELIZABETH HAAS:  Elizabeth Haas with Foley and

24   Lardner on behalf Apitex.

25            THE COURT:  Thank you.

1            MS. TAMARA WEAVER:  Tamara Weaver from the Indiana

2     Attorney General's Office.

3            THE COURT:  Thank you.

4            MR. MATTHEW MCKINLEY:  Matthew McKinley from the Ohio

5     Attorney General's Office.

6            THE COURT:  Thank you.

7            MR. DAVID HASSELMAN:  David Hasselman [phonetic] on

8     behalf of Impax.

9            THE COURT:  Thank you.  I guess that's it.  Thank you

10    very much.

11           Let's address the joint proposed agenda.  It has two

12    items.  Of course, there are other items that the Court could

13    entertain, if there is time this morning.  But I would like to

14    address what counsel--liaison counsel believe should be

15    addressed first.  And I'm going to ask the Plaintiffs to

16    proceed.

17           MR. JOSEPH NIELSEN:  Good morning, Your Honor.  Joe

18    Nielsen from the State of Connecticut Attorney General's Office

19    on behalf of the Plaintiff states.

20           THE COURT:  Good morning.

21           MR. NIELSEN:  I think number one on the agenda is we

22    wanted to notify the Court that the Plaintiff states will be

23    amending, as of right, the complaint that we filed on May 10th,

24    2019.  We're planning to add several additional Plaintiff

25    states and jurisdictions as well as, likely, an additional

1   case cited by the Defendants, the Ninth Circuit emphasized that

2   effective coordination of an MDL proceeding requires that a

3   district court be given even greater discretion to structure a

4   procedural framework that will move the case as a whole and

5   that Rule 16 authorizes the Court to manage these cases so that

6   disposition is expedited and settlement is facilitated.

7           Plaintiffs endorse the Case Management proposal set

8   forth by Special Master Marion because it provides an efficient

9   procedural framework for the timely commencement and completion

10  of discovery for all drugs in these cases and it avoids the

11  substantial delays inherent in Defendants' phased discovery

12  approach.  I'm now going to turn the presentation over to Mr.

13  Nielsen to address really what we think are the two key

14  discovery issues before this Court and that is the use of

15  custodial files or broad search terms.  Thank you, Your Honor.

16          THE COURT:  Mr. Nielsen?

17          MR. NIELSEN:  Thank you, Your Honor.  Before I start,

18  I just wanted to mention that with me today is Angelina

19  Whitfield, an Assistant Attorney General from the State of

20  Illinois, sitting in the jury box, who prepared the briefing

21  for the states on this issue and I wanted her to introduce

22  herself to the Court.

23          THE COURT:  Thank you.

24          MR. NIELSEN:  As Ms. Liebenberg said, I did want to

25  address the two key issues involved in the case management

1  briefing and that is the Plaintiffs' request for full custodial

2  file productions from certain key individuals at the Defendants

3  as well as the Defendants' request to filter their productions

4  based on responsive - - relevance prior to producing the

5  documents as to the Plaintiff states.

6           First, Your Honor, with regard to the custodial file

7  issue, I wanted to make it clear that the Plaintiffs are

8  requesting full custodial files for a limited set of the key

9  individuals from each company.  This is not an expansion of

10 what the Plaintiffs were previously seeking in discovery.  In

11 fact, the Plaintiffs had negotiated a much larger list of

12 custodians in the meet and confer with the Defendants prior to

13 this case management proposal.  So, this is actually a

14 concession in that respect from the Plaintiffs and there is a

15 lot of risk involved from the Plaintiffs' perspective to make

16 this proposal.  There will certainly be a number of custodians

17 who had relevant and, indeed, highly relevant documents that

18 the Plaintiffs would be willing to forgo discovery on in order

19 to focus on the limited set of key individuals and getting a

20 real deep dive into their documents.  Because they are the key

21 individuals responsible for engaging in the collusion or in the

22 price increases that were at issue in the complaints.

23           And in the context of making this proposal, Your

24 Honor, what the Plaintiffs are trying to do here is come up

25 with an innovative and creative way to accomplish the

1    objectives of the JPML and of this MDL, which are number one,

2    to avoid duplication of discovery and, two, to conserve the

3    resources of the parties, their counsel, and of this Court.

4         The Plaintiffs believe that the production of full

5    custodial files is the most efficient and reasonable approach

6    to move the entire MDL forward as quickly as possible while

7    still taking into account and accommodating future complaints

8    that will be filed and not putting all of those cases into a

9    suspense docket where they would be stayed indefinitely.

10        Full custodial file production, Your Honor, would

11   reduce the number of custodians at issue significantly.  It

12   would, therefore, reduce the number of places where the

13   Defendants have to go to find and produce documents.  It will

14   likely reduce the total number of documents that have to be

15   produced by the Defendants.  And that's just common sense, Your

16   Honor.  Less custodians equal less documents.  Especially when

17   the alternative is what Special Master Marion has proposed

18   which would be broad search terms apply to a larger, much

19   larger, number of custodians.

20        And, in their brief, Your Honor, the Defendants

21   argue, and I'm quoting from page 11, that the sheer size of a

22   typical custodial file would make the volume of documents to be

23   reviewed unworkable.  And I can tell you from experience that

24   that's flatly incorrect.  Number one, many of these Defendants

25   have actually produced full custodial files to the states

1   during the course of their investigation so, I know it's not

2   unworkable.

3         Also, the volume of the documents in those custodial

4   files that have been produced is not overwhelming.  In fact,

5   the largest custodial file that the states received as part of

6   their investigation was a total of 167,000 pages.  Which, in a

7   very large antitrust case such as this one, is not significant

8   overall where typically cases involve hundreds of millions of

9   documents in cases like this.  But even if the custodial file

10  were much larger than 167,000 pages, that would be proportional

11  to the scope and magnitude of this MDL.  The sheer size, the

12  volume of the evidence, the allegations, the overarching

13  conspiracy, and the importance of the market that we're talking

14  about, Your Honor.

15        Production of full custodial files will also be

16  quicker and more efficient.  We can eliminate search terms

17  entirely from the process.  And I would point to pages 18 to 23

18  of the Defendants' brief, Your Honor, where they go through and

19  describe the inherent delays associated with applying search

20  terms.  In particular, the parade of horribles that will result

21  if Special Master Marion's recommendation is applied to them.

22  They go through and they seek, you know, they describe the

23  significant delays that will result.  Many of those delays are

24  just the basic fundamental agreement on search terms

25  themselves.  Which search terms are going to be applied and

1   will there be a dispute about that?  And I would point to page

2   19 of the Defendants' brief, Your Honor, where the Defendants

3   actually say, without knowing--without having done any testing

4   on any of the search terms and without having gone through meet

5   and confer on any of these proposed search terms from Special

6   Master Marion's recommendation, that most if not all of the

7   Defendants will dispute the search terms.  They say they know

8   that that's going to happen, and the production of full

9   custodial files will cut through all of that, leaving only a

10  privileged review by the Defendants.  And there are many ways

11  for these Defendants to engage in a very efficient and

12  reasonable privileged review that can be done quickly and

13  protect their rights.

14          The production of full custodial files would also

15  eliminate duplication, which again is one of the primary

16  objectives of the MDL.  With full custodial files documents are

17  produced once, that is it.  These Defendants will never have to

18  go back to that custodian's files ever again for anything.  And

19  they will accomplish discovery in the cases that are on file

20  currently as well as future cases that involve different drugs

21  but the same companies.

22          These key individuals at these companies had

23  responsibility for all the companies' drugs and would be

24  involved and key players in future cases as well.

25          Custodial files will also reduce the number of

1  potential depositions as well as the risk of multiple

2  depositions of the same individuals over time.  As additional

3  documents are produced piecemeal...  If we do this the way the

4  Defendants proposed to do it, as additional cases come out of

5  the suspense docket and new discovery is conducted, additional

6  depositions of the same individuals would have to happen

7  multiple times over and over again.  The production of full

8  custodial files will cut through that.

9          And, in additional to all these benefits and savings,

10  the production of full custodial files is appropriate based on

11  the allegations in the complaints that are on file.  This is an

12  extremely unique case with the volume of the allegations, the

13  allegations of an industry-wide overarching conspiracy and the

14  volume of the evidence and communications that has already been

15  alleged.  But I just want to identify one example of why a full

16  custodial file would be important, Your Honor.  And that

17  involves the full custodial file that the Defendant Teva

18  produced with regard to Nisha Patel who was also an individual

19  Defendant in the state's May 10th complaint.  Having the full

20  custodial file from Defendant Patel allowed the states to

21  understand the extensive nature of the conduct and develop that

22  complaint based almost primarily on her full custodial file.

23          As you may or may not know, if you haven't read the

24  full entire complaint, it goes through in painstaking detail

25  alleging how the Defendant Nisha Patel started at Teva, she

1    began formulating price increase lists and formulating--ranking

2    competitors based on their quality and identifying price

3    increase candidates based on the relationships that she and

4    others at Teva had with these competitors.  And she...

5    Ultimately, we determined that she spent a good day [sic] of

6    her--of each of her workday communicating with competitors to

7    identify and seek agreements on these price increases.

8            And this story, when you read it in the complaint,

9    Your Honor, it seems obvious and apparent but none of that was

10   obvious or immediately apparent from the documents as they were

11   produced.  Significantly, Nisha Patel never once referred to a

12   single competitor that she communicated with by name in a

13   document.  When she spoke to these competitors and then passed

14   along information internally to her colleagues, in emails or in

15   other documents, she would often do it using code or veiled,

16   opaque references to information that she had learned from the

17   competitors.

18           Throughout the complaint, you see terms like

19   strategic, to identify that there was an agreement in place

20   with a competitor on a certain drug.  When she would get off

21   the phone with a competitor, she would send an email saying

22   there was a rumor of a price increase.  It didn't say where she

23   got the information, who she had spoken to, any of those

24   things.  She used terms like fluff pricing to indicate a cover

25   bid where Teva would not seek to obtain the business from their

1    competitor.  Even the term quality, Your Honor, doesn't

2    necessarily immediately jump out at you as identifying that

3    there is a collusive relationship in place.  All of that, the

4    context of each and every document was important and could not

5    be properly evaluated without having access to many other

6    sources of information, many of which the Defendants just

7    simply won't have in order to look through these documents and

8    determine relevance.

9            For example, the states have an industry-wide phone

10   record database where it makes it very easy for the states to

11   identify which competitors were talking to each other, when and

12   for how long.  We have developed extensive information about

13   pricing and price increases throughout the industry over time

14   relating to specific companies and the states also, in the

15   course of their investigation, have a number of documents from

16   competitors that we can look at to determine the context and

17   determine whether these documents are relevant.

18           And all of these documents and all of these sources

19   of information were necessary in order to create this context

20   where the documents in her full custodial file could be

21   properly understood.  And she is not alone, Your Honor.  We

22   identified a number of individuals at various companies who are

23   also named as individual Defendants in our complaint who

24   engaged in conduct at similar levels in terms of communicating

25   with competitors.  And at a minimum, the states have

1    established through their allegations that the full custodial

2    files from the individual Defendants would be appropriate based

3    on the scope and volume of their conduct.

4         Full custodial files would also be necessary and

5    appropriate in order to evaluate the defenses that will be

6    raised by the Defendants in this case.  Just on example of a

7    defense that will be hotly contested, Your Honor, is the

8    authority of these individuals to engage in price fixing

9    agreements and market allocation agreements with their

10   competitors.  And the full custodial files are necessary to

11   determine the scope of these individuals' authority on an

12   everyday basis.  Is this part of their authority to identify

13   price increases or to list price increases or to do these

14   different things?  The full context, even with regard to drugs

15   that are not at issue in the complaint, will be relevant to

16   determine these key individuals' authority.  And full custodial

17   files will be necessary to evaluate that.

18        One thing that the...one opposition that the

19   Defendants raised to the production of full custodial files is

20   that they will contain a lot of personal information.  And I

21   can tell you, Your Honor, from experience, some of that

22   personal information is actually highly relevant to the case

23   and to the story on what happened over time.

24        One example I'll point out, I'll be brief, it also

25   involves Nisha Patel while we're on that theme of Nisha Patel.

78

# **C E R T I F I C A T I O N**

We, Nathalie I. Moore and Ubiqus Reporting, Inc., court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

_____

Nathalie I. Moore

_____

DATE:  September 26, 2019

# **C E R T I F I C A T I O N**

We, Kimberly Berg and Ubiqus Reporting, Inc., court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

_____
Kimberly Berg


_____


DATE:  September 26, 2019

## **C E R T I F I C A T I O N**

We, Karen D. Schiff and Ubiqus, Inc., court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

_Karen D. Schiff_

Karen D. Schiff

_____

Ubiqus, Inc.

DATE:  September 27, 2019